UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| SEAH STEEL CORPORATION,<br>Plaintiff<br>v.<br>UNITED STATES,<br>Defendant. | ) | Court No. 26-03096 |

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC 20005
(202) 774-5500

*Attorneys for SeAH Steel Corporation*

August 21, 2026

# Table of Contents

Page

ARGUMENT ..... 1

A. Subject Matter Jurisdiction ..... 1

1. Commerce's Ministerial Error Determination Changed the Methodology Described in its Issues and Decision Memorandum and Reversed Long-Standing Agency Practice Regarding its Ministerial Error Procedure ..... 3

2. The Court Has 28 U.S.C. § 1581(i) Jurisdiction Over SeAH Steel's First Claim Because Commerce's Ministerial Error Determination Changed the Methodology Contained in its Final Determination ..... 11

3. The Court Has 28 U.S.C. § 1581(i) Jurisdiction Over SeAH Steel's Second Claim Because Commerce's Ministerial Error Determination Changed Long-Standing Agency Policy ..... 15

4. Appealing the Final Determination Under 28 U.S.C. § 1581(c) Jurisdiction Was Also Manifestly Inadequate ..... 22

B. Preliminary Injunction ..... 28

1. Because the Court Has Residual Jurisdiction, Defendant's Opposition to SeAH Steel's Motion Fails ..... 29

2. Defendant's Other Arguments in Opposition to SeAH Steel's Motion Are Also Unsupported ..... 29

CONCLUSION ..... 36

# Table of Authorities

Page

CASES

*Am. Silicon Techs. v. United States*,
22 C.I.T. 776, 777 (1998)……………………………………………………………34

*Asociacion Colombiana de Exportadores de Flores (Asocoflores) v. United States*,
717 F. Supp. 847, 850 (Ct. Int'l Trade 1989)…………………………………………...28

*Best Key Textiles Co. v. United States*,
37 C.I.T. 1580, 1583 (2013)…………………………………………………………18

*Bethlehem Steel Corp. v. United States*,
25 C.I.T. 307 (2001)………………………………………………………………21

*Chemsol, LLC v. United States*,
755 F.3d 1345, 1355 (Fed. Cir. 2014)…………………………………………………..18

*Consol. Bearings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003)………………………….…………………………14

*Daewoo Elecs. Co. v. United States*,
712 F. Supp. 931 (Ct. Int'l Trade 1989)………………………..…………………23, 24

*Dental EZ Inc. v. United States*,
31 C.I.T. 985, 987 (2007)…………………………………………………………14

*Euro SME SDN BHD v. United States*,
No. 1:22-CV-00108 (SAV), 2024 WL 550334 (Ct. Int'l Trade Feb. 12, 2024)……11, 12

*Hor Liang Indus. Corp. v. United States*,
337 F. Supp. 3d 1310 (Ct. Int'l Trade 2018)…………………………………………11

*In re Section 301 Cases*,
524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021)…………………………………………35

*Invenergy Renewables LLC v. United States*,
476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020)…………………………………………24

*J.D. Irving, Ltd. v. United States*,
615 F. Supp. 3d 1323 (Ct. Int'l Trade 2023)…………………………..……17, 18

*NMB Singapore Ltd. v. United States*,
120 F.Supp.2d 1135 (Ct. Intl Trade 2000)…………………………………………...35

*NTN Bearing Corp. of Am. v. United States*,
46 F. Supp. 3d 1375 (Ct. Int'l Trade 2015)……………………………………………..24

*Okaya (USA) v. United States*,
27 C.I.T 1509 (2003)……………………………………………………………………14

*Parkdale Int'l, Ltd. v. United States*,
31 C.I.T. 720 (2007)……………………………………………………………………14

*QVD Food Co., Ltd v. United States*,
34 C.I.T. 1166 (2010)………………………………………………………………….30, 31

*Seah Steel Corp. v. United States*,
513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021)…………………………………………13

*Shinhan Diamond Indus. Co. v. United States*,
34 C.I.T. 227 (2010)…………………………………………………………………...17, 33

*SKF USA Inc. v. United States*,
33 C.I.T. 370 (2009)……………………………………………………………………26

*Suntec Indus. Co. v. United States*,
37 C.I.T. 1670, 1678 (2013), aff'd, 857 F.3d 1363 (Fed. Cir. 2017)……………………33

STATUTES

19 U.S.C. § 1675(h)……………………………………………………………………….28

9 U.S.C. § 1516a(a)(2)…………………………………………………………………….22

AGENCY DECISIONS

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Amended Final Results of the Fourteenth Antidumping Duty Administrative Review*,
74 Fed. Reg. 19199 (April 28, 2009)……………………………………………...20

*Certain Quartz Surface Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*,
84 Fed. Reg. 23767 (May 23, 2019)………………………………………………15

*Certain Steel Nails From Malaysia: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*,
88 Fed. Reg. 15660 (Mar. 14, 2023)………………………………………………16

*Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2015-2016,*
83 Fed. Reg. 6163 (Feb. 13, 2018)…………………………………………………...11

*Certain Steel Nails from the People's Republic of China: Amended Final Results of the Fourth Antidumping Duty Administrative Review*,
79 Fed. Reg. 27283 (May 13, 2014)……………………………………………..20, 21

*Large Diameter Welded Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2023–2024*,
91 Fed. Reg. 23400 (May 1, 2026)………………………………………………..8, 12

*Live Swine From Canada: Amended Final Results of Countervailing Duty Administrative Reviews*,
61 Fed. Reg. 58383 (Nov. 14, 1996)……………………………………………19, 20

*Notice of Amended Final Determination of Sales at Less Than Fair Value: Certain Automotive Replacement Glass Windshields from the People's Republic of China*,
67 Fed. Reg. 11670 (March 15, 2002)…………………………………...…31, 32

*Notice of Amended Final Results of Antidumping Duty Administrative Review: Certain Corrosion-Resistant Carbon Steel Flat Products from Canada*,
70 Fed. Reg. 22846 (May 3, 2005)………………………………………………..16

*Welded Line Pipe from Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; 2020–2021,
87 Fed. Reg. 80156 (Dec. 29, 2022)……………………………………………… 6

*Welded Line Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020-2021*,
88 Fed. Reg. 42295 (June 30, 2025)……………………………………………..6

<u>REGULATIONS</u>

19 C.F.R. § 351.224(b)……………………………………………………………….24

19 C.F.R. § 351.224(c)(2)……………………………………………………………25

19 C.F.R. § 351.224(e)……………………………………………………………….19

<u>OTHER AUTHORITIES</u>

*Antidumping Duties; Countervailing Duties*,
61 Fed. Reg. 7308 (Feb. 27, 1996)………………………………… ………...24, 27

*Antidumping Duties; Countervailing Duties*,
62 Fed. Reg. 27296 (May 19, 1997)........................................................27

H.R. REP. No. 317,
96th Cong., 1st Sess. (1979)...............................................................23

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*,
89 Fed. Reg. 20766 (Mar. 25, 2024)........................................................24

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE RICHARD K. EATON, JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION,<br>Plaintiff<br>v.<br>UNITED STATES,<br>Defendant. | Court No. 26-03096 |

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

On behalf of SeAH Steel Corporation ("SeAH Steel" or "Plaintiff"), we are writing in opposition to Defendant's July 17, 2026, Motion to Dismiss and Response in Opposition to Plaintiff's Motion for Preliminary Injunction in the above-captioned matter. In its Motion, Defendant requests to have SeAH Steel's complaint dismissed for lack of subject matter jurisdiction. And, in its Response, Defendant requests that the Court deny SeAH Steel's Motion for Preliminary Injunction. We respectfully request that the Defendant's Motion be denied and that the Court grant SeAH Steel's Motion for Preliminary Injunction.

ARGUMENT

*A. Subject Matter Jurisdiction*

SeAH Steel filed this appeal under 28 U.S.C. § 1581(i) jurisdiction to challenge Commerce's June 1, 2026, ministerial error determination in the review of the antidumping order on *Large Diameter Welded Pipe from Korea* ("LDWP") for the 2023-2024 review period. In this appeal, SeAH Steel makes two claims:

(1) Commerce's ministerial error determination improperly changed the methodology described in Commerce's April 28 final determination issues and decision memorandum.

(2) The conclusion in Commerce's ministerial error determination that corrections to the SAS computer program to reflect the methodology stated in its final determination are not ministerial in nature is inconsistent with Commerce's established practice.

In its Motion, Defendant argues that the Court does not have subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1581(i); because (1) the Courts have previously found they have jurisdiction pursuant to 28 U.S.C. § 1581(c) to hear claims related to a refusal to correct of ministerial errors by Commerce which precludes exercising 28 U.S.C. § 1581(i) over such claims; (2) the "true nature" of SeAH Steel's claims is a disagreement with Commerce's methodological choices in its final determination which must be appealed under 28 U.S.C. § 1581(c); and (3) an appeal of Commerce's final determination under 28 U.S.C. § 1581(c) would not have been manifestly inadequate.[1]

Defendant's arguments, however, are unavailing. As explained below, the unique facts of this case are readily distinguishable from past appeals involving negative ministerial error determinations by Commerce. Those facts establish residual jurisdiction over SeAH Steel's claims related to Commerce's June 1 ministerial error determination.

[1] *See* Defendant's July 17, 2026, Submission at 8-12 (ECF No. 12).

### 1. *Commerce's Ministerial Error Determination Changed the Methodology Described in its Issues and Decision Memorandum and Reversed Long-Standing Agency Practice Regarding its Ministerial Error Procedure*

#### a. *Commerce's Issues and Decision Memorandum Made Clear it Intended to Apply State Pipe's G&A Expense Rate as an Indirect Selling Expense to State Pipe's Own Sales*

SeAH Steel was selected as a mandatory respondent in the review that is at issue in this appeal. In its responses to Commerce's questionnaires, SeAH Steel reported it had U.S. sales of subject LDWP products during the review period through two U.S. affiliated companies, Pusan Pipe America Inc. ("PPA") and State Pipe Supply Co. Ltd. ("State Pipe"). The sales through each affiliated company were reported as separate sales channels in the U.S. sales listing: Channel 1 sales corresponded to sales to unaffiliated U.S. customers through PPA, and Channel 2 sales corresponded to sales to unaffiliated U.S. customers through State Pipe.

Furthermore, SeAH Steel explained that all sales made through PPA during the period reported in Channel 1 were back-to-back sales (*i.e.*, the merchandise was sold, on paper, from SeAH Steel to PPA and then from PPA to the unaffiliated U.S. customer, but the merchandise was actually shipped directly from SeAH Steel to the unaffiliated U.S. customer). By contrast, the sales by State Pipe to the unaffiliated U.S. customer involved merchandise physically stored in State Pipe's inventory. And, some of that merchandise underwent further processing at State Pipe's facility prior to sale to the unaffiliated U.S. customer. As a result, the LDWP sold through State Pipe reported in Channel 2 was either sold to the unaffiliated U.S. customer "as is" (*i.e.*, non-further-manufactured sales) or "as processed" in the United States prior to sale to the unaffiliated U.S. customer (*i.e.*, further-manufactured sales).

In its preliminary margin calculation, the Department included the general and administrative ("G&A") expenses incurred by State Pipe as part of the adjustment for the cost of further manufacturing in the United States pursuant to Section 772(d)(2) of the Trade Act.[2] The Domestic Interested Parties ("DIPs") then argued that Commerce should also apply State Pipe's G&A expenses as an indirect selling expense to State Pipe's sales of non-further manufactured merchandise.[3] DIPs argued that such an adjustment was consistent with Commerce's decisions in the 2020-2021 administrative review of the antidumping duty order on *Welded Line Pipe from Korea*, which in turn, was based on a previous determination by Commerce in the 2018-2019 administrative review of the antidumping duty order on *Oil Country Tubular Goods ("OCTG") from Korea*.[4]

On April 28, 2026, Commerce publicly announced its final determination by uploading to ACCESS (the electronic platform used by Commerce) the unpublished final determination notice that identified the final dumping margin for the reviewed companies, and the Issues and Decision Memorandum ("IDM") that explained what changes the Department made since the preliminary determination. In the IDM, Commerce explained that it *agreed with DIPs* on this issue related to State Pipe and stated that "we find that the

[2] *See e.g.*, Department's April 28, 2026, IDM at 15. A copy was provided in Exhibit A of Defendant's Motion.

[3] *See* DIP's Case Brief at 19-20. A copy of the public version of DIPs' case brief is provided in Attachment 1 for the Court's reference.

[4] *See id*.

G&A expenses attributable to the imported pipe should be treated as indirect selling expenses."[5] Therefore, for purposes of the final determination, Commerce stated that:

> to ensure that the G&A expense ratio is applied on the same basis on which the ratio is calculated (i.e., a COGS denominator that includes the imported pipe and the further manufacturing costs), the G&A expense ratio must be applied to the imported pipe costs, whether further manufactured and or not, and to the further manufacturing costs.[6]

In light of the fact that the COGS denominator used to calculate State Pipe's G&A expense ratio reflects the total cost of goods *sold by State Pipe*, the "imported pipe cost" to which the G&A expense rate "must be applied to" could only mean imported pipe *sold by State Pipe*.

In addition, Commerce further clarified that, because State Pipe performed both further manufacturing and reselling activities, Commerce, in its view, was authorized to apply State Pipe's G&A expense rate as a further manufacturing and indirect selling expense deduction to the price of *State Pipe's* sales:

> The statute thereby requires that Commerce deduct both the selling expenses and costs of further manufacture from CEP. Accordingly, if all G&A expenses incurred by an affiliated U.S. reseller can be treated as indirect selling expenses when the affiliated U.S. reseller only performs reselling activities, and all G&A expenses incurred by an affiliated U.S. further manufacturer/reseller can be treated as further manufacturing expenses *when the affiliated U.S. further manufacturer/reseller performs both further manufacturing and reselling activities*, Commerce unquestionably has the authority to allocate G&A expenses to both types of activities when both activities occur, and to make appropriate deductions.[7]

[5] IDM at 13.

[6] *Id.*

[7] IDM at 15.

Furthermore, Commerce asserted that the adjustment it intended to make in the final determination was consistent with past practice and the statute:

> … Applying State Pipe's G&A expense ratio to the cost of the imported LDWP, whether or not further manufactured, and deducting the resulting expense from CEP *is consistent with Commerce's practice*, *and in accordance with sections 772(d)(1)(D)* and 772(d)(2) of the Act.[8]

Importantly, Commerce's practice was only to apply the G&A expense rate of the U.S. affiliate that performed both further manufacturing and reselling activities as an indirect selling expense deduction for sales made by that same U.S. affiliate.

For example, the *Welded Line Pipe* case cited by DIPs in their case brief for Commerce's past practice also involved U.S. sales by SeAH Steel through both its U.S. affiliates PPA and State Pipe, with State Pipe's sales separately reported as Channel 2 sales.[9] In that case, Commerce provided the same reasoning in support of the adjustment as in the final IDM of this case.[10] And, Commerce only deducted State Pipe's G&A expense rate as either an indirect selling expense or further manufacturing cost from the

---

[8] *Id.*

[9] *See Welded Line Pipe from Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; 2020–2021, 87 Fed. Reg. 80156 (Dec. 29, 2022), and accompanying Preliminary Decision at 8 and 11.

For the sake of completeness, we note that PPA's sales during the 2020-2021 review of Welded Line Pipe from Korea included back-to-back sales, which were reported as Channel 1 sales, and sales from inventory which were reported as Channel 3 sales.

[10] *See Welded Line Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 42295 (June 30, 2025), and accompanying Issues and Decision Memorandum at cmt. 11. For the Court's Reference, a copy is provided in Attachment 2.

price of U.S. sales made by State Pipe, and did not apply State Pipe's G&A expense rate as an adjustment to the price of U.S. sales made by PPA.

In that regard, in its calculation materials Commerce stated that:

> Consistent with the denominator used in the calculation of State Pipe & Supply Inc.'s (State Pipe's) general and administrative (G&A) expense ratio, we applied the company's general expenses to all activities *of the company*.[11]

And, the SAS code used by Commerce to effectuate that adjustment only applied State Pipe's G&A expense rate, either a further manufacturing cost or indirect selling expense, to Channel 2 sales by State Pipe.[12]

This methodology, which applies the adjustment based on State Pipe's G&A expenses only to State Pipe's sales, is also consistent with the statute. In that regard, under Section 772(d)(1) of the Tariff Act, the expenses that may be deducted from constructed export price must be "generally *incurred by or for the account of* the producer or exporter, or *the affiliated seller in the United States, in selling the subject merchandise*."[13]

---

[11] *See* 2020-2021 Welded Line Pipe from Korea Antidumping Administrative Review, December 22, 2022, Preliminary Results Margin Calculation for SeAH Steel at 3. For the Court's Reference, a copy the public version is provided in Attachment 3.

It should be noted that Attachment 2 of the Preliminary Margin Calculation Memorandum for the 2020-2021 review of Welded Line Pipe from Korea includes additional SAS code that further confirms that no adjustment was made to PPA's sales for State Pipe's G&A expense rate. However, that attachment was omitted from the public version of Commerce's memorandum. As a party to that proceeding, SeAH Steel has a copy of the proprietary version of Commerce's memorandum. Accordingly, if it would be helpful to the Court, SeAH Steel would be able to submit a copy of the proprietary version of Commerce's memorandum upon request.

[12] *Id*. at 4.

[13] 19 U.S.C. § 1677a(d)(1).

(1) Commerce's ministerial error determination improperly changed the methodology described in Commerce's April 28 final determination issues and decision memorandum.

(2) The conclusion in Commerce's ministerial error determination that corrections to the SAS computer program to reflect the methodology stated in its final determination are not ministerial in nature is inconsistent with Commerce's established practice.

In its Motion, Defendant argues that the Court does not have subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1581(i); because (1) the Courts have previously found they have jurisdiction pursuant to 28 U.S.C. § 1581(c) to hear claims related to a refusal to correct of ministerial errors by Commerce which precludes exercising 28 U.S.C. § 1581(i) over such claims; (2) the "true nature" of SeAH Steel's claims is a disagreement with Commerce's methodological choices in its final determination which must be appealed under 28 U.S.C. § 1581(c); and (3) an appeal of Commerce's final determination under 28 U.S.C. § 1581(c) would not have been manifestly inadequate.[1]

Defendant's arguments, however, are unavailing. As explained below, the unique facts of this case are readily distinguishable from past appeals involving negative ministerial error determinations by Commerce. Those facts establish residual jurisdiction over SeAH Steel's claims related to Commerce's June 1 ministerial error determination.

[1] *See* Defendant's July 17, 2026, Submission at 8-12 (ECF No. 12).

### 1. *Commerce's Ministerial Error Determination Changed the Methodology Described in its Issues and Decision Memorandum and Reversed Long-Standing Agency Practice Regarding its Ministerial Error Procedure*

#### a. *Commerce's Issues and Decision Memorandum Made Clear it Intended to Apply State Pipe's G&A Expense Rate as an Indirect Selling Expense to State Pipe's Own Sales*

SeAH Steel was selected as a mandatory respondent in the review that is at issue in this appeal. In its responses to Commerce's questionnaires, SeAH Steel reported it had U.S. sales of subject LDWP products during the review period through two U.S. affiliated companies, Pusan Pipe America Inc. ("PPA") and State Pipe Supply Co. Ltd. ("State Pipe"). The sales through each affiliated company were reported as separate sales channels in the U.S. sales listing: Channel 1 sales corresponded to sales to unaffiliated U.S. customers through PPA, and Channel 2 sales corresponded to sales to unaffiliated U.S. customers through State Pipe.

Furthermore, SeAH Steel explained that all sales made through PPA during the period reported in Channel 1 were back-to-back sales (*i.e.*, the merchandise was sold, on paper, from SeAH Steel to PPA and then from PPA to the unaffiliated U.S. customer, but the merchandise was actually shipped directly from SeAH Steel to the unaffiliated U.S. customer). By contrast, the sales by State Pipe to the unaffiliated U.S. customer involved merchandise physically stored in State Pipe's inventory. And, some of that merchandise underwent further processing at State Pipe's facility prior to sale to the unaffiliated U.S. customer. As a result, the LDWP sold through State Pipe reported in Channel 2 was either sold to the unaffiliated U.S. customer "as is" (*i.e.*, non-further-manufactured sales) or "as processed" in the United States prior to sale to the unaffiliated U.S. customer (*i.e.*, further-manufactured sales).

In its preliminary margin calculation, the Department included the general and administrative ("G&A") expenses incurred by State Pipe as part of the adjustment for the cost of further manufacturing in the United States pursuant to Section 772(d)(2) of the Trade Act.[2] The Domestic Interested Parties ("DIPs") then argued that Commerce should also apply State Pipe's G&A expenses as an indirect selling expense to State Pipe's sales of non-further manufactured merchandise.[3] DIPs argued that such an adjustment was consistent with Commerce's decisions in the 2020-2021 administrative review of the antidumping duty order on *Welded Line Pipe from Korea*, which in turn, was based on a previous determination by Commerce in the 2018-2019 administrative review of the antidumping duty order on *Oil Country Tubular Goods ("OCTG") from Korea*.[4]

On April 28, 2026, Commerce publicly announced its final determination by uploading to ACCESS (the electronic platform used by Commerce) the unpublished final determination notice that identified the final dumping margin for the reviewed companies, and the Issues and Decision Memorandum ("IDM") that explained what changes the Department made since the preliminary determination. In the IDM, Commerce explained that it *agreed with DIPs* on this issue related to State Pipe and stated that "we find that the

---

[2] *See e.g.*, Department's April 28, 2026, IDM at 15. A copy was provided in Exhibit A of Defendant's Motion.

[3] *See* DIP's Case Brief at 19-20. A copy of the public version of DIPs' case brief is provided in Attachment 1 for the Court's reference.

[4] *See id*.

G&A expenses attributable to the imported pipe should be treated as indirect selling expenses."[5] Therefore, for purposes of the final determination, Commerce stated that:

> to ensure that the G&A expense ratio is applied on the same basis on which the ratio is calculated (i.e., a COGS denominator that includes the imported pipe and the further manufacturing costs), the G&A expense ratio must be applied to the imported pipe costs, whether further manufactured and or not, and to the further manufacturing costs.[6]

In light of the fact that the COGS denominator used to calculate State Pipe's G&A expense ratio reflects the total cost of goods *sold by State Pipe*, the "imported pipe cost" to which the G&A expense rate "must be applied to" could only mean imported pipe *sold by State Pipe*.

In addition, Commerce further clarified that, because State Pipe performed both further manufacturing and reselling activities, Commerce, in its view, was authorized to apply State Pipe's G&A expense rate as a further manufacturing and indirect selling expense deduction to the price of *State Pipe's* sales:

> The statute thereby requires that Commerce deduct both the selling expenses and costs of further manufacture from CEP. Accordingly, if all G&A expenses incurred by an affiliated U.S. reseller can be treated as indirect selling expenses when the affiliated U.S. reseller only performs reselling activities, and all G&A expenses incurred by an affiliated U.S. further manufacturer/reseller can be treated as further manufacturing expenses *when the affiliated U.S. further manufacturer/reseller performs both further manufacturing and reselling activities*, Commerce unquestionably has the authority to allocate G&A expenses to both types of activities when both activities occur, and to make appropriate deductions.[7]

[5] IDM at 13.

[6] *Id.*

[7] IDM at 15.

Furthermore, Commerce asserted that the adjustment it intended to make in the final determination was consistent with past practice and the statute:

> … Applying State Pipe's G&A expense ratio to the cost of the imported LDWP, whether or not further manufactured, and deducting the resulting expense from CEP *is consistent with Commerce's practice*, *and in accordance with sections 772(d)(1)(D)* and 772(d)(2) of the Act.[8]

Importantly, Commerce's practice was only to apply the G&A expense rate of the U.S. affiliate that performed both further manufacturing and reselling activities as an indirect selling expense deduction for sales made by that same U.S. affiliate.

For example, the *Welded Line Pipe* case cited by DIPs in their case brief for Commerce's past practice also involved U.S. sales by SeAH Steel through both its U.S. affiliates PPA and State Pipe, with State Pipe's sales separately reported as Channel 2 sales.[9] In that case, Commerce provided the same reasoning in support of the adjustment as in the final IDM of this case.[10] And, Commerce only deducted State Pipe's G&A expense rate as either an indirect selling expense or further manufacturing cost from the

---

[8] *Id.*

[9] *See Welded Line Pipe from Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; 2020–2021, 87 Fed. Reg. 80156 (Dec. 29, 2022), and accompanying Preliminary Decision at 8 and 11.

For the sake of completeness, we note that PPA's sales during the 2020-2021 review of Welded Line Pipe from Korea included back-to-back sales, which were reported as Channel 1 sales, and sales from inventory which were reported as Channel 3 sales.

[10] *See Welded Line Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 42295 (June 30, 2025), and accompanying Issues and Decision Memorandum at cmt. 11. For the Court's Reference, a copy is provided in Attachment 2.

price of U.S. sales made by State Pipe, and did not apply State Pipe's G&A expense rate as an adjustment to the price of U.S. sales made by PPA.

In that regard, in its calculation materials Commerce stated that:

> Consistent with the denominator used in the calculation of State Pipe & Supply Inc.'s (State Pipe's) general and administrative (G&A) expense ratio, we applied the company's general expenses to all activities *of the company*.[11]

And, the SAS code used by Commerce to effectuate that adjustment only applied State Pipe's G&A expense rate, either a further manufacturing cost or indirect selling expense, to Channel 2 sales by State Pipe.[12]

This methodology, which applies the adjustment based on State Pipe's G&A expenses only to State Pipe's sales, is also consistent with the statute. In that regard, under Section 772(d)(1) of the Tariff Act, the expenses that may be deducted from constructed export price must be "generally *incurred by or for the account of* the producer or exporter, or *the affiliated seller in the United States, in selling the subject merchandise*."[13]

---

[11] *See* 2020-2021 Welded Line Pipe from Korea Antidumping Administrative Review, December 22, 2022, Preliminary Results Margin Calculation for SeAH Steel at 3. For the Court's Reference, a copy the public version is provided in Attachment 3.

It should be noted that Attachment 2 of the Preliminary Margin Calculation Memorandum for the 2020-2021 review of Welded Line Pipe from Korea includes additional SAS code that further confirms that no adjustment was made to PPA's sales for State Pipe's G&A expense rate. However, that attachment was omitted from the public version of Commerce's memorandum. As a party to that proceeding, SeAH Steel has a copy of the proprietary version of Commerce's memorandum. Accordingly, if it would be helpful to the Court, SeAH Steel would be able to submit a copy of the proprietary version of Commerce's memorandum upon request.

[12] *Id*. at 4.

[13] 19 U.S.C. § 1677a(d)(1).

In short, the methodology explained in Commerce's IDM in this case unequivocally described the intention to only apply State Pipe's G&A expense rate as an indirect selling expense deduction to State Pipe's own sales of imported pipe during the period, whether further manufactured or not, and did not suggest any intention of applying State Pipe's G&A expense rate as an indirect selling expense deduction to *PPA's* sales of imported pipe during the period.

*b. Commerce's Final Calculation Materials Reflected a Different Methodology Than Described in the Issues and Decision Memorandum*

On May 1, 2026, the Department published the final determination in the Federal Register for the LDWP review.[14] Commerce initially uploaded the calculation materials for SeAH Steel on the same day. However, those materials were incomplete and removed from the record. On May 4, 2026, the complete calculation materials of the final determination for SeAH Steel were placed on the record. Upon examination, SeAH Steel discovered that the computer programming language (*i.e.*, SAS code) used to apply State Pipe's G&A expenses as an indirect selling expense, applied the adjustment to *all* U.S. sales and not just U.S. sales made by State Pipe. As a result, the State Pipe's G&A expenses were also deducted from the price of SeAH Steel's sales made through its other U.S. affiliate, PPA.

SeAH Steel timely filed ministerial error comments alerting Commerce that the SAS code in the final calculation materials was inconsistent with the methodology described in

[14] *See Large Diameter Welded Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2023–2024*, 91 Fed. Reg. 23400, 23400 (May 1, 2026) (hereinafter "Final FR Notice").

its IDM, because it deducted State Pipe's G&A expenses from the reported prices for all U.S. sales, including sales made through PPA (*i.e.*, sale that did not involve State Pipe).[15] In those comments, SeAH Steel cited to an example of a past agency determination that expressed agency practice to correct SAS code errors that did not reflect Commerce's intended methodology as a ministerial error correction.[16] SeAH Steel also provided corrected SAS code programming language that would restrict the adjustment to only Channel 2 sales (consistent with the SAS code used in the *Welded Line Pipe* case) and, therefore, ensure that the calculation materials reflect the methodology described in the IDM.[17]

On May 18, 2026, DIPs requested a two-day extension of the deadline to file rebuttal ministerial error comments in order to have "sufficient time to review SeAH's allegations and prepare any necessary response."[18] Commerce granted the extension. DIPs did not file rebuttal comments.

---

[15] *See* SeAH Steel's May 11, 2026, Ministerial Error Comments. A copy was provided in Exhibit C of Defendant's Motion.

For the sake of completeness, it should be noted that SeAH Steel alleged a second ministerial error. SeAH Steel, however, has not challenged the Department's determination on that issue on appeal.

[16] *See id*.

[17] *See id*. at Attachment 2.

[18] DIP's May 11, 2026, Extension Request. For the Court's reference, a copy of DIPs' extension request is provided in Attachment 4.

*c. Commerce's Ministerial Error Determination Clarified that the Methodology Reflected in the SAS Code, and Not the Methodology Described in its IDM, Reflected its Intended Methodology*

On June 1, 2026, Commerce issued its ministerial error determination. In that determination, Commerce refused to correct the obvious error in its calculations. According to Commerce:

> We do not find that the alleged error constitutes a ministerial error within the meaning of 19 CFR 351.224(f) *because it concerns Commerce's methodological decision to apply State Pipe's G&A expense ratio to non-further manufactured sales* in order to capture all G&A expenses incurred by State Pipe in the calculation of the dumping margin.[19]

Commerce claimed that its calculation materials simply "reiterated" the methodology explained in its IDM.[20]

After rejecting SeAH Steel's ministerial error allegation on methodological grounds, Commerce went on to state that it also would not be able to correct the SAS code through the ministerial error procedure, because the correction is not related to an "'error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like,' within the alleged SAS code error."[21] Commerce, then recommended not to issue an amended final determination.[22]

---

[19] Commerce's June 1, 2026, Memorandum Re: Analysis of Ministerial Error Allegations for the Final Results at 3 (hereinafter "Ministerial Error Determination"). A copy was provided in Exhibit D of Defendant's Motion.

[20] *Id.*

[21] *Id.*

[22] *Id.*

*2. The Court Has 28 U.S.C. § 1581(i) Jurisdiction Over SeAH Steel's First Claim Because Commerce's Ministerial Error Determination Changed the Methodology Contained in its Final Determination*

Defendant has pointed to past cases where the Courts have found that it had jurisdiction under 28 U.S.C. § 1581(c) to address claims regarding Commerce's decision not to correct ministerial errors.[23] But these cases involved situations where Commerce's ministerial error determination did not change the methodology in its final determination.

For example, in *Hor Liang Industrial*, Commerce's final determination notice explained that, because the margins for all examined companies were based on adverse facts available ("AFA"), the AFA rate would also be applied to non-selected companies.[24] Two non-selected companies claimed that Commerce had committed a ministerial error in assigning them the AFA rate.[25] Commerce rejected their comments on the basis that Commerce had not made a ministerial error in assigning the non-selected companies the AFA rate.[26] Similarly, in *Euro SME*, Commerce's final determination did not make any changes to the methodology used to calculate the freight revenue cap for the respondent in the preliminary determination.[27] The respondent filed ministerial error comments that

---

[23] *See* Defendant's July 17, 2026, Submission at 9 (ECF No. 12).

[24] *See Hor Liang Indus. Corp. v. United States*, 337 F. Supp. 3d 1310, 1315-16 (Ct. Int'l Trade 2018). *See also*, *Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2015-2016,* 83 Fed. Reg. 6163, 6164 (Feb. 13, 2018).

[25] *See Hor Liang Indus. Corp.*, 337 F. Supp. 3d at 1315-16.

[26] *See id*.

[27] *See Euro SME SDN BHD v. United States*, No. 1:22-CV-00108 (SAV), 2024 WL 550334, at *5 (Ct. Int'l Trade Feb. 12, 2024).

Commerce had mistakenly excluded certain logistics expenses from the freight revenue cap calculation.[28] Commerce rejected their comments on the basis that it was untimely.[29] As a result, when plaintiffs in those appeals challenged Commerce's rejection of their ministerial error allegation, they necessarily also challenged the methodology in Commerce's final determination as expressed in the Federal Register notice and accompanying issues and decision memorandum. In other words, the "true nature" of plaintiffs' complaint in those appeals were with the methodology of Commerce's final determination. Therefore, the Court exercised jurisdiction under 28 U.S.C. § 1581(c), which establishes exclusive jurisdiction over appeals of final determinations by Commerce in antidumping proceedings.

This case, by contrast, is distinguishable because Commerce's ministerial error determination changed the methodology of its final determination. In this case, Commerce's final determination notice stated that the methodology for its final determination was the methodology described in its IDM.[30] And, as explained above, the methodology described in Commerce's IDM clearly established that Commerce would deduct State Pipe's G&A expense rate as an indirect selling expense for *State Pipe's* own sales, whether further manufactured or not. Commerce's calculation materials, however,

---

[28] *See id.*

[29] *See id.*

[30] *See* Final FR Notice ("Based on our evaluation of the comments received from interested parties regarding our Preliminary Results and our review of the record to address those comments, *we made certain changes to the weighted-average dumping margin calculations for… SeAH, as detailed in the Issues and Decision Memorandum*.") (emphasis added).

deducted State Pipe's G&A expense rate as an indirect selling expense for *all* U.S. sales, including sales by SeAH Steel's other U.S. affiliate, PPA, that did not involve State Pipe.

When Commerce rejected SeAH Steel's request for correction on the basis that the calculation materials reflected its intended methodology, Commerce's ministerial error determination endorsed a methodology different from that described in its IDM. No amount of reframing — whether by assertion or quoting select portions of Commerce's IDM out of context — can change this fact.[31] Consequently, Commerce's ministerial error determination revised the announced methodology of its final determination. Therefore, the "true nature" of SeAH Steel's claim in this appeal is not to challenge the methodology described in Commerce's final determination.[32] Instead, SeAH Steel is challenging the new methodology described in the ministerial error determination.

In these circumstances, these past cases which found 28 U.S.C. § 1581(c) to be the appropriate basis to appeal a negative ministerial error determination are not applicable. And, because the methodology adopted in the ministerial error determination is inconsistent with the methodology described in the IDM, Commerce's ministerial error determination "incorrectly implement{s} a § 1675 determination" like other post-final administrative actions where this Court has exercised 28 U.S.C. § 1581(i) jurisdiction.

---

[31] *See* Commerce's Ministerial Error Determination at 3.

[32] In fact, SeAH Steel already has challenged Commerce's application of its U.S. affiliate's G&A expenses as an indirect selling expense for sales made by that U.S. affiliate in an earlier appeal related to *OCTG from Korea*. This Court agreed that Commerce could treat the G&A expenses as an indirect selling expense adjustment for that affiliate's own sales. *See Seah Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1044 (Ct. Int'l Trade 2021). In light of the Court's past decision, SeAH Steel had no reason to appeal the methodology described in Commerce's IDM.

This situation is analogous to cases in which parties appealed erroneous liquidation instructions. The Courts have consistently found that they have 28 U.S.C. § 1581(i) jurisdiction to review a claim that liquidation instructions issued by Commerce after a final determination were inconsistent with the methodology stated in the final results.[33] The Courts have explained that "{a} challenge to liquidation instructions essentially contends that the instructions do not accurately (i.e., lawfully) reflect the results of the underlying administrative proceeding."[34] Therefore, if liquidation instructions "incorrectly implement a § 1675 determination, relief will be granted pursuant to an Administrative Procedure Act ("APA") action brought under 28 U.S.C. § 1581(i)."[35]

Here Commerce's ministerial error determination rejected SeAH Steel's proposal that would have made Commerce's calculation consistent with the methodology described in the final IDM. In doing so, Commerce effectively amended the reasoning of the final determination without issuing amended final results. Therefore, Commerce's ministerial error determination "incorrectly implement{s} a § 1675 determination" (*i.e.*, its published final determination and accompanying IDM). Given the specific facts of this case, Commerce's ministerial error determination is properly appealed under 28 U.S.C.

---

[33] *See, e.g., Okaya (USA) v. United States*, 27 C.I.T 1509, 1515-1516 (2003); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1002 (Fed. Cir. 2003).

[34] *Dental EZ Inc. v. United States*, 31 C.I.T. 985, 987 (2007) (internal citations and quotations omitted).

[35] *Parkdale Int'l, Ltd. v. United States*, 31 C.I.T. 720, 725 (2007) (internal citations omitted) ("The general rule appears to be that liquidation instructions lead to § 1581(i) jurisdiction unless they directly implement a 19 U.S.C. § 1516a determination, such as the final results of an administrative review under § 1675. If they incorrectly implement a § 1675 determination, relief will be granted pursuant to an Administrative Procedure Act ("APA") action brought under 28 U.S.C. § 1581(i).").

§ 1581(i) as a challenge to the manner in which Commerce administered the final results and not as a challenge to the final determination itself.

*3. The Court Has 28 U.S.C. § 1581(i) Jurisdiction Over SeAH Steel's Second Claim Because Commerce's Ministerial Error Determination Changed Long-Standing Agency Policy*

As explained above, Commerce rejected SeAH Steel's ministerial error allegation on the grounds that the calculation materials reflected its intended methodology. As an aside, Commerce also stated in its ministerial error determination that it would not be able to correct the SAS code through the ministerial error procedure, because the correction is not related to an "'error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like,' *within the alleged SAS code error*."[36] Essentially, Commerce claimed that because correction of the SAS code would require *adding* language to the SAS code to limit the adjustment to a specific sales channel, rather than simply correcting mathematical signs or clerical errors in the *existing* SAS code, it was not a correctible ministerial error. That assertion is inconsistent with long-standing agency practice to correct any SAS code error inconsistent with Commerce's intended methodology as part of its ministerial error procedure.[37]

---

[36] *See* Commerce's Ministerial Error Determination at 3.

[37] *See, e.g., Certain Quartz Surface Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 23767 (May 23, 2019), and accompanying Issues and Decision Memorandum (May 14, 2019) ("We agree with the petitioner that the code, as written, did not properly perform the data operations Commerce had intended to perform and therefore, we have corrected these two ministerial errors to modify the SAS programming language, as proposed by the petitioner, for the final determination."); *Certain Steel Nails From Malaysia: Amended Final Results of Antidumping Duty Administrative Review;* 2020-2021, 88 Fed. Reg. 15660 (Mar. 14,

*(footnote continued on following page)*

For example, in the 2002-2003 antidumping review of *Certain Corrosion-Resistant Carbon Steel Flat Products from Canada*, Commerce published an amended final determination to correct ministerial errors. The notice stated, in relevant part:

> …we are amending our Final Results to correct a ministerial error alleged by Dofasco pursuant to section 751(h) of the Act. On March 29, 2005, in accordance with section 751(h) of the Act and 19 CFR 351.224(c)(2), Dofasco filed a timely allegation that the Department erred in its calculation of the antidumping duty margin by treating all of Dofasco's U.S. sales as CEP sales. Dofasco has four separate channels of U.S. sales. *As indicated in the Final Results, the Department intended to classify Channels 1 and 4 as EP sales, and Channels 2 and 3 as CEP sales. However, Dofasco contends that the SAS code in the U.S. Sales program resulted in all four channels of U.S. sales being classified as CEP sales.*
>
> *After reviewing Dofasco's allegation, we have determined that the alleged error is a ministerial error pursuant to section 751(h) of the Act and 19 CFR 351.244(f)*. We agree with Dofasco that the Department inadvertently used SAS language that resulted in the classification of all Dofasco's U.S. sales as CEP sales. Therefore, we have amended the SAS programming to correct an above-described ministerial error.[38]

The correction to the SAS code to effectuate Commerce's intended methodology in the *Certain Corrosion-Resistant Carbon Steel Flat Products from Canada* case necessarily required additional SAS language to be included with the existing SAS code and was not limited to correcting an error within the existing SAS code.

---

*(footnote continued from previous page)*
2023), and accompanying Memorandum (Mar. 8, 2023) (finding that an error in the SAS programming language that inadvertently excluded the fourth quarter when calculating home market weighted-average costs and production quantities constituted a "ministerial error" within the meaning of 19 C.F.R. 351.224(f)).

[38] *Notice of Amended Final Results of Antidumping Duty Administrative Review: Certain Corrosion-Resistant Carbon Steel Flat Products from Canada*, 70 Fed. Reg. 22846 (May 3, 2005).

This Court has also confirmed that, where the SAS code does not reflect Commerce's intended methodology, Commerce may correct the code as a ministerial error. In *Shinhan Diamond*, Commerce agreed with respondents during the underlying proceeding that the omission of a CEP offset in its calculation of the final margin for two companies did not reflect its intended methodology.[39] However, due to the particular procedural posture of that case, the Government was required to ask leave from the Court for Commerce to be able to publish an amended final determination reflecting its ministerial error determination.[40] The Court granted leave, finding that, because nothing in Commerce's final decision explained that it intended to omit the CEP offset, the omission was unintentional and, therefore, a correctable "ministerial error."[41]

In these circumstances, SeAH Steel's second claim that Commerce improperly changed long-standing policy through its ministerial error determination when it announced that it could not correct errors in the SAS code to reflect intended methodology, identifies "…a legal error that is distinct from Commerce's determination."[42] In these circumstances, the "true nature" of SeAH Steel's second claim is also not with Commerce's final determination but only with the change in agency policy announced in its ministerial error determination. And consistent with the Court's reasoning in past cases

---

[39] *See Shinhan Diamond Indus. Co. v. United States*, 34 C.I.T. 227, 228 (2010).

[40] *See id*. 228-229. .

[41] *See id*. 232. .

[42] *J.D. Irving, Ltd. v. United States*, 615 F. Supp. 3d 1323, 1332 (Ct. Int'l Trade 2023), aff'd, 119 F.4th 48 (Fed. Cir. 2024).

addressing challenges to post-final administrative actions, the Court has 28 U.S.C. § 1581(i) jurisdiction to review SeAH Steel's claim.[43]

*a. Courts Have Also Confirmed that 28 U.S.C. § 1581(i) Jurisdiction is Appropriate When an Agency Action Prevents the Ability of Parties to Seek Appeal Under Other Provisions of the Statute*

The Courts have also held that they have subject matter jurisdiction under 28 U.S.C. § 1581(i) when an agency fails to fulfill the required procedural steps to permit a party to appeal that agency's decision under 28 U.S.C. § 1581(a)-(h) of the statute. For example, the Federal Circuit explained that parties could seek redress by filing a subsection (i) claim if Customs fails to liquidate entries within the permissible timeframe thus denying parties the ability to seek judicial review under 28 U.S.C. 1581(a).[44] Similarly, this Court has found that it has § 1581(i) jurisdiction over a claim that "CBP had unlawfully withheld or unreasonably delayed agency action" — namely publication of its ruling in the Customs Bulletin — which was necessary for plaintiff to appeal that agency's ruling under 28 U.S.C. 1581(h).[45]

As described above, the methodology described in Commerce's IDM indicated that State Pipe's G&A expense rate would be considered an indirect selling expense only for State Pipe's sales of imported pipe. And, the methodology in the Department's calculation materials treated State Pipe's G&A expense rate as an indirect selling expense for all U.S. sales of imported pipe, including sales that were not made through State Pipe. Both cannot

---

[43] *See id.* ,

[44] *See Chemsol, LLC v. United States*, 755 F.3d 1345, 1355 (Fed. Cir. 2014).

[45] *See Best Key Textiles Co. v. United States*, 37 C.I.T. 1580, 1583 (2013).

be Commerce's intended methodology. Because Commerce was made aware of the methodological discrepancy between the IDM and its calculation materials, Commerce's rejection of SeAH Steel's request necessarily involved a determination that the methodology used in its calculation materials, not the methodology described in its IDM, was its intended methodology.

As explained more fully below, Plaintiff contends that Commerce was not permitted to change its methodology through the ministerial error process. But, if such a change were permitted, Commerce's regulations *require* publishing an amended determination in the Federal Register to correct any ministerial errors in its original determination.[46] Significantly, Commerce has found that its regulations require correcting discrepancies between the methodology in its decisional materials and calculation materials to reflect the agency's intent.

For example, in the countervailing duty case on *Live Swine from Canada*, Commerce's final decisional materials for the 1991-1992, 1992-1993, and 1993-1994 reviews indicated that Commerce would use the same methodology as in the "sixth administrative review" of that order to calculate benefits under the "Feed Freight Assistance Program."[47] However, Commerce's final calculation materials used a different methodology.[48] Commerce, therefore, corrected the calculation materials to use the

---

[46] 19 C.F.R. § 351.224(e).

[47] *See Live Swine From Canada; Amended Final Results of Countervailing Duty Administrative Reviews*, 61 Fed. Reg. 58383, 58384 (Nov. 14, 1996).

[48] *Id.*

methodology identified in its decisional materials (*i.e.*, the methodology in the "sixth administrative review") and published an amended final determination for the reviews.[49]

Commerce would be required to publish an amended determination even if the correction does not change the margin for the respondent. For example, in the 2006-2007 antidumping administrative review of *Certain Corrosion-Resistant Carbon Steel Flat Products from Korea*, the petitioner argued that Commerce should not publish amended final results, because correction of the errors would not change the respondent's margin.[50] Commerce disagreed and explained that it is agency practice to publish amended final determinations whenever it makes any correction to the final determination materials.[51]

Indeed, Commerce has found that the statute and regulations require publication of an amended determination even when the discrepancy is contained in the issues and decision memorandum and does not affect the calculation materials or margin identified in the Federal Register notice of the final determination. For example, in the 2011-2012 antidumping administrative review of *Certain Steel Nails from China*, the Federal Register notice of Commerce's final determination indicated that the company, CPI, had no shipments during the period, but the issues and decision memorandum identified CPI on the list of companies subject to the country-wide rate.[52] CPI alerted Commerce to the

---

[49] *Id.*

[50] *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Amended Final Results of the Fourteenth Antidumping Duty Administrative Review*, 74 Fed. Reg. 19199, 19199 (April 28, 2009).

[51] *See id.* at 19200.

[52] *See Certain Steel Nails from the People's Republic of China: Amended Final Results of the Fourth Antidumping Duty Administrative Review*, 79 Fed. Reg. 27283 (May 13, 2014).

issue. Commerce agreed with CPI and also found other no-shipment companies listed in the final determination Federal Register notice that were incorrectly on the country-wide rate list in the issues and decision memorandum.[53] Commerce published an amended final determination, which corrected its issues and decision memorandum and clarified that the correction "does not change the dumping margin for any of these companies, and thus their assessment rates and cash deposit rates remain the same as in the Final Results."[54]

The Court has explained that a party is not required to have first filed a claim under the original determination to preserve its ability to appeal the amended determination, and may raise claims related to both the original and amended final determinations when appealing the amended final determination.[55] Here, SeAH Steel's claims are rooted in the Department's ministerial error determination and not in its final determination. Because Commerce's ministerial error determination modified the methodology described in the IDM, Commerce was required to publish an amended final determination correcting its IDM in this case. Accordingly, because Commerce failed to publish an amended determination to effectuate its ministerial error determination, thus preventing parties to

---

[53] *Id.*

[54] *Id.*

[55] *See e.g.*, *Bethlehem Steel Corp. v. United States*, 25 C.I.T. 307 (2001) (asserting jurisdiction over an appeal that was initiated within 30 days after the amended final determination was published and covered issues related to the final and amended final determinations). *See also Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Grp. Corp. v. United States*, 29 C.I.T. 1300, 1305 (2005) ("…the determination contained in the Amended Final Results is a final determination properly subject to judicial review and the date of the publication of the Amended Final Results serves as the basis for the start of the jurisdictional clock.").

appeal the amended determination under 28 U.S.C. 1581(c), 28 U.S.C. 1581(i) jurisdiction is appropriate for SeAH Steel's claims.

#### 4. *Appealing the Final Determination Under 28 U.S.C. § 1581(c) Jurisdiction Was Also Manifestly Inadequate*

Nevertheless, even if the Court were to find that the "true nature" of SeAH Steel's claims related to Commerce's final determination and "could have" been addressed by appealing Commerce's final determination under 28 U.S.C. § 1581(c), that option was manifestly inadequate.[56]

##### a. *As a Practical Matter, SeAH Steel Could Not Have Challenged Commerce's Ministerial Error Determination in an Appeal Under 28 U.S.C. § 1581(c)*

First, Commerce's factual and legal conclusions that are the subject of this appeal were contained exclusively in its post-final ministerial error decision. As a result, Plaintiff could not have raised its claims by appealing the final determination.

Second, Commerce's release of its final calculation materials after publication of the final determination denied Plaintiff the statutorily guaranteed time to appeal issues contained in those materials under 28 U.S.C. § 1581(c). The statute guarantees parties a full 30 days after publication of Commerce's final determination to initiate an appeal pursuant to 28 U.S.C. § 1581(c) jurisdiction.[57] Furthermore, Congress and this Court have made clear that all materials, including the calculation materials, related to Commerce's

---

[56] Defendant's July 17, 2026, Submission at 10 (ECF No. 12) (claiming that "SeAH would not be able to show that the remedy afforded by Section 1581(c) would be manifestly inadequate").

[57] *See* 19 U.S.C. § 1516a(a)(2).

final determination need to be available to the parties by the time the Federal Register notice is published.

Congress stated that:

> Notice of all determinations made by the Authority… shall be published in the Federal register. Such notice need not contain the findings of fact or conclusions of law on which the determination is based. However, such information *must be publicly available*, *and the notice will indicate where it* *can* *be obtained*. [58]

The word "can" is a present-tense verb that means a present "ability" to do something, and cannot indicate "ability" in the future without modification.[59] In other words, Congress intended parties to have access to the materials reflecting Commerce's "findings of fact or conclusions of law" related to the final determination by the time the Federal Register notice is published.

This Court then made clear that, in addition to "findings of fact or conclusions of law," Commerce is required to provide parties the "the actual calculations of the dumping margins."[60] As a result, the Court instructed Commerce to "establish and follow a procedure" that would provide parties with the necessary access to the calculation

---

[58] H.R. REP. No. 317, at 69, 96th Cong., 1st Sess. (1979).

[59] *Can*, Merriam Webster Dictionary, available at « https://www.merriam-webster.com/simple/can». For the Court's reference, a printout of the webpage is provided in Attachment 5.

[60] *Daewoo Elecs. Co. v. United States*, 712 F. Supp. 931, 954 (Ct. Int'l Trade 1989) (reversed in part on other grounds) ("Commerce is required to disclose, *not only the basic facts and conclusions of law, which form the basis of the final results as published in the Federal Register, but also the actual calculations of the dumping margins* used during the process of manipulating the factual data in accordance with the law. These calculations are an *essential component of the final results* and a crucial part of the determination of the actual amount of antidumping duties to be assessed on the subject merchandise."

materials, "including the computer programs and printouts" that were used for Commerce's determinations.[61]

To that end, Commerce has established the following schedule for final determinations in antidumping cases:

- Sign the final determination by the statutorily required deadline;[62]
- Make the public announcement of the final determination, which generally includes copies the unpublished final determination notice and Issues and Decision Memorandum by the following business day;[63]
- Release the disclosure materials, which include the calculation materials reflecting the methodology explained in the issues and decision memorandum, within 5 days of the public announcement;[64]
- Publish the final determination in the Federal Register seven or more days after the public announcement.[65]

This timeline ensures that all decision and calculation materials used by Commerce for the final determination are released to the parties before the notice is published in the Federal Register. Commerce, however, did not follow this timeline in this case. As described

---

[61] *Id. See also Invenergy Renewables LLC v. United State*s, 476 F. Supp. 3d 1323, 1348 (Ct. Int'l Trade 2020), citing *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 ("The fact that a detailed explanation of the agency's action exists somewhere is irrelevant to the question of whether the agency explained itself to the public when it acted.").

[62] *See e.g.*, *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20766, at note 246 (Mar. 25, 2024) (indicating that the final determination was signed by the deadline).

[63] *See id.* ( *See also*, *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7320 (Feb. 27, 1996).

[64] *See* 19 C.F.R. § 351.224(b).

[65] *See e.g.*, *NTN Bearing Corp. of Am. v. United States*, 46 F. Supp. 3d 1375, note 5 (Ct. Int'l Trade 2015).

above, and confirmed by Defendant, the complete calculation materials for SeAH Steel were placed on the record on May 4 — three days *after* the Federal Register notice was published.

The late release of the complete calculation materials was not trivial. Under Commerce's regulations, parties have five days after all "disclosure materials" (*i.e.*, the calculation materials) have been released to file ministerial error comments.[66] Parties then have five days to file rebuttal comments.[67] Commerce then makes its determination after the comment period has closed.

In this case, Commerce followed the above timeline for ministerial error corrections but could only start the clock when all the materials were placed on the record (*i.e.*, on May 4). Commerce issued its ministerial error determination at 3:46 p.m. on June 1, 2026 (*i.e.*, the thirtieth day after the publication of the Federal Register notice).[68] Had Commerce released complete calculation materials by the date of the Federal Register notice, the ministerial error comment period would have closed three days earlier, and Commerce's ministerial error determination could have been issued three days earlier. This would have given Plaintiff at least one business day to decide whether to appeal

---

[66] *See* 19 C.F.R. § 351.224(c)(2).

It should be noted that parties may request an extension of the deadline for comments. No parties requested such an extension during the underlying proceeding.

[67] *See id.* .

It should be noted that parties may request an extension of the deadline for rebuttal comments. As mentioned, DIPs requested a two-day extension during the underlying proceeding for rebuttal comment which they did not ultimately file.

[68] *See* Ministerial Error Determination ("Filed Date: 6/1/26 3:46 PM").

Commerce's ministerial error determination, prepare the necessary materials, and file before the 30-day deadline.[69] Instead, the delay resulted in Plaintiff having less than 9 hours after the issuance of the ministerial error determination to meet the 30-day deadline.

This Court has previously found it unreasonable in light of the statute for Commerce to have a policy that might require parties to seek judicial redress for a final determination within 24 hours.[70] As discussed above, the final determination for which Congress had provided parties with 30 days to appeal under 28 U.S.C. § 1581(c), includes Commerce's "findings of fact or conclusions of law" contained in the issues and decision memorandum. Because Commerce's ministerial error determination effectively amended its IDM in this case, SeAH Steel had less than one day to evaluate Commerce's "findings of fact or conclusions of law" before appealing the final determination in contravention of Congressional intent and this Court's past decision.

*b. Releasing the Ministerial Error Determination on the Final Day to File an Appeal was Contrary to Agency Regulations*

Commerce's release of its ministerial error determination on the thirtieth day after the publication of the Federal Register notice was also contradictory to its own regulations.

---

[69] Three days before June 1, 2026, was Friday, May 29, 2026.

[70] *See SKF USA Inc. v. United States*, 33 C.I.T. 370, 386 (2009) (finding Commerce's policy of issuing liquidation instructions within 15 days after publication of the final determination as unreasonable because, *inter alia*, it may require plaintiffs "…to file a summons, complaint, and a motion or application for a TRO (if a consented-to injunction is not obtainable), and actually obtain a TRO, all on the day following publication of the final results.").

Specifically, the preamble to Commerce's proposed regulations regarding the ministerial error procedure states:

> The principal goal of these changes is to provide for the issuance of a correction notice normally within 30 days after the date of public announcement of the preliminary or final determination or final results of review. The date of public announcement is the date on which the signed determination or results of review is first made available to interested parties. This goal is consistent with the proposal from a number of commentators that *the Department should respond to ministerial error allegations prior to the date when a summons must be filed with the Court of International Trade* or when a notice of intent to commence panel review must be filed with the NAFTA Secretariat. This 30-day framework is intended to avert needless litigation by *allowing parties sufficient time to review the correction notice before the litigation deadline arrives*.[71]

Commerce adopted the proposed regulations without change, and further clarified in the preamble to its final regulations that:

> Section 351.224(e) provides for the analysis of any comments received and the announcement of the issuance of a correction notice normally not later than 30 days after the date of public announcement of the Department's preliminary or final determination or final results of review. One commenter proposed that the proposed regulations be modified to provide for announcement of the Department's decision on ministerial error allegations no later than 25 days after publication of the final in the Federal Register… The Department has not made any changes to the provision. *A period of 30 days after the date of public announcement (the Department's regulation) or 25 days after publication in the Federal Register (the commenter's proposal) is roughly the same…*[72]

Furthermore, the "30-day framework" was adopted by Commerce to effectuate the statutory directive to "…establish procedures for the correction of ministerial errors in final

---

[71] *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7320 (Feb. 27, 1996).

[72] Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27296, 27327 (May 19, 1997).

determinations within a *reasonable time* after the determinations are issued under this section."[73] In light of the above, the fact that Commerce issued its ministerial error determination *on* "the date when a summons must be filed with the Court of International Trade," and the fact that the delay in issuing its ministerial error determination can be tied to Commerce's own actions, appealing the final determination under 28 U.S.C. § 1581(c) jurisdiction was not a "manifestly adequate" option for SeAH Steel in this case.[74]

In these circumstances, this Court has 28 U.S.C. § 1581(i) jurisdiction over the claims made by SeAH Steel in this appeal, and Defendant's Motion should be dismissed.

*B. Preliminary Injunction*

On July 2, 2026, SeAH Steel filed a Motion for Temporary Restraining Order and for Preliminary Injunction to Enjoin Liquidation of entries of LDWP produced or exported by SeAH Steel in Korea that were entered, or withdrawn from warehouse for consumption, during the period May 1, 2023, to April 30, 2024. In that Motion, SeAH Steel explained that all four of the Court's traditional factors — threat of immediate irreparable harm, likelihood of success on the merits, public interest, and balance of hardship — for granting a preliminary injunction have been met.[75]

---

[73] 19 U.S.C. § 1675(h).
[74] *See e.g.*, *Asociacion Colombiana de Exportadores de Flores (Asocoflores) v. United States*, 717 F. Supp. 847, 850 (Ct. Int'l Trade 1989), *aff'd sub nom. Asociacion Colombiana de Exportadores de Flores v. United States*, 903 F.2d 1555 (Fed. Cir. 1990) (exercising 28 U.S.C. § 1581(i) jurisdiction over parties' challenge to Commerce's initiation of a review because 28 U.S.C. § 1581(c) jurisdiction was not manifestly adequate "{g}iven the difficulties of participation under the facts of this case…").

[75] *See* SeAH Steel's July 2, 2026, Motion for Temporary Restraining Order and for Preliminary Injunction to Enjoin Liquidation (ECF No. 9).

In its Response to SeAH Steel's Motion for a Preliminary Injunction, Defendant argues that the Court should deny SeAH Steel's motion for preliminary injunction, because SeAH Steel failed to demonstrate any of the traditional factors necessary to grant an injunction. Defendant is mistaken.

*1. Because the Court Has Residual Jurisdiction, Defendant's Opposition to SeAH Steel's Motion Fails*

Defendant's primary argument rests on its claim that this Court does not have subject matter jurisdiction under 28 U.S.C. § 1581(i). Defendant asserts that because the Court does not have the authority to adjudicate SeAH Steel's claims, SeAH Steel cannot succeed on the merits or suffer irreparable harm and the balance of hardship and public policy favor denying the injunction.[76] However, as explained above, this Court does have jurisdiction over SeAH Steel's claims under 28 U.S.C. § 1581(i) jurisdiction. Therefore, Defendant's arguments opposing SeAH Steel's Motion for Preliminary Injunction on jurisdictional grounds are unavailing.

*2. Defendant's Other Arguments in Opposition to SeAH Steel's Motion Are Also Unsupported*

Defendant offers additional criticisms regarding the "likelihood of success" and "irreparable harm" factors for SeAH Steel's request for a preliminary injunction against liquidation. Those arguments are similarly ill-founded. We address each factor in turn.

*a. Likelihood of Success*

Defendant argues that SeAH Steel is unlikely to succeed on the merits, because this Court has held that the type of correction SeAH Steel requested is not ministerial in nature.

[76] Defendant's July 17, 2026, Submission at 12 and 15-16 (ECF No. 12).

Specifically, Defendant cites to cases where this Court found that "the inclusion or exclusion of certain figures in a calculation that are not an arithmetic or clerical error or similar inadvertent mistake . . . do{ } not fall within the statutory definition of 'ministerial error.'"[77]

*(1) The Cases Cited by Defendant Do Not Support its Posture*

As an initial matter, Defendant's reliance on those cases is misplaced. The cases cited by Defendant addressed situations where the "the inclusion or exclusion of certain figures" in the calculation was in line with Commerce's own described methodology in its decisional materials. As a result, the parties' disagreement with the "the inclusion or exclusion of certain figures" was a challenge to Commerce's methodology and not ministerial.

For example, during the administrative proceeding that was the subject of the *QVD Food* appeal cited by Defendant, Commerce's preliminary determination calculated the surrogate financial ratios by averaging the figures from the financial statements for two companies.[78] During briefing, the parties disagreed with the financial statements Commerce used to calculate the surrogate financial ratios but did not take issue with how the financial ratios were calculated.[79] In its issues and decision memorandum, Commerce explained that it would continue to use the same two financial statements for the final determination and would also continue to average the figures as it did in the preliminary

---

[77] *Id* at 13.

[78] *See id*. *See also QVD Food Co., Ltd v. United States*, 34 C.I.T. 1166, 1178 (2010), *aff'd sub nom. QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011).

[79] *See id*.

determination.[80] Respondents then filed ministerial error comments stating that Commerce incorrectly included certain expenses from those financial statements in the financial ratio calculation.[81] However, because Commerce indicated that it was continuing to use same methodology from its preliminary determination in its issues and decision memorandum, and its calculation followed that methodology, the respondents' disagreement with how the financial ratios were calculated was a disagreement with Commerce's methodology and not a ministerial error in the calculation.

By contrast, when the "the inclusion or exclusion of certain figures" in Commerce's calculation is inconsistent with Commerce's own described methodology, Commerce has found it appropriate to correct the calculation as a ministerial error. For example, in the antidumping investigation of *Certain Automotive Replacement Glass Windshields from China* , Commerce stated in its issues and decision memorandum that "it would disregard prices that the Department has reason to believe or suspect are distorted by subsidies, including FYG's market economy purchases from Thailand and Korea."[82] Its final calculation materials, however, included FYG's purchases from Thailand and Korea for one factor of production.[83] The petitioner filed ministerial error comments identifying the issue to Commerce.[84] Commerce agreed and revised its calculation to exclude the

---

[80] *See id*.

[81] *See id*.

[82] *Notice of Amended Final Determination of Sales at Less Than Fair Value: Certain Automotive Replacement Glass Windshields from the People's Republic of China*, 67 Fed. Reg. 11670, 11671-72 (March 15, 2002).

[83] *See id*. (see discussion on colored float glass).

[84] *See id*.

Thailand and Korea figures from the valuation of that factor of production for FYG consistent with the methodology identified in its issues and decision memorandum.[85]

The decision in *Certain Automotive Replacement Glass Windshields* indicates that when the calculation materials do not reflect the methodology described in its issues and decision memorandum, the discrepancy is inadvertent, and therefore, a correctible ministerial error.[86] Similarly, in this case, Commerce's IDM explained its intended methodology (*i.e.*, apply State Pipe's G&A expense as an indirect selling expense to State Pipe's sales) and the calculation materials did not reflect that methodology (*i.e.*, they applied State Pipe's G&A expense as an indirect selling expense to all U.S. sales). As a result, revising the calculation materials to reflect the methodology stated in the IDM, as SeAH Steel requested, was a correctable ministerial error.

*(2) Defendant Overlook the Actual Claims Made by SeAH Steel in this Appeal*

More fundamentally, Defendant overlooks the actual claims made by SeAH Steel in this case. SeAH Steel's first claim is that Commerce's failure to correct the ministerial error identified by SeAH Steel resulted in a calculation that was inconsistent with the methodology described in Commerce's IDM. In support of that claim, SeAH Steel provided relevant information on the case history (both in its Motion and in more details in this submission) that demonstrate the inconsistency between the methodology described in Commerce's IDM and the calculation materials.

[85] *See id.*

[86] *See id.*

Furthermore, Commerce and this Court have confirmed that methodological changes to the final determination cannot be made through the ministerial error process.[87] In this regard, Commerce's IDM is required to reflect Commerce's "findings of fact or conclusions of law" and Commerce represented that its IDM in this case "detailed" the "changes to the weighted-average dumping margin calculations" for SeAH. As a result, the description in Commerce's IDM necessarily reflected the methodology of its final determination. When Commerce's ministerial error determination asserted that its calculation materials reflected its intended methodology, it improperly changed the methodology of the final determination through the ministerial error process.

To the extent that Commerce was permitted to modify the methodology described in its IDM to purportedly reflect its intended methodology as contained in its calculation materials, Commerce was required to publish an amended final determination to effectuate that change, which it failed to do.[88] As a result, Commerce's ministerial error determination not to correct the calculation error on the basis that it reflected its intended methodology was unreasonable, unlawful, and an abuse of discretion.[89]

---

[87] *See e.g.*, *Shinhan Diamond Indus. Co. v. United States*, 34 C.I.T. 227, 231 (2010) ("mistakes of law or mistakes that require cerebration or research into the law or planetary excursions into facts are not reasonably viewed as ministerial errors") (internal citations and quotations omitted).

[88] *See* pages 18-21 above.

[89] *See e.g.*, *Suntec Indus. Co. v. United States*, 37 C.I.T. 1670, 1678 (2013), aff'd, 857 F.3d 1363 (Fed. Cir. 2017) (finding that because the respondent "was not provided the actual notice to which it was entitled under 19 C.F.R. § 351.303(f)(3)(ii)…Commerce's initiation of AR3 Final as to Suntec was unlawful.").

SeAH Steel's second claim is that Commerce's announcement that correction of errors in the SAS code to reflect the methodology stated in its IDM are not correctible ministerial errors is inconsistent with Commerce's established practice. To support that claim, SeAH Steel cited multiple cases (both in its Motion and in this submission) that identified Commerce's longstanding practice of correcting various types of SAS code errors to conform with its intended methodology as ministerial corrections. As a result, Commerce's announcement that it cannot correct such errors through the ministerial error process unless they are "'error{s} in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like,' within the alleged SAS code error" was unreasonable, unlawful, and an abuse of discretion.[90]

In these circumstances, the evidence clearly supports the merits of SeAH Steel's claims. Defendant has not proffered any argument to the contrary.

*b. Irreparable Harm*

Defendant also argues that SeAH Steel has failed to demonstrate that it would suffer irreparable harm because (1) it has not shown an "actual threat" of injury; and (2) the Federal Circuit's decision in *Sumecht*, established that this Court has equitable powers to reliquidate entries subject to an appeal under 28 U.S.C. § 1581(i). Defendant's arguments are again without merit.[91]

---

[90] *See e.g.*, *Am. Silicon Techs. v. United States*, 22 C.I.T. 776, 777 (1998) ("When the Court finds that an agency has departed from past practice without an adequate explanation for the basis of the departure, the agency's determination must be rejected.").

[91] *See* Defendant's July 17, 2026, Submission at 15-16 (ECF No. 12).

First, SeAH Steel has demonstrated an "actual threat" of injury. As explained in SeAH Steel's Motion, Commerce already issued liquidation instructions to Customs and Border Protection to liquidate and assess the final antidumping duties on SeAH Steel's entries. As a result, without a preliminary injunction to replace the temporary restraining order currently in place, SeAH Steel's entries *will* liquidate. And, since adjudication of this appeal could result in a lower margin for SeAH Steel, Plaintiff will suffer unrecoverable loss due to excess antidumping duties assessed on the liquidated entries.[92]

Second, in *In re Section 301 Cases*, this Court addressed *Sumecht* and other Federal Circuit decisions related to the Court's equitable power to order reliquidation. This Court explained that:

> …despite the broad statutory language granting the Court authority to order whatever relief is appropriate, the Court of Appeals has consistently refrained from relying on that language in finding the CIT has authority to order reliquidation or refunds in 1581(i) cases and has raised doubts about the CIT's authority to do so.[93]

The Court also stated in that case that the mere "potential unavailability of reliquidation… sufficiently demonstrates irreparable harm."[94] In light of the fact that this Court itself has expressed uncertainty of the scope of its equitable power to order reliquidation in 1581(i) cases, there is a "potential unavailability of reliquidation" in this case, which establishes irreparable harm to SeAH Steel absent an injunction preventing liquidation.

---

[92] *See NMB Singapore Ltd. v. United States*, 120 F.Supp.2d 1135, 1139 (Ct. Intl Trade 2000).

[93] *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2021).

[94] *Id*. at 1362. .

In sum, Defendant has failed to put forth any argument that undermines SeAH Steel's position related to the likelihood of success on the merits, the threat of immediate irreparable harm, public interest, or balance of hardship. In these circumstances, we ask the Court to grant SeAH Steel's Motion and issue a preliminary injunction against liquidation of SeAH Steel's entries during the period until a final and conclusive court decision.

## CONCLUSION

In light of the foregoing, SeAH Steel respectfully requests that the Court dismiss Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and grant SeAH Steel's Motion for Preliminary Injunction to Enjoin Liquidation of Entries.

Respectfully submitted,

/s/ Jeffrey M. Winton

Jeffrey M. Winton
Michael Chapman
Amrietha Nellan
Vi N. Mai
Rachel Hauser

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC 20005
(202) 774-5500

Attorneys for SeAH Steel Corporation

August 21, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the portion of the brief for the response in Opposition to Defendant's Motion to Dismiss contains 7,594 words including headings, footnotes, and quotations; and the portion of the brief for the reply in Support of Plaintiff's Motion for Preliminary Injunction to Enjoin Liquidation contains 2,012 words including headings, footnotes, and quotations. The word counts noted above do not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, counsel's signature block, or any other parts of the brief exempted from the word limitation.

/s/ Jeffrey M. Winton

August 21, 2026

# ATTACHMENT 1

Domestic Interested Parties' Case Brief

Barcode:4829533-01 A-580-897 REV - Admin Review 5/1/23 - 4/30/24

wiley

PUBLIC VERSION

September 19, 2025

DOC Case No. A-580-897
Total Pages: 34
Administrative Review for the POR: 05/01/2023 – 04/30/2024
AD/CVD Operations, E&C Office VIII
Hyundai Steel's Business Proprietary Information Removed from Pages: i, 2, 10-11
SeAH Steel's Business Proprietary Information Removed from Pages: i, 3-5, 12-16, 18
**PUBLIC VERSION**

The Honorable Howard W. Lutnick
Secretary of Commerce
International Trade Administration
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

**Re:** ***Large Diameter Welded Pipe from the Republic of Korea:*** Case Brief

Dear Secretary Lutnick,

On behalf of the American Line Pipe Producers Association Trade Committee, we respectfully submit the enclosed case brief, in accordance with 19 C.F.R. § 351.309(c), for the consideration of the U.S. Department of Commerce in its upcoming final results. This case brief is timely filed.[1]

[1] *Large Diameter Welded Pipe from the Republic of Korea*, 90 Fed. Reg. 42,192 (Dep't Commerce Aug. 29, 2025) (prelim. results of antidumping duty admin. rev.; 2023-2024).

Filed By: tbrightbill@wiley.law, Filed Date: 9/22/25 4:40 PM, Submission Status: Approved

* * *

If you have any questions regarding this submission, please do not hesitate to contact us.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.
Paul A. Devamithran, Esq.

*Counsel to the American Line Pipe Producers Association Trade Committee*

***Large Diameter Welded Pipe from the Republic of Korea***
**Case No. A-580-897**
**Administrative Review POR 05/01/2023-04/30/2024**

# PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2025, and in accordance with 19 C.F.R. § 351.303(f)(1)(i), the foregoing public submission was filed electronically on ACCESS and service has been effectuated on the parties on the Public Service List issued by the U.S. Department of Commerce in the above-captioned proceeding.

*/s/ Elizabeth S. Lee*
Elizabeth S. Lee, Esq.

Barcode:4829533-01 A-580-897 REV - Admin Review 5/1/23 - 4/30/24



DOC Case No. A-580-897
Total Pages: 31
Administrative Review for the POR:
05/01/2023 – 04/30/2024
AD/CVD Operations, E&C Office VIII
Hyundai Steel's Business Proprietary Information
Removed from Pages: i, 2, 10-11
SeAH Steel's Business Proprietary Information
Removed from Pages: i, 3-5, 12-16, 18
PUBLIC VERSION

BEFORE THE
INTERNATIONAL TRADE ADMINISTRATION OF THE
U.S. DEPARTMENT OF COMMERCE

# LARGE DIAMETER WELDED PIPE FROM THE REPUBLIC OF KOREA

ON BEHALF OF:
THE AMERICAN LINE PIPE PRODUCERS ASSOCIATION TRADE COMMITTEE

# CASE BRIEF

**Timothy C. Brightbill, Esq.**
**Laura El-Sabaawi, Esq.**
**Elizabeth S. Lee, Esq.**
**Paul A. Devamithran, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

***Counsel to the American Line Pipe Producers Association Trade Committee***

**Dated: September 19, 2025**

Filed By: tbrightbill@wiley.law, Filed Date: 9/22/25 4:40 PM, Submission Status: Approved

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. SUMMARY OF ARGUMENT ........ 1

III. ARGUMENT ........ 8

A. Issues Related to Hyundai Steel ........ 8

1. The Department Should Not Adjust HM Price For Hyundai's Unsupported Billing Adjustments ........ 8

2. The Department Should Exclude Hyundai's [ ] **{Hyudai's BPI}** from G&A Calculation ........ 10

3. The Department Should Exclude [ ] **{Hyudai's BPI}** from Hyundai's INTEX Calculation ........ 10

B. Issues Related to SeAH ........ 12

1. The Department Should Not Allow Investment-Related Offsets to SeAH's G&A Expenses ........ 12

2. The Department Should Not Allow SeAH [ ] **{SeAH's BPI}** G&A Expenses for "Provision Transferred" ........ 13

3. SeAH Steel Inappropriately Excluded from the Reported Costs Custom Duties on Imported Materials ........ 14

4. State Pipe Omitted Certain Costs from Cost of Further Manufacturing ........ 15

5. State Pipe's G&A Expense Ratio Must Be Calculated on Company-Wide Basis ........ 16

6. Fields FURGNA and FURINT Must Be Recalculated by Applying the Ratios to the Further Manufacturing Costs Plus the Cost of the Imported LDWP ........ 18

7. Application of Further Manufacturing G&A Expenses ........ 19

C. The Department Should Apply Zeroing to All Sales Comparisons and Deny Offsets by Assigning a Value of Zero to Non-Dumped Sales ........ 20

1. Background ........ 20

2. The Statute Is Best Read to Require Zeroing ........ 21

3. 19 U.S.C. § 1677(35)(A)-(B) Requires Zeroing ........ 22

4. 19 U.S.C. § 1677f-1(d) Requires Zeroing ........ 23

5. There Are No Procedural Limitations to the Department's Restoration of Zeroing ........ 25

IV. CONCLUSION ........ 26

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bowe Passat Reinigungs-Und Waschereitechnik Gmbh v. United States*,
926 F. Supp. 1138 (Ct. Int'l Trade 1996) ....................20

*China Steel Corp. v. United States*,
393 F. Supp. 3d 1322 (Ct. Int'l Trade 2019) ....................8

*Corus Staal BV v. U.S. Dep't of Com.*,
395 F.3d 1343 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 1023 (2006) ....................20

*Dongbu Steel Co. v. United States*,
635 F.3d 1363 (Fed. Cir. 2011)....................20

*Leocal v. Ashcroft*,
543 U.S. 1 (2004)....................23

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)....................7, 21, 22, 25

*Loughrin v. United States*,
573 U.S. 351 (2014)....................24

*Serampore Indus. PVT. Ltd. v. U.S. Dep't of Com, Int'l Trade Admin.*,
675 F. Supp. 1354 (Ct. Int'l Trade 1987) ....................20

*Timken Co. v. United States*,
354 F.3d 1334 (Fed. Cir. 2004)....................20, 23

*U.S. Steel Corp. v. United States*,
621 F.3d 1351 (Fed. Cir. 2010)....................21, 24

*Williams v. Taylor*,
529 U.S. 362 (2000)....................24

## Statutes

19 U.S.C. § 1677(35)(A)....................7, 22

19 U.S.C. § 1677(35)(A)-(B)....................22

19 U.S.C. § 1677f-1(d) ....................23

19 U.S.C. § 1677f-1(d)(1)(A) ....................7

19 U.S.C. § 1677f-1(d)(1)(A)(i) ....................23

19 U.S.C. § 1677f-1(d)(1)(A)(ii) ....................23

19 U.S.C. § 3512(a) ....................8

19 U.S.C. § 3512(a)(1)....................25

**Regulations**

19 C.F.R § 351.401(c)....................1, 8, 9, 10

**Other Authorities**

*Antidumping Proceedings*, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) ....................21

*Antidumping Proceedings*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012)....................21, 25

*Certain Cold-Rolled Steel Flat Products From Brazil*, 81 Fed. Reg. 44,946 (Dep't Commerce July 29, 2016) ....................6

*Certain Steel Concrete Reinforcing Bars From Turkey*, 69 Fed. Reg. 64,731 (Dep't Commerce Nov. 8, 2004) ....................4, 24

*Certain Steel Concrete Reinforcing Bars From Turkey*, 71 Fed. Reg. 65,082 (Dep't Commerce Nov. 7, 2006) ....................13

*Certain Steel Nails From Taiwan*, 80 Fed. Reg. 28, 959 (Dep't Commerce May 20, 2015) ....................5

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 86 Fed. Reg. 35,060 (Dep't Commerce July 1, 2021)....................3

*Large Diameter Welded Pipe from the Republic of Korea*, 90 Fed. Reg. 42,192 (Dep't Commerce Aug. 29, 2025)....................1

*Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 Fed. Reg. 15,641, 15,644-45 (Mar. 24, 2016) ....................8, 9

Off. of the President, *America First Trade Policy* (Jan. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/america-first-trade-policy/ ....................7, 8, 25

Panel Report, *United States – Final Anti-dumping Measures on Stainless Steel from Mexico*, WTO Doc. WT/DS344/RW ....................24

Panel Report, *United States – Measures Relating to Zeroing and Sunset Reviews*, WTO Doc. WT/DS322/R....................24

*Stainless Steel Sheet and Strip in Coils from Mexico*, 74 Fed. Reg. 6,365 (Dep't Commerce Feb. 9, 2009)....................14

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994....................8, 23, 25

*Welded Line Pipe From the Republic of Korea*, 88 Fed. Reg. 42,295 (Dep't Commerce June 30, 2023) ....................5

*Welded Line Pipe from the Republic of Korea*, 89 Fed. Reg. 35,060 (Dep't Commerce May 1, 2024) .................... 6, 17, 19-20



Filed By: tbrightbill@wiley.law, Filed Date: 9/22/25 4:40 PM, Submission Status: Approved

# I. INTRODUCTION

On behalf of the American Line Pipe Producers Association Trade Committee (the "Committee"), we hereby submit the following case brief for consideration by the U.S. Department of Commerce (the "Department") in the administrative review of the antidumping duty order on *Large Diameter Welded Pipe from the Republic of Korea*, Case Number A-580-897, for the period from May 1, 2023 through April 30, 2024. This case brief is timely filed.[2] For the final results, the Committee respectfully requests that the Department revise its preliminary calculations as detailed herein.

# II. SUMMARY OF ARGUMENT

## A. Issues Related to Hyundai Steel

### 1. Whether the Department Should Adjust HM Price For Hyundai's Unsupported Billing Adjustments?

No. The Department's practice pursuant to 19 C.F.R § 351.401(c), which has been upheld by the U.S. Court of International Trade ("CIT"), is not to accept post-sale adjustments unless a respondent can demonstrate whether the terms and conditions of the adjustment were established or known at the time of sale. Hyundai Steel Company ("Hyundai Steel" or "Hyundai") indicates that its reported billing adjustments relate to 1) the correction of invoicing errors; 2) non-error price adjustments; 3) additional minor processing charges; and 4) customer incentives such as quantity and cash (transfer) discounts.[3] The company did not differentiate between these billing

---

[2] *Large Diameter Welded Pipe from the Republic of Korea*, 90 Fed. Reg. 42,192 (Dep't Commerce Aug. 29, 2025) (prelim. results of antidumping duty admin. rev.; 2023-2024).

[3] Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Large Diameter Welded Pipe from the Republic of Korea: Hyundai Steel's Sections B-D Questionnaire Response* (Sept. 30, 2024) at B-33 – B-34 ("Hyundai Steel BCDQR").

adjustments and reported a single combined BILLADJH field.[4] Nowhere did Hyundai provide any documentation to demonstrate that the conditions of its non-error price adjustments and customer incentives were established at the time of sale. As such, the Department should set the BILLADJH field to zero for all HM sales. Although the BILLADJH field also captures invoicing errors and other charges, the record lacks the detail needed to separately identify the types of adjustments reported under BILLADJH.

**2. Whether the Department Should Exclude Hyundai's [ ] from G&A Calculation?**

Yes. Hyundai Steel failed to clarify the nature of this amount or demonstrate why it should be included as an offset.[5] There is thus no basis for the Department to allow this portion of the offset.

**3. Whether the Department Should Exclude Should Exclude [ ] from Hyundai's INTEX Calculation?**

Yes. Hyundai did not demonstrate that the reported short-term assets were interest-bearing. As such, the Department should exclude both the "Short-term Financial Asset" of KRW [ ] and the "Short-term Other Financial Asset" of KRW [ ] from the calculation of the interest income offset for the final results.[6] In addition, the Department should exclude "Gain on disposal of financial assets at FVPL" in the amount of KRW [ ] and "Gain on valuation of financial assets at FVPL" in the amount of KRW [ ].[7] The

---

4 *Id.* at Exhibit B-1.

5 *Id.* at Exhibit D-12.

6 *Id.* at Exhibit D-13.

7 *Id.*

Department generally considers financial assets at FVPL to be investment-related, and excludes them from net interest expense calculations.[8]

### B. Issues Related to SeAH Steel

#### 1. Whether the Department Should Allow Investment-Related Offsets to SeAH's G&A Expenses?

No. Consistent with its practice, the Department should disallow the "Gain on Disposal of Stock Using Equity Method" offset to SeAH Steel's G&A expenses.[9] SeAH Steel claims that this income is not investment related because "the shares SeAH holds in its subsidiaries are not for financial investment purposes, but for the operation of its overall business operations," and, therefore, "the revenue derived from such disposal is properly treated as an offset to SeAH's G&A expenses."[10] However, any equity in other entities by definition represents investments, and income from such assets clearly represents an investment-related item and should be excluded from the calculations.

#### 2. Whether the Department Should Allow SeAH [ ] G&A Expenses for "Provision Transferred"?

No. SeAH Steel's SG&A expenses include "Provision Transferred" in the [ ] amount of KRW [ ].[11] The company provided no additional explanations regarding this

---

8 *See, e.g.,* Issues and Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 86 Fed. Reg. 35,060 (Dep't Commerce July 1, 2021) (final results of antidumping duty admin. rev.; 2018-2019) (ACCESS Barcode: 4137701-02) at cmt. 13 ("We agree with the petitioner regarding the gains and losses on the valuation and disposal of financial assets. The record evidence demonstrates that these gains and losses are related to investment activity.") ("*HWRPT from Korea* IDM").

9 *See* Letter from Winton & Chapman PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Large Diameter Welded Pipe from Korea – Response to the Department's June 13 Supplemental Questionnaire* (June 30, 2025) at Exhibit SD-4 ("SeAH SQR").

10 *Id.* at 17.

11 *See* Letter from Winton & Chapman PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Large Diameter Welded Pipe from Korea – Response to Sections B, C, D, and E of Department's August 1 Questionnaire* (Sept. 30, 2024) at Exhibit D-15 ("SeAH BQR," "SeAH CQR," "SeAH DQR," and "SeAH EQR"); SeAH SQR at Exhibit SD-3-B.

[ ] G&A expenses. The name of the account, *i.e.*, "Provision Transferred," appears to imply that a corresponding [ ] amount was booked in some other account. There is no evidence that [ ] were included in [ ]. In addition, provisions with [ ] most often represent reversals of prior period provisions. Consistent with its practice,[12] the Department should not allow [ ] G&A expenses for "Provision Transferred" in the final results.

### 3. **Whether SeAH Inappropriately Excluded from the Reported Costs Custom Duties on Imported Materials?**

Yes. The Department's "Instructions for Submitting COP and CV Data File" in the antidumping duty questionnaire specify that direct material cost should include import duties.[13] The company acknowledged that the "COGS for Others" reconciling item that was excluded from the reported costs contained "customs duties on imported materials."[14] The Department should include the account that includes customs duties in the reported costs either by adding it to the reported COM, or, as an acceptable shortcut, add its fiscal year version to SeAH Steel's G&A expenses.[15]

### 4. **Whether State Pipe Omitted Certain Costs from Cost of Further Manufacturing?**

Yes. According to the trial balance in Appendix E-7-3, the U.S. Divisions [ ] *i.e.*, [

---

12 *See* Issues and Decision Memorandum accompanying *Certain Steel Concrete Reinforcing Bars From Turkey*, 69 Fed. Reg. 64,731 (Dep't Commerce Nov. 8, 2004) (final results, rescission of antidumping duty admin. rev. in part, and deter. not to revoke in part) at cmt. 20 ("*Rebar from Turkey 2004*").

13 *See* Antidumping Request for Information, *Large Diameter Welded Pipe from the Republic of Korea* (Aug. 1, 2024) at D-18 ("SeAH Initial Questionnaire").

14 SeAH SQR at 23.

15 *Id.* at Exhibit SD-6-A.

] in the amount of USD[ ].[16] All costs involved in moving the merchandise under consideration (MUC) from the U.S. port of entry to the further manufacturer should be included in the cost of further manufacturing. State Pipe failed to provide any details about this account, *i.e.*, whether any portion of it was related to sales. According to the U.S. Division's trial balance in Appendix E-7-3, however, there is a dedicated account for [ ], *i.e.*, account [ ]. Therefore, it would be reasonable to assume that the entire balance of account [ ] pertains to [ ], and should be included in the reported cost of further manufacturing.

### 5. <u>Whether State Pipe's G&A Expense Ratio Must be Calculated on a Company-Wide Basis?</u>

Yes. In its G&A expense ratio calculations in Appendix E-6, State Pipe excluded all SG&A expenses of "Non-Subject Divisions" (*i.e.*, the divisions other than the U.S. Divisions). G&A expenses by their nature belong to the company's operations as a whole, even if they were booked at some other division, and under the Department's practice should not be excluded from the G&A expense calculations.[17]

### 6. <u>Whether Fields FURGNA and FURINT Must Be Recalculated by Applying the Ratios to the Further Manufacturing Costs Plus the Cost of the Imported LDWP?</u>

Yes. State Pipe calculated its G&A expense ratios by dividing the G&A expenses by the costs of goods sold inclusive of the cost of the processed MUC.[18] Similarly, SeAH Steel Holdings

---

16 SeAH EQR at Appendix E-7-3.1.

17 *See* Issues and Decision Memorandum accompanying *Certain Steel Nails From Taiwan*, 80 Fed. Reg. 28,959 (Dep't Commerce May 20, 2015) (final deter. of sales at less than fair value) at cmt. 13 (ACCESS Barcode: 3276397-02) ("*Certain Steel Nails from Taiwan* IDM"); Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 88 Fed. Reg. 42,295 (Dep't Commerce June 30, 2023) (final results of antidumping duty admin. rev.; 2020-2021) at cmt. 11 ("*WLP from Korea 2020-2021*").

18 SeAH EQR at Appendix E-6.

Corporation's ("SSHC's") consolidated interest ratio that was used to calculate the values in field FURINT was based on a full cost of goods sold.[19] However, to calculate the values in fields FURGNA and FURINT, these ratios were applied only to the cost of further processing.[20] This is inappropriate because the denominators of the ratios and the amount they are being applied to should be on the same basis. The Department should recalculate State Pipe's values in fields FURGNA and FURINT by applying the ratios to the total cost of the further manufactured products, *i.e.*, the further manufacturing costs plus the cost of the imported LDWP that was further manufactured, consistent with its practice.[21]

#### 7. Whether the Department Should Allocate State Pipe's G&A Expenses to Both Reselling and Further Manufacturing Activities?

Yes. The Department has previously rejected the argument that if an affiliated company engages in both further manufacturing and reselling activities, the statute prohibits the recognition of all G&A expenses.[22] Consistent with its practice, the Department should allocate State Pipe's G&A expenses to both reselling and further manufacturing activities.

### C. Whether the Department Should Apply Zeroing to All Sales Comparisons and Deny Offsets by Assigning a Value of Zero to Non-Dumped Sales

Yes. In the final results, the Department should apply zeroing regardless of comparison method, *i.e.*, deny offsets to positive dumping margins by assigning a value of zero to non-dumped

---

19 SeAH DQR at 50-51.

20 SeAH EQR at 14.

21 *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products From Brazil*, 81 Fed. Reg. 44,946 (Dep't Commerce July 29, 2016) (final deter. of sales at less than fair value) at cmt. 7 (ACCESS Barcode: 3489882-02) ("*Certain Cold-Rolled Steel Flat Products from Brazil* IDM"); Issues and Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea*, 89 Fed. Reg. 35,060 (Dep't Commerce May 1, 2024) (final results of antidumping duty admin. rev.; 2021-2022) at cmt 2 (ACCESS Barcode: 4549704-02) ("*WLP from Korea AR 21-22* IDM").

22 *See WLP from Korea AR 21-22* IDM at cmt 2.

sales. Zeroing will enable the Department to address the full extent of dumping in most cases. If the Department decides not to apply zeroing across the board, the agency should at a minimum continue to faithfully implement the targeted dumping provision of the statute by using the same differential pricing analysis that it used in the preliminary results.

The statute requires zeroing. The statute defines "dumping margin" as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."[23] The best reading of this provision is that the Department may only calculate a dumping margin when normal value is greater than U.S. price. When normal value does not exceed U.S. price, the negative margins must be disregarded, *i.e.*, zeroed. This reading flows from the ordinary meaning of the term "exceeds." In addition, in 19 U.S.C. § 1677f-1(d)(1)(A), Congress directed the Department to compare normal values to U.S. prices using two different methodologies in two different scenarios: the average-to-average method in normal investigations and the average-to-transaction method in investigations with targeted dumping. The language and structure of the statute further demonstrate that zeroing is required regardless of comparison method. Otherwise, the different methodologies could yield the same results and render meaningless this part of the statute, contrary to well-established principles of statutory interpretation. In light of the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ("*Loper Bright*") as well as the President's "America First Trade Policy" memorandum directing the Department to "review policies and regulations regarding the application of antidumping and countervailing duty (AD/CVD) laws, including with regard

---

[23] 19 U.S.C. § 1677(35)(A) (emphasis added).

to . . . 'zeroing,'"[24] the Department should again apply zeroing regardless of comparison method, which is the best reading of the statute.

There are no procedural limitations to the Department's restoration of zeroing. The Department does not need to follow the requirements of Section 123 ("Section 123") of the Uruguay Round Agreement Act ("URAA") (19 U.S.C. § 3533), which is limited to instances in which the Department is implementing an adverse World Trade Organization ("WTO") report. The Department is also not bound by prior Section 123 determinations that purport to prohibit zeroing. 19 U.S.C. § 3512(a) provides that "{n}o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect." As zeroing is required by the statute, any application of WTO law to the contrary is inconsistent with U.S. law and cannot have effect.

## III. ARGUMENT

### A. Issues Related to Hyundai Steel

#### 1. The Department Should Not Adjust HM Price For Hyundai's Unsupported Billing Adjustments

The Department's practice pursuant to 19 C.F.R § 351.401(c), which has been upheld by the CIT, is not to accept post-sale adjustments unless a respondent can demonstrate whether the terms and conditions of the adjustment were established or known at the time of sale.[25] As the

[24] Off. of the President, *America First Trade Policy* (Jan. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/america-first-trade-policy/ ("America First Trade Policy").

[25] 19 C.F.R. § 351.401(c); *Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 Fed. Reg. 15,641, 15,644-45 (Mar. 24, 2016) (final modification) ("*Final Modification*"); *China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1346-1349 (Ct. Int'l Trade 2019).

Department has explained, it revised 19 C.F.R. § 351.401(c) in order to prevent the manipulation of dumping calculations vis-à-vis after-the-fact, or post-sale, adjustments:

> "…in proposing certain modifications to 19 CFR 351.102(b)(38) and 19 CFR 351.401(c), was intended to codify the Department's intent to prevent such potentially manipulative post-sale price adjustments. As discussed below, in this final rule the Department has made further modifications to these regulations to clarify that the Department does not intend to accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Department, its entitlement to such an adjustment. These final modifications continue to be consistent with the Department's statutory authority, in setting the "starting price" of normal value or export price, and prevent the potential manipulation of dumping margins through certain post-sale price adjustments."[26]

Hyundai indicates that its reported billing adjustments relate to 1) the correction of invoicing errors; 2) non-error price adjustments; 3) additional minor processing charges; and 4) customer incentives such as quantity and cash (transfer) discounts.[27] The company did not differentiate between these types of billing adjustments in its reported HM database, but rather reported a single combined BILLADJH field.[28] Moreover, nowhere did Hyundai provide any documentation to demonstrate that the conditions of its non-error price adjustments and customer incentives were established at the time of sale. These are the very types of potentially manipulative post-sale price adjustments that the Department' s modification to its regulations seeks to prevent. Yet, the record does not contain any related written agreements, discount schedules, or other similar documentation detailing the terms of these adjustments.

Undocumented, verbal arrangements with home market customers provides Hyundai with the opportunity to retroactively revise discount rates and customer incentives at their own discretion to secure larger adjustments to home market price. If the Department adjusts home

---

26 *Final Modification* at 15,644.

27 Hyundai Steel BCDQR at B-33 – B-34.

28 *Id.* at Exhibit B-1.

market price for these unsupported adjustments, it opens the door to the very same manipulation it acted to prevent pursuant to the revision to 19 C.F.R. § 351.401(c). Accordingly, for the final results, the Department should set the BILLADJH field to zero for all HM sales. Although the BILLADJH field also captures invoicing errors and other charges, the record lacks the detail needed to separately identify the types of adjustments reported under BILLADJH. The only way that the Department can eliminate the potential for manipulation is to deny all reported BILLADJH amounts.

### 2. The Department Should Exclude Hyundai's [ ] from G&A Calculation

In Exhibit D-12, Hyundai Steel included a G&A offset categorized under [ ]," amounting to KRW [ ].[29] Hyundai Steel failed to clarify the nature of this amount or demonstrate why it should be included as an offset. As such, there is no basis for the Department to allow this portion of the offset. For the final results, the Department should exclude KRW [ ] from the offset and revise the G&A calculation for Hyundai Steel accordingly.

### 3. The Department Should Exclude [ ] from Hyundai's INTEX Calculation

In its net interest expense ratio calculations in Exhibit D-13,[30] Hyundai estimated the short-term portion of the interest income offset. As part of these calculations, Hyundai reported total short-term interest-bearing assets at the end of FY2023 in the amount of KRW [ ].[31] To support this figure, Hyundai identified components of the total short-term interest-bearing

29 *Id.* at Exhibit D-12.

30 *Id.* at Exhibit D-13.

31 *Id.*

assets as "Short-term Financial Asset" and "Short-term Other Financial Asset," amounting to KRW [ ] and KRW [ ], respectively.

However, Hyundai failed to specify the nature of the assets included in the "Short-term Financial Asset" category or demonstrate that these assets were indeed interest-generating. This omission is inconsistent with the Department's instructions in the Section D questionnaire, which clearly require respondents to "{d}emonstrate the short-term nature of the short-term interest."[32] Because Hyundai did not demonstrate that the reported short-term assets were interest-bearing, the Department should exclude both the "Short-term Financial Asset" of KRW [ ] and the "Short-term Other Financial Asset" of KRW [ ] from the calculation of the interest income offset for the final results.[33]

Additionally, in Exhibit D-13, Hyundai included "Gain on disposal of financial assets at FVPL" in the amount of KRW [ ] and "Gain on valuation of financial assets at FVPL" in the amount of KRW [ ].[34] The Department generally considers financial assets at FVPL to be investment-related, and excludes them from net interest expense calculations.[35] Therefore, the Department should also exclude these line items in the final results.

---

32 *Id.* at D-48.

33 **{Hyundai's BPI}**

34 *Id.* at Exhibit D-13. **{Hyundai's BPI}**

35 *See, e.g., HWRPT from Korea* IDM at cmt. 13 ("We agree with the petitioner regarding the gains and losses on the valuation and disposal of financial assets. The record evidence demonstrates that these gains and losses are related to investment activity.").

### B. Issues Related to SeAH

#### 1. <u>The Department Should Not Allow Investment-Related Offsets to SeAH's G&A Expenses</u>

SeAH Steel included as an offset against to its G&A expenses "Gain on Disposal of Stock Using Equity Method" in the amount of KRW[ ] thousand.[36] SeAH Steel claims that this income is not investment related because "the shares SeAH holds in its subsidiaries are not for financial investment purposes, but for the operation of its overall business operations," and, therefore, "the revenue derived from such disposal is properly treated as an offset to SeAH's G&A expenses."[37]

However, any equity in other entities by definition represents investments, and income from such assets clearly represents an investment-related item and should be excluded from the calculations. The Department specifically addressed these types of items in *HWRPT from Korea*:

> It is {the Department}'s practice to exclude investment-related gains and losses from the calculation of the COP. Investment activities are a separate profit-making activity not related to the company's normal operations. Therefore, for the final results, we have excluded these investment-related activities (*i.e.*, dividend income, depreciation on investment properties, <u>gain or loss on disposal of investment properties, impairment losses on investment in subsidiary, and gains on disposition of subsidiary</u>) from the calculation of SSHC's and SHC's net profit or loss associated with determining whether the services provided to the respondent occurred at arm's-length prices.[38]

Similarly, in *Rebar from Turkey 2006*, the Department stated:

> Based on information obtained at verification, we determined that it is not appropriate to treat "sale income from affiliates" as an offset to Diler's G&A expenses because it relates to the sale of stock and is considered an investment

---

36 *See* SeAH SQR at Exhibit SD-4. **{SeAH Steel's BPI}**

37 *Id.* at 17.

38 *See HWRPT from Korea* IDM at cmt. 7 (emphasis added).

> activity by the Department. It is the Department's practice not to allow gains and losses from investment activity in the reported cost calculations.[39]

Consistent with its practice, the Department should disallow the "Gain on Disposal of Stock Using Equity Method" offset to SeAH Steel's G&A expenses.

### 2. The Department Should Not Allow SeAH [ ] G&A Expenses for "Provision Transferred"

SeAH Steel's SG&A expenses include "Provision Transferred" in the [ ] amount of KRW [ ].[40] The company provided no additional explanations regarding this [ ] G&A expenses. The Department must thus rely on the information available regarding the nature of this item, including the label. In general, when deciding whether a particular income item should be included in the G&A expenses, the Department considers the nature of the item, whether corresponding costs were included, and the period it relates to. For example, in *Rebar from Turkey 2006*, the Department explained:

> To determine whether it is appropriate to include or exclude a particular income or expense item, the Department reviews the nature of each item, its relationship to the general operations of the company, and how such items are recorded in the normal books and records of the respondent (*i.e.*, whether they are included in the overall G&A account or within a COGS account).
>
> …
>
> Based on the Department's testing of significant items within the other income and profit account at verification, we determined that the income offset for rental income from vehicles should be disallowed because the related expenses were not included in the submitted G&A expenses. We allowed the income related to hotel activities because the related hotel expenses are included in Yazici's Demir's G&A expenses.[41]

---

39 *See* Issues and Decision Memorandum accompanying *Certain Steel Concrete Reinforcing Bars From Turkey*, 71 Fed. Reg. 65,082 (Dep't Commerce Nov. 7, 2006) (final results and rescission of antidumping duty admin. rev. in part) at cmt. 9 ("*Rebar from Turkey 2006*").

40 *See* SeAH DQR at Exhibit D-15; SeAH SQR at Exhibit SD-3-B.

41 *See Rebar from Turkey 2006* at cmt. 9.

In the current case, the name of the account, *i.e.*, "Provision Transferred," appears to imply that a corresponding [ ] amount was booked in some other account. However, a review of the trial balance in Exhibit SD-3B did not reveal a matching [ ] amount anywhere. Thus, there is no evidence that [ ] were included in [ ].

In addition, provisions with [ ] most often represent reversals of prior period provisions. The Department has consistently expressed its policy on this issue. For example, in *Rebar from Turkey 2004*, the Department explained:

> ICDAS included certain income and expense items in its reported G&A expense rate which resulted from the reversal of expense and income items related to prior periods. The Department's established practice in calculating the G&A expense rate is to include only expense and income items that relate to the current period. … Because the reversal of prior period provisions for income and expense items do not relate to costs incurred in the current period, we have excluded from the G&A calculation the reversal of both the income and expense items in question.[42]

Thus, based on the information available, the Department should not allow [ ] G&A expenses for "Provision Transferred" in the final results.

### 3. SeAH Steel Inappropriately Excluded from the Reported Costs Custom Duties on Imported Materials

The Department's "Instructions for Submitting COP and CV Data File" in the antidumping duty questionnaire specify that direct material cost should include import duties.[43] SeAH Steel claimed that it did "include the applicable import duties on its purchases of imported raw material in the cost of manufacture recorded in its normal accounting records," and, "{a}ccordingly, the reported direct materials costs include the amount of any duties paid on purchases of imported raw

---

[42] *See Rebar from Turkey 2004* at cmt. 20; *see also* Issues and Decision Memorandum accompanying *Stainless Steel Sheet and Strip in Coils from Mexico*, 74 Fed. Reg. 6,365 (Dep't Commerce Feb. 9, 2009) (final results of antidumping duty admin. rev.) at cmt. 7 (where the respondent was not permitted to offset its G&A expenses with the reversal of a provision relating to the respondent's over-estimation of the costs associated with a disposal of fixed assets during the previous year).

[43] *See* SeAH Initial Questionnaire at D-18.

material."[44] However, as the company has acknowledged, the "COGS for Others" reconciling item that was excluded from the reported costs contained "customs duties on imported materials."[45]

By tracing the "COGS for Others" from Exhibit SD-6-A-1 to the accounts that comprised this item in the trial balance in Exhibit SD-6-A-2, the Committee identified the customs duties in question as account [ ], in the fiscal year and period of review amounts of KRW[ ] and KRW[ ], respectively.[46] Notably, according to Exhibit SD-6-A-2, column "Treatment in Response," this account was supposed to be [ ].

Accordingly, for the final results, the Department should include this account in the reported costs either by adding it to the reported COM, or, as an acceptable shortcut, add its fiscal year version to SeAH Steel's G&A expenses.

#### 4. State Pipe Omitted Certain Costs from Cost of Further Manufacturing

State Pipe's reported cost of further manufacturing does not include any costs from the cost of goods sold from its audited income statement because the company claimed that all the costs associated with further processing of the MUC were booked only in SG&A expenses:

> The costs for the State Pipe employees at the storage locations where the LDWP was processed, and the costs for any utilities and supplies consumed in the processing at those locations, are recorded as part of State Pipe's selling, general and administrative ("SG&A") expenses. As a result, the in-house processing at State Pipe's storage locations does not affect the inventory value of the processed item or the cost of goods sold recognized when those processed items are sold.[47]

---

[44] SeAH DQR at 47.

[45] SeAH SQR at 23.

[46] *Id.* at Exhibit SD-6-A.

[47] SeAH EQR at 7.

State Pipe also claimed that it "did not incur any direct materials costs in connection with further processing of LDWP."[48]

However, according to the trial balance in Appendix E-7-3, the U.S. Divisions' [ ] *i.e.*, [ ] in the amount of USD[ ].[49] It should be noted that while the cost of imported merchandise obviously should not be included in the cost of further manufacturing, all costs involved in moving the MUC from the U.S. port of entry to the further manufacturer should be.

State Pipe failed to provide any details about this account, *i.e.*, whether any portion of it was related to sales. Meanwhile, according to the U.S. Divisions' trial balance in Appendix E-7-3, there is a dedicated account for [ ], *i.e.*, account [ ]. Therefore, for the final results, it would be reasonable to assume that the entire balance of account [ ] pertains to [ ], and therefore should be included in the reported cost of further manufacturing.

### 5. <u>State Pipe's G&A Expense Ratio Must Be Calculated on Company-Wide Basis</u>

As shown in State Pipe's G&A ratio calculations in Appendix E-6, the company calculated its G&A expense ratio by dividing G&A expenses of the U.S. Divisions by [ ].[50] Specifically, in its G&A expense ratio calculations in Appendix E-6, State Pipe excluded all SG&A expenses of "Non-Subject Divisions" (*i.e.*, the divisions other than the U.S. Divisions). While it might be appropriate to exclude certain expenses already reported elsewhere,

---

48 *Id.* at 12.

49 *Id.* at Appendix E-7-3.

50 *Id.* at Appendix E-6.

G&A expenses by their nature belong to the company's operations as a whole, even if they were booked at some other division, and under the Department's practice should not be excluded from the G&A expense calculations:

> {T}he Department has, over time, developed a consistent and predictable practice for calculating and allocating G&A expenses. This reasonable, consistent, and predictable method is to calculate the rate based on the company-wide G&A costs incurred by the producing company allocated over the producing company's company-wide COGS, and not on a consolidated, divisional, or product-specific basis. Moreover, the nature of G&A expenses is that they relate to the administration of the company as a whole.[51]

This policy is also reflected in the Department's "Instructions for Submitting Further Manufacturing Cost Data File" in the antidumping duty questionnaire: "Compute the G&A expense ratio on an annual basis as a ratio of the company's total G&A expenses divided by its total cost of sales."[52]

Contrary to the Department's long-established practice, State Pipe calculated its G&A expense ratio at the divisional, and not company-wide level. This very issue has already been discussed in parallel proceedings involving SeAH Steel, where the Department explained:

> We agree with the Domestic Interested Parties that it is appropriate to base the further manufacturing G&A on the company-wide figures, and not exclude other divisions' G&A expenses from State Pipe's G&A expense ratio. It is {the Department}'s practice to calculate the G&A ratio by dividing the company-wide G&A expenses by the company-wide total costs of goods sold. While we recognize that in previous segments of this case we have accepted SeAH's methodology, for this review we have revised State Pipe's G&A accordingly in accordance with our practice to rely on company-wide G&A expenses.[53]

---

51 *See Certain Steel Nails from Taiwan* IDM at cmt. 13.

52 See SeAH Initial Questionnaire at E-10.

53 *WLP from Korea 2020-2021* at cmt. 11.

Therefore, in the final results the Department should revise State Pipe's G&A expense ratio on the company-wide basis as follows (see Appendix E-6):

| | USD |
|---|---|
| Total G&A expenses of Non-Subject Divisions | [ ] |
| Total G&A expenses of U.S. Divisions | [ ] |
| State Pipe total G&A expenses | [ ] |
| State Pipe Cost of Goods Sold | [ ] |
| State Pipe G&A Expense Ratio | [ ]% |

### 6. **Fields FURGNA and FURINT Must Be Recalculated by Applying the Ratios to the Further Manufacturing Costs Plus the Cost of the Imported LDWP**

As shown in Appendix E-6, State Pipe calculated its G&A expense ratios by dividing the G&A expenses by the costs of goods sold inclusive of the cost of the processed MUC.[54] Similarly, SSHC's consolidated interest ratio that was used to calculate the values in field FURINT was based on a full cost of goods sold.[55] However, to calculate the values in fields FURGNA and FURINT, these ratios were applied only to the cost of further processing.[56] This is inappropriate because the denominators of the ratios and the amount they are being applied to should be on the same basis:

> However, we also agree with CSN that the denominator to the G&A expense ratio and the per-unit costs to which it is applied must be on the same basis. Thus, if we are now applying the G&A expense ratio to the total cost of all further manufactured and non-further manufactured goods, then the denominator of the ratio, which as reported includes only further processing costs, must be revised to include not only the further processing costs, but also the cost of the imported coils

54 SeAH EQR at Appendix E-6.

55 SeAH DQR at 50-51.

56 SeAH EQR at 14.

> that were further processed, as well as the cost of all non-further manufactured products.[57]

The Department reaffirmed this policy in a parallel proceeding involving SeAH Steel, stating that "{the Department} has determined that ratios should be applied on the same basis as the per-unit costs to which the ratios are applied."[58]

Therefore, for the final results, the Department should recalculate State Pipe's values in fields FURGNA and FURINT by applying the ratios to the total cost of the further manufactured products, *i.e.*, the further manufacturing costs plus the cost of the imported LDWP that was further manufactured.

### 7. Application of Further Manufacturing G&A Expenses

SeAH Steel has argued that "if an affiliated company engages in both further manufacturing and reselling activities, the statute prohibits the recognition of all G&A expenses."[59] The Department disagreed with SeAH Steel, and provided a detailed rational for its determination, explaining that:

> {I}f all G&A expenses incurred by an affiliated U.S. reseller can be treated as indirect selling expenses when the affiliated U.S. reseller only performs reselling activities, and all G&A expenses incurred by an affiliated U.S. further-manufacturer/reseller can be treated as further manufacturing expenses when the affiliated U.S. further manufacturer/reseller performs both further manufacturing and reselling activities, **{the Department} has the authority to allocate G&A expenses to both types of activities when both activities occur and to make appropriate deductions.** Thus, the statute directs {the Department} to reduce the U.S. price by any selling expenses and further manufacturing costs.
> …
> **Therefore, we find that {the Department}'s method for allocating State Pipe's G&A expenses as either further manufacturing or indirect selling expenses is based on a reasonable interpretation of sections 772(d)(1)(D) and 772(d)(2) of**

[57] *See, e.g., Certain Cold-Rolled Steel Flat Products from Brazil* IDM at cmt. 7.

[58] *See WLP from Korea AR 21-22* IDM at cmt 2.

[59] *See WLP from Korea 2020-2021* at cmt. 11.


Filed By: tbrightbill@wiley.law, Filed Date: 9/22/25 4:40 PM, Submission Status: Approved

> **the Act.** Consequently, consistent with the *Preliminary Results* and *OCTG 2018-2019 Final Results*, we continue to include State Pipe's G&A expenses (revised as noted above) in our calculations as either further manufacturing or indirect selling expenses, pursuant to section 772(d)(1)(D) of the Act.[60]

Consistent with its determination in *WLP from Korea 2020-2021*, the Department should allocate State Pipe's G&A expenses to both reselling and further manufacturing activities.

### C. The Department Should Apply Zeroing to All Sales Comparisons and Deny Offsets by Assigning a Value of Zero to Non-Dumped Sales

In the final results, the Department should apply zeroing to all sales comparisons in calculating the weighted-average dumping margins, *i.e.*, to deny offsets to positive dumping margins by assigning a value of zero to non-dumped sales. Zeroing will enable the Department to address the full extent of dumping in most cases. If the Department decides not to apply zeroing across the board, the agency should at a minimum continue to faithfully implement the targeted dumping provision of the statute by using the same differential pricing analysis that it used in the preliminary results.[61]

#### 1. <u>Background</u>

Historically, the Department's practice was to apply the zeroing methodology regardless of comparison method and treat all non-dumped sales as having zero dumping margins for purposes of calculating respondents' weighted-average dumping margins. This practice was upheld by U.S. courts.[62] Notwithstanding sustained judicial approval of zeroing, prior administrations chose

---

[60] *Id.* (emphasis added).

[61] *See generally id.*

[62] *See, e.g.*, *Serampore Indus. PVT. Ltd. v. U.S. Dep't of Com, Int'l Trade Admin.*, 675 F. Supp. 1354 (Ct. Int'l Trade 1987); *Bowe Passat Reinigungs-Und Waschereitechnik Gmbh v. United States*, 926 F. Supp. 1138 (Ct. Int'l Trade 1996); *Corus Staal BV v. U.S. Dep't of Com.*, 395 F.3d 1343, 1346 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 1023 (2006) (holding that "zeroing is in fact permissible in administrative investigations" and "{the Department} is not obligated to incorporate WTO procedures into its interpretation of U.S. law"); *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (holding that the Department may apply its zeroing methodology in administrative reviews and that the zeroing methodology "makes practical sense"); *see also Dongbu Steel Co. v. United States*, 635


Filed By: tbrightbill@wiley.law, Filed Date: 9/22/25 4:40 PM, Submission Status: Approved

to cease zeroing after adverse WTO decisions.[63] Those WTO determinations were wrong, and the Department should reconsider its current practice. In fact, President Trump, on his first day in office, issued an "America First Trade Policy" memorandum to the Secretary of Commerce directing the agency to "review policies and regulations regarding the application of antidumping and countervailing duty (AD/CVD) laws, including with regard to … 'zeroing.'"[64] In light of this, as well as the Supreme Court's recent decision in *Loper Bright*, the Department should again apply zeroing regardless of comparison method. This is the best reading of the statute.

### 2. <u>The Statute Is Best Read to Require Zeroing</u>

The Supreme Court overruled *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* ("*Chevron*") in *Loper Bright,* holding that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous" and rejected *Chevron*'s "presum{ption} that statutory ambiguities are implicit delegations to agencies."[65] In such cases, courts must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity."[66] Although agency interpretations may be accorded "due respect," especially "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," ultimately "{c}ourts must exercise their independent judgment in deciding whether an agency has

F.3d 1363, 1365 (Fed. Cir. 2011) (holding that the Department must apply zeroing consistently across reviews and investigations and noting seven instances where the Federal Circuit has upheld zeroing).

[63] *See Antidumping Proceedings*, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) (calculation of the weighted-average dumping margin during an antidumping inv.; final modification) ("*Antidumping Proceedings during AD Inv.*"); *Antidumping Proceedings*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012) (calculation of the weighted-average dumping margin and assessment rate in certain antidumping duty proceedings; final modification); *see also U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1354 (Fed. Cir. 2010).

[64] America First Trade Policy.

[65] *Loper Bright*, 603 U.S. at 399.

[66] *See id.* at 373.

acted within its statutory authority."[67] Following *Loper Bright*, an agency action taken on the basis of a statutory interpretation that is not the "best reading" of the statute is unlawful. The best reading of the antidumping statute is to apply zeroing regardless of comparison method.

### 3. 19 U.S.C. § 1677(35)(A)-(B) Requires Zeroing

The statute defines "dumping margin" as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."[68] The statute also defines "weighted average dumping margin" as "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer."[69] The best reading of these provisions is to require a "dumping margin" to be calculated when normal value is greater than, *i.e.*, exceeds the export price or constructed export price, and not when normal value is less than such prices. A calculation methodology that includes instances in which normal value is less than the export price or constructed price is thus inconsistent with the statute. The statute does not use a value-neutral term, such as the "difference between" normal value and U.S. price, which could permit normal value to be either greater than or less than U.S. price and allow the calculation of both positive and negative dumping margins. Instead, the statute indicates that the Department may only calculate a dumping margin when normal value is greater than U.S. price, which limits dumping margins to positive margins. Thus, when normal value does not exceed U.S. price, the negative margins must be disregarded, or zeroed, in the numerator of the dumping margin calculation.

---

67 *Id.* at 370, 394, and 412.

68 19 U.S.C. § 1677(35)(A) (emphasis added).

69 *Id.* § 1677(35)(B).

This reading flows from the ordinary meaning of the term "exceeds," as demonstrated in dictionary definitions. Dictionaries from the period in which the URAA was adopted defined "exceed" as "to be or go beyond (the given or supposed limit, measure, or quantity)," or "1. To be greater than; surpass. 2. To go beyond the limits of."[70] Current dictionaries likewise define "exceed" as "to be greater than or superior to"; "to go beyond a limit set by"; and "to extend outside of."[71] Statutes must be interpreted to "give words their 'ordinary or natural' meaning."[72] It defies basic mathematical logic for a smaller number to "be greater than" or "go beyond" a larger number. An interpretation otherwise would be an unnatural and out-of-ordinary meaning of "exceed," and not the best reading of the statute.

### 4. <u>19 U.S.C. § 1677f-1(d) Requires Zeroing</u>

19 U.S.C. § 1677f-1(d) further demonstrates that the antidumping statute is best read to require zeroing. This provision directs the Department to compare normal values to U.S. prices using two different methodologies in two different scenarios:

1. In normal investigations (*i.e.*, those without targeted dumping), the Department is to use the "average-to-average" comparison method and compare weighted average normal values to weighted average U.S. prices;[73] and
2. In investigations with targeted dumping, the Department is to use the "average-to-transaction" comparison method and compare weighted average normal values to individual U.S. transaction prices.

---

70 *Timken Co.*, 354 F.3d at 1341 (citing Webster's New Twentieth Century Dictionary of the English Language Unabridged (2d. ed. 1980) and The American Heritage College Dictionary (3d. ed. 1993)).

71 *Exceed*, Merriam-Webster, available at www.merriam-webster.com/dictionary/exceed (last accessed August 3, 2024).

72 *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)).

73 *See* 19 U.S.C. § 1677f-1(d)(1)(A)(i). The statute also authorizes the Department to compare individual home market transactions to individual U.S. transaction prices. *See* 19 U.S.C. § 1677f-1(d)(1)(A)(ii). This "transaction-to-transaction" methodology is used infrequently and intended for cases where "there are very few sales and the merchandise sold in each market is identical or very similar or is custom made." *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 842 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178.

The language and structure of the statute indicate that Congress intended for the different methodologies to yield different margin outcomes. Otherwise, the requirement to use a given methodology in a given scenario would be meaningless. Without zeroing, however, that is the result. Specifically, the average-to-transaction methodology mathematically yields the same result as the average-to-average methodology without zeroing, as the U.S. Government has argued before the WTO.[74] It makes sense that Congress structured the statute this way because these provisions were adopted while the Department was still applying the zeroing methodology.[75]

It is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute{.}"[76] Further, "'when Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume{s} that Congress intended a difference in meaning.'"[77] To interpret the statute to not require zeroing would render meaningless the specific language directing the Department to use different calculation methods in different investigations and thus, would be contrary to these principles of statutory interpretation.

74 *See, e.g.*, Panel Report, *United States – Final Anti-dumping Measures on Stainless Steel from Mexico*, WTO Doc. WT/DS344/RW (adopted Dec. 20, 2007) at para. 7.70; Panel Report, *United States – Measures Relating to Zeroing and Sunset Reviews*, WTO Doc. WT/DS322/R (adopted Sept. 20, 2006) at para. 4.154. *In U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1363 (Fed. Cir. 2010), after the Department modified its practice to apply offsetting methodology instead of zeroing methodology in response to the WTO decisions, the agency defended its position by arguing, *inter alia*, that different outcomes would be preserved between the two calculation methods because the agency would continue to use zeroing in targeted dumping investigations. Even if the Department continues to apply zeroing in targeted dumping investigations, the fact remains that the comparison method chosen by Congress for use in normal investigations would itself have no independent impact on the margin outcome absent zeroing, contrary to the clear requirement in the statute that the Department specifically use the average-to-average method (and not use the average-to-transaction method) in normal investigations.

75 *See U.S. Steel*, 621 F.3d at 1362-63.

76 *Williams v. Taylor*, 529 U.S. 362, 364 (2000).

77 *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

### 5. There Are No Procedural Limitations to the Department's Restoration of Zeroing

The Department does not need to follow the requirements of Section 123 of the URAA to restore zeroing pursuant to *Loper Bright* and the President's "America First Trade Policy" memorandum. Section 123 describes procedures necessary before the Department may modify its practice "in the implementation of {a WTO} report" that "finds . . . that a regulation or practice of {the Department} is inconsistent with any of the Uruguay Round Agreements." Section 123 is inapplicable here, where there is no adverse WTO report being implemented, and the Department would be modifying its practice to comply with Congress's mandate in the statute.

The Department is also not bound by the Section 123 determination issued in 2006, which modified the agency's zeroing practice following the adverse WTO ruling.[78] 19 U.S.C. § 3512(a)(1) provides that "{n}o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect." As demonstrated above, zeroing in all comparison methods is required by the statute, and any application of WTO law that purports to prohibit this practice, such as the Section 123 determination in 2006, is inconsistent with U.S. law and cannot have effect. The prior Section 123 determination is thus not binding on the Department.

Under the best reading of the antidumping statute, the Department is required to zero non-dumped sales regardless of comparison method and should do so in the final results in this review. If the Department nonetheless decides not to apply the zeroing methodology when using the average-to-average comparison method in this proceeding, it should at a minimum continue to

---

78 *See Antidumping Proceedings*, 71 Fed. Reg. 77,722.

faithfully implement the targeted dumping provision of the statute by using the same differential pricing analysis that it used in the preliminary results.

## IV. CONCLUSION

The Committee respectfully requests that the Department reach its final results in this proceeding consistent with the arguments made above.

* * *

If you have any questions regarding this submission, please do not hesitate to contact us.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.
Paul A. Devamithran, Esq.

*Counsel to the American Line Pipe Producers Association Trade Committee*

ATTACHMENT 2

Welded Line Pipe from Korea 2020-2021 Antidumping Review
Issues and Decision Memorandum

Barcode:4394279-02 A-580-876 REV - Admin Review 12/1/20 - 11/30/21

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-580-876
Administrative Review
POR: 12/01/2020-11/30/2021
**Public Document**
E&C/OIX: AS/PG

June 26, 2023

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations e

**FROM:** Scot Fullerton
Associate Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for the Final Results of the 2020-2021 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from Korea

---

## I. SUMMARY

We analyzed the comments of the interested parties in the 2020-2021 administrative review of the antidumping duty (AD) order covering welded line pipe (WLP) from the Republic of Korea (Korea).[1] As a result of our analysis, we made certain changes to the margin calculations from the *Preliminary Results* for the mandatory respondents NEXTEEL Co., Ltd. (NEXTEEL) and SeAH Steel Corporation (SeAH).[2] We recommend that you approve the positions described in the "Discussion of Issues" section of this memorandum. Below is the complete list of issues in this administrative review for which we received comments from the interested parties:

Comment 1: Treatment of NEXTEEL's Non-Prime Products
Comment 2: NEXTEEL's Quarterly Cost
Comment 3: NEXTEEL's Suspended Production Lines
Comment 4: NEXTEEL's Obsolete Hot Rolled Steel Coil
Comment 5: Treatment of Cost of Goods Sold (COGS) assigned to SeAH's Headquarters
Comment 6: SeAH's Scrap Offset
Comment 7: SeAH's General and Administrative (G&A) Expenses
Comment 8: SeAH's Interest Expense Ratio
Comment 9: Reconciliation of State Pipe & Supply, Inc.'s (State Pipe's) Cost of Further Manufacturing

---

[1] *See Welded Line Pipe from the Republic of Korea and the Republic of Turkey: Antidumping Duty Orders*, 80 FR 75056 (December 1, 2015) (*Order*).
[2] *See Welded Line Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021*, 87 FR 80156 (December 29, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

Filed By: Paul Gill, Filed Date: 6/27/23 12:10 PM, Submission Status: Approved

Comment 10: State Pipe's COGS Accounts
Comment 11: State Pipe's G&A Expenses
Comment 12: State Pipe's Loan Forgiveness
Comment 13: Whether SeAH's Reported Movement Expenses Should Be Deducted from its Home Market Price
Comment 14: Whether Commerce Should Use SeAH's Reported Surrogate Costs
Comment 15: SeAH's Constructed Export Price (CEP) Offset
Comment 16: Differential Pricing Methodology
Comment 17: SeAH's Assessment Rates

## II. BACKGROUND

On December 29, 2022, the U.S. Department of Commerce (Commerce) published the *Preliminary Results* of this administrative review. This review covers 31 producers and/or exporters. Commerce selected NEXTEEL and SeAH for individual examination.[3] The period of review (POR) is December 1, 2020, through November 30, 2021.

We invited parties to comment on the *Preliminary Results*.[4] On February 6, 2023, we received case briefs from American Cast Iron Pipe Company, Dura-Bond Industries, Stupp Corporation, Welspun Global Trade LLC, and Axis Pipe & Tube (Domestic Interested Parties), NEXTEEL, and SeAH.[5] On February 14, 2023, we received rebuttal briefs from Domestic Interested Parties, NEXTEEL, and SeAH, as well as a letter in-lieu-of a rebuttal brief from Hyundai Steel Company.[6] On April 6, 2023, we extended the final results of this review to no later than June 27, 2023.[7]

## III. MARGIN CALCULATIONS

For NEXTEEL and SeAH, we calculated CEP and normal value (NV) using the same methodology stated in the *Preliminary Results*, except as follows:[8]

- We made a revision to the calculation of quarterly costs for NEXTEEL and SeAH. Specifically, we corrected an issue affecting the cost recovery test whereby the

---

[3] *See* Memorandum, "Respondent Selection," dated February 22, 2022.
[4] *See Preliminary Results*, 87 FR at 80157.
[5] *See* Domestic Interested Parties' Letter, "Case Brief," dated February 6, 2023 (Domestic Interested Parties' Case Brief); NEXTEEL's Letter, "NEXTEEL's Case Brief," dated February 6, 2023 (NEXTEEL's Case Brief); and SeAH's Letter, "Case Brief of SeAH Steel Corporation," dated February 6, 2023 (SeAH's Case Brief).
[6] *See* Domestic Interested Parties' Letter, "Rebuttal Brief," dated February 14, 2023 (Domestic Interested Parties' Rebuttal Brief); NEXTEEL's Letter, "NEXTEEL's Rebuttal Brief," dated February 14, 2023 (NEXTEEL's Rebuttal Brief); SeAH's Letter, "Rebuttal Brief of SeAH Steel Corporation," dated February 14, 2023 (SeAH's Rebuttal Brief); and Hyundai Steel Company's Letter, "Letter in Support of Mandatory Respondents' Case and Rebuttal Briefs," dated February 14, 2023.
[7] *See* Memorandum, "Extension of Deadline for Final Results of 2020-2021 Antidumping Duty Administrative Review," dated April 6, 2023.
[8] *See* Memorandum, "Final Results Margin Calculation for NEXTEEL" (NEXTEEL's Final Calculation Memo); and Memorandum, "SeAH Final Calculation Memorandum" (SeAH Final Calculation Memo), both dated concurrently with this memorandum.

programming language inadvertently excluded one quarter when calculating the quarterly average cost of production (COP).[9]

- In the *Preliminary Results*, the market economy Macros SAS program used in the calculation of NEXTEEL and SeAH's weighted-average dumping margins inadvertently failed to implement Commerce's practice of matching weighted-average sales in the U.S. and home markets by month within the same quarter of the POR. We revised our calculations for NEXTEEL and SeAH to correct this error.[10]
- We revised our calculations for NEXTEEL to include the average, per-unit direct materials (DIRMAT) costs it provided for quarter zero (Q0). *See* Comment 2, below.
- We made certain adjustments to SeAH's G&A and financial expense ratios. *See* Comments 7, 8, 11, and 12, below.
- We revised SeAH's home market movement expenses to include the freight expenses incurred to transport merchandise to the unaffiliated processor (*i.e.*, INLFTPH and FTPLNSMH). *See* Comment 13, below.

## IV. DISCUSSION OF ISSUES

### Comment 1: Treatment of NEXTEEL's Non-Prime Products

*Domestic Interested Parties' Case Brief*

- NEXTEEL's non-prime merchandise should be treated as by-product because it cannot be sold as subject merchandise.[11]
- NEXTEEL calculated the cost of producing non-prime merchandise in the same manner it calculated the cost of producing prime products. NEXTEEL claims this approach is correct and consistent with the Court of Appeals for the Federal Circuit's (Federal Circuit's) decision in *Dillinger*.[12] However, in *Dillinger*, the non-prime product at issue was still sold and used as in-scope steel plate.[13]
- NEXTEEL acknowledged that Commerce previously determined that non-prime products that cannot be used in oil and gas applications fall outside the scope of the *Order*.[14]
- NEXTEEL's customers would not attempt to use non-prime WLP in applications meant for WLP due to potential liabilities and costs of a pipe failure.[15]
- NEXTEEL does not promote non-prime products under any categories within its marketing materials.[16]
- It is not appropriate to treat NEXTEEL's non-prime products as subject merchandise, and therefore, NEXTEEL's reported costs should be allocated to prime products. NEXTEEL

[9] *Id.*
[10] *Id.*
[11] *See* Domestic Interested Parties' Case Brief at 5.
[12] *Id.* at 6 (citing *Dillinger France S.A. v. United States*, 981 F. 3d 1318, 1323 (Fed. Circ. 2020) (*Dillinger*)).
[13] *Id.* at 6.
[14] *Id.*
[15] *Id.* at 7.
[16] *Id.*

should be granted a by-product offset based on the actual sales value of the non-prime products.[17]

*NEXTEEL's Rebuttal Brief*

- NEXTEEL does not calculate costs differently for prime and non-prime products and incurs the same production costs for prime and non-prime products.[18]
- At the end of the production process, NEXTEEL examines whether a product is prime or non-prime. NEXTEEL flags any non-prime products in its production records but does not otherwise alter product codes on the basis of prime versus non-prime distinction.[19]
- NEXTEEL does not maintain a separate general ledger account, journal entries, or inventory movement information pertaining to the reclassification of products from prime to non-prime products in the ordinary course of business.[20]
- Prior to the *Preliminary Results*, the Domestic Interested Parties similarly argued that NEXTEEL treated its non-prime products as subject merchandise when these products should have instead been treated as by-products. However, Commerce declined to make the corresponding by-product and cost-allocation adjustments that the Domestic Interested Parties desired.[21]
- In the fourth administrative review regarding the *Order*, Commerce faced essentially the same facts and arguments, and made no adjustments (under a by-product theory or otherwise) to NEXTEEL's reported non-prime production costs.[22]
- Commerce's decision regarding NEXTEEL's reporting should be guided by whether NEXTEEL's reported costs are "based on the records…kept in accordance with the generally accepted accounting principles {GAAP} of the exporting country (or producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."[23]
- NEXTEEL's reporting reflects its normal accounting records and practices, which are in line with the Korean GAAP. NEXTEEL's treatment of non-prime production is wholly logical because the non-prime products use the same materials and undergo the same production process as prime products.[24]
- In *Dillinger*, the respondent reported the costs of non-prime products based on the average COP of all plate (prime and non-prime), despite the fact that the respondent recorded the costs for non-prime plate in its normal books and records based on the likely selling price. Commerce adjusted costs as reported to reflect the likely selling price, on the logic that costs should be reported as they appear in the respondent's books and records. However, the Federal Circuit rejected this logic, finding that prior precedent has

[17] *Id.*
[18] *See* NEXTEEL's Rebuttal Brief at 2.
[19] *Id.*
[20] *Id.* at 2-3.
[21] *Id.* at 3.
[22] *Id.* at 3-4.
[23] *Id.* at 4.
[24] *Id.* at 5.

directed Commerce to use the actual costs of production as the basis of costs under the statute.[25]

- In *Dillinger*, the Federal Circuit's reasoning did not depend on whether the prime and non-prime products at issue were within the scope of the order. The Federal Circuit's analysis focused on the actual costs the respondent incurred in making the prime and non-prime products.[26]
- The Domestic Interested Parties cannot support their claim that NEXTEEL's non-prime products should be considered by-products, and furthermore, whether a product is covered by the scope does not determine whether it is a by-product.[27]
- Non-prime pipe is not an unavoidable and distinguishable product emanating from pipe production, rather it is an unintended result in the attempted production of the primary product. Therefore, it is still the primary product, even when not successfully manufactured to the intended specifications.[28]

**Commerce's Position:** We disagree with the Domestic Interested Parties that it would be appropriate to adjust NEXTEEL's non-prime costs to its sales value. In its normal books and records, NEXTEEL calculates the cost for non-prime products in the same manner as prime products.[29] As NEXTEEL claimed, it neither classifies prime and non-prime products separately, nor does it value these products differently for inventory purposes, because the costs incurred in manufacturing them are the same. Given that NEXTEEL's reported costs reflect the actual costs of producing its prime and non-prime products, for purposes of these final results, and consistent with the Federal Circuit's decision in *Dillinger* (in which it determined Commerce is required to determine the actual costs of non-prime products),[30] we are relying on the costs NEXTEEL reported in its normal books and records. Also, in contrast to the Domestic Interested Parties' claims, the Federal Circuit's decision in *Dillinger* does not rest on whether the non-prime products at issue fall within the scope of the orders.[31] Therefore, whether non-prime welded line pipe is covered by the scope of this *Order* has no effect on our position here.

**Comment 2: NEXTEEL's Quarterly Cost**

*Domestic Interested Parties' Case Brief*

- Commerce's decision to request that NEXTEEL provide cost data for Q0 is contrary to established practice and significantly prejudices the Domestic Interested Parties' ability to participate in this proceeding.[32]

---

[25] *Id.* at 5-6.
[26] *Id.* at 6.
[27] *Id.*
[28] *Id.* at 7.
[29] *See* NEXTEEL's Letter, "NEXTEEL's Sections C and D Questionnaire Response," dated April 20, 2022 (NEXTEEL's IQCDR), at D-20; *see also* NEXTEEL's Letter, "NEXTEEL's Supplemental Section D Questionnaire Response," dated November 29, 2022 (NEXTEEL's November SQDR) at 2.
[30] *See Dillinger*, 981 F. 3d at 1324.
[31] *Id.*
[32] *See* Domestic Interested Parties' Case Brief at 8.

- Commerce's practice is to apply surrogate costs from the POR to control numbers (CONNUMs) that were not produced during the POR.[33] Commerce outlined its practice in proceedings such as *LDWP from Canada*.[34]
- No party has argued that Commerce's decision to use NEXTEEL's quarter one (Q1) average, per-unit DIRMAT cost as a surrogate for NEXTEEL's Q0 average, per-unit DIRMAT cost is distortive or inaccurate.[35]
- Domestic Interested Parties would be materially prejudiced if Commerce decides to accept critical cost information from NEXTEEL this late in the proceeding. NEXTEEL submitted these cost data to the record 11 days before the briefing deadline, and therefore, the Domestic Interested Parties were deprived of an opportunity to sufficiently analyze and comment on these data.[36]
- Commerce should disregard NEXTEEL's submitted cost data for Q0 and continue relying on NEXTEEL's Q1 average, per-unit DIRMAT cost to derive NEXTEEL's Q0 average, per-unit DIRMAT cost.[37]

*NEXTEEL's Rebuttal Brief*

- Commerce assigned the average, per-unit DIRMAT calculated for Q1 to Q0, but Commerce explained that this approach would be limited to the *Preliminary Results* because Commerce intended to request that NEXTEEL report cost data for Q0 that could be used in the margin calculations for the final results.[38]
- After the *Preliminary Results*, Commerce requested that NEXTEEL provide the monthly inventory movement schedule for hot-rolled coil (HRC) for Q0.[39]
- The Domestic Interested Parties provide no reason for why it would be more reasonable, accurate, or better to use Q1 surrogate data for Q0 instead of actual data NEXTEEL provided for Q0.[40]
- The Domestic Interested Parties cite *LDWP from Canada* to support their claim that Commerce's practice is to use surrogate costs from the POR for CONNUMs that are not produced during the POR. However, the cited practice is irrelevant to situation at hand because it applies to proceedings that do not necessitate applying a quarterly cost methodology.[41]
- In a typical cost case (*i.e.*, without quarterly costing), the substitution of one CONNUM cost with another, while imperfect, does not suffer any distortions related to the timing of production (as in these typical situations, costs have not fluctuated throughout the entire POR). In stark contrast, Commerce applies the quarterly costing methodology precisely because costs changed significantly during the POR, and therefore, it would introduce an

---

33 *Id.*
34 *Id.* at 8-9 (citing *Large Diameter Welded Line Pipe from Canada: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 FR 71580 (November 23, 2022) (*LDWP from Canada*), and accompanying Issues and Decision Memorandum (IDM) at Comment 4).
35 *Id.* at 9.
36 *Id.*
37 *Id.*
38 *See* NEXTEEL's Rebuttal Brief at 9.
39 *Id.*
40 *Id.*
41 *Id.* at 10.

unacceptable distortion to apply any cost from one period as a surrogate for a different period. Hence, the Domestic Interested Parties' proposal that Commerce continue to rely on NEXTEEL's Q1 average, per-unit DIRMAT as a surrogate for NEXTEEL's Q0 average, per-unit DIRMAT would allow distortion to remain in Commerce's margin calculations. [42]

- The Domestic Interested Parties had ample time to review NEXTEEL's January 26, 2023, submission containing Q0 cost data. Commerce granted the Domestic Interested Parties' request that the deadline for case briefs be extended to 10 days after the date that NEXTEEL's supplemental response regarding Q0 cost was due.[43]

**Commerce's Position:** In the *Preliminary Results*, Commerce determined that the price of HRC fluctuated significantly during the POR, and as a result, NEXTEEL's cost of manufacturing (COM) significantly fluctuated during the POR.[44] Thus, Commerce applied its quarterly cost methodology to NEXTEEL's cost reporting. This decision necessitated the collection of cost data for CONNUMs that were not produced during the POR (*i.e.*, CONNUMs produced in Q0) because applying any cost from any period of the POR as a surrogate for subject merchandise produced in a different period of the POR would introduce an unacceptable distortion due to the significant fluctuations in COM. Therefore, Commerce solicited Q0 cost information from NEXTEEL to ensure that quarter-to-quarter changes in COM were accounted for ahead of the final results of this review.[45] We noted our intention to obtain Q0 cost data from NEXTEEL in the *Preliminary Results*, stating that, "after the preliminary results, we intend to request that NEXTEEL report cost data for Q0 for use in our final results margin calculations."[46]

We disagree with the Domestic Interested Parties' argument that Commerce should use costs of producing subject merchandise during the POR as surrogate cost data for subject merchandise produced prior to the POR. The Domestic Interested Parties rely on *LDWP from Canada* as support for their position; however, *LDWP from Canada* did not involve the use of quarterly costs, meaning that Commerce was able to follow its typical practice of using annualized costs as surrogate costs for subject merchandise produced before the POR. This approach is impermissible in a quarterly cost situation because it includes an underlying assumption that major input prices have not significantly changed during the POR, but quarterly cost methodology is applied specifically in instances where input prices did significantly fluctuate during the POR. Therefore, Commerce cannot follow its typical practice because it cannot use a cost from one quarter of the POR as a surrogate for another quarter of the POR because doing so would not account for significant input price changes.[47]

Furthermore, we disagree that the Domestic Interested Parties did not have an opportunity to analyze and comment on NEXTEEL's Q0 data. Commerce granted an extension to the deadline for case briefs, and the Domestic Interested Parties used this extension to include arguments in

---

[42] *Id*. at 10-11
[43] *Id*. at 11.
[44] *See Preliminary Results* PDM at 12-13.
[45] *See* Commerce's Letter, "Supplemental Questionnaire," dated January 19, 2023.
[46] *Id*. at 3.
[47] *See e.g.*, *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review, 2020-2021; Correction*, 88 FR 30726 (May 4, 2023), and accompanying IDM.

their case brief regarding whether Commerce should accept NEXTEEL's Q0 cost data.[48] We have reviewed the Domestic Interested Parties' comments on this issue and do not agree with the logic they have presented. Consequently, we have included NEXTEEL's reported Q0 costs in our analysis for purposes of calculating NEXTEEL's quarterly costs for these final results.

**Comment 3: NEXTEEL's Suspended Production Lines**

*NEXTEEL's Case Brief*

- NEXTEEL has reported that none of its production lines were permanently suspended during the POR.[49] Therefore, NEXTEEL treated costs associated with these temporarily suspended production lines as COGS, as these costs related to ongoing production.[50]
- During the POR, NEXTEEL suspended the operation of one of its production lines (not related to the production of subject merchandise) due to lack of sufficient staff to operate it due to the COVID-19 pandemic. Suspending production due to a lack of sufficient personnel is akin to a temporary shutdown due to maintenance issues because the shutdown was expected to be short in nature.[51]
- As for other production lines that faced suspension during the POR, NEXTEEL has not made any official determinations to permanently suspend them, and therefore, NEXTEEL appropriately treated the suspensions of these lines during the POR as temporary.[52]
- Commerce's revision of the G&A expenses is not consistent with the statute, which directs Commerce to rely upon a company's normal books and records when they are prepared in accordance with the home country's GAAP and reasonably reflect the COP.[53]
- The suspended loss was not included in NEXTEEL's reported costs because it was recognized as COGS, in accordance with Korean GAAP.[54]
- In *NEXTEEL*, the U.S. Court of International Trade (CIT) instructed that "if NEXTEEL suspended production for only part of the POR, {Commerce} should explain why NEXTEEL's costs as reported for those lines would not be 'reasonably reflective of the cost associated with the production and sale of merchandise,'" as required by the statute.[55]
- Commerce should reconsider its reallocation of NEXTEEL's costs associated with the suspended lines to G&A expenses for the final results.[56]

---

[48] *See* Domestic Interested Parties Case Brief at 8-9.
[49] *See* NEXTEEL's Case Brief at 2; *see also* NEXTEEL's November SQDR at 2.
[50] *See* NEXTEEL's Case Brief at 2.
[51] *Id.* at 2-3.
[52] *Id.* at 3.
[53] *Id.* at 3-4.
[54] *Id.* at 4.
[55] *Id.* at 5-6 (citing *NEXTEEL Co. v. United States*, Slip Op. 22-135 (CIT December 6, 2022) (*NEXTEEL*)).
[56] *Id.* at 6.

*Domestic Interested Parties' Rebuttal Brief*

- Commerce should include the suspended production loss in the reported COP by reclassifying the amount in question from COGS to G&A expenses, which is consistent with its practice.[57]
- Commerce's practice is to consider the costs for extended production shutdowns to be related to the general operations of the company as a whole, not to the cost of producing the goods associated with suspended production lines.[58]
- Under Commerce's practice, expenses related to idle assets should be included in G&A expenses. For example, in *Silicomanganese from India*, the agency explained, "This inclusion of depreciation on idle assets in G&A expenses is in conformity with the standard practice of the Department… Even though an asset may be idle, the expenses associated with that asset are part of the general expense burden of the company which is attributable to all sales of the company. There is no basis on which to assign the expenses of idle assets to merchandise they were employed in producing before being idled."[59]

**Commerce's Position:** We disagree with NEXTEEL and, consistent with our practice, we have continued to classify the suspended losses as G&A expenses and deduct them from the COGS denominator for purposes of these final results. In this case, NEXTEEL recognized certain expenses associated with suspended production lines related to non-WLP products. These suspension expenses were transferred directly to the COGS, in accordance with NEXTEEL's normal accounting treatment.[60] Commerce's normal practice is to include routine shutdown expenses (*i.e.*, maintenance shutdowns) in a respondent's reported costs and to associate them to the products produced on those lines.[61]

However, in the instant review, the suspended loss is not related to a routine shutdown; rather, it relates to NEXTEEL's suspension of production on certain lines for a period of time.[62] During the POR, there were two production lines that were suspended for the whole POR and one production line that was suspended for eleven months of the POR.[63] Unlike a routine maintenance shutdown, once a production line is suspended for an extended period of time, it no longer relates to ongoing production. A company can suspend production lines for numerous reasons, but regardless of the reason for the extended suspension of production activity, in contrast to routine maintenance shutdowns, products are not produced on those production lines to recover the costs associated with them.

---

[57] *See* Domestic Interested Parties' Rebuttal Brief at 15.
[58] *Id*. at 21.
[59] *Id*. at 21-22 (citing *See Silicomanganese from India: Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances Determination*, 67 FR 15531 (April 2, 2002) (*Silicomanganese from India*), and accompanying IDM at Comment 12).
[60] *See* NEXTEEL's IQCDR at D-13.
[61] *See Gray Portland Cement and Clinker from Mexico: Final Results of Antidumping Duty Administrative Review*, 62 FR 17148 (April 9, 1997), and accompanying IDM at Comment 9.
[62] *See* NEXTEEL's IQCDR at D-13.
[63] *See* NEXTEEL's November SQDR at Exhibit SD-2-c.

Further, we disagree with NEXTEEL that Commerce should follow the treatment of the suspended losses in the company's normal books and records and not recognize them as part of Commerce's analysis. The costs of suspended lines were transferred directly to the COGS, in accordance with NEXTEEL's normal accounting treatment.[64] In accordance with section 773(f)(1)(A) of the Tariff Act of 1930, as amended (the Act), Commerce normally relies on data from a respondent's normal books and records when those records are prepared in accordance with the GAAP of the exporting country and reasonably reflect the costs associated with the production and sales of merchandise. However, in those instances where Commerce determines that a company's normal books and records do not reasonably reflect the production costs of the merchandise under review, Commerce' practice has been to adjust these costs as necessary.[65] The costs in question, which NEXTEEL excluded, are not assigned to product costs in NEXTEEL's cost accounting system, and are not included in overhead costs or G&A expenses, but rather, are expensed in aggregate directly to COGS.

Commerce's normal practice in determining whether particular items should be included in G&A expenses is to review the nature of the item and its relation to the general operations of the company as a whole.[66] Here NEXTEEL suspended certain production lines for an extended period of time during the POR. No revenue from any products normally produced on those lines was generated for the period of suspension because those production lines were not producing products; however, the cost of maintaining the lines for future operations continued to be incurred.[67] As such, the costs associated with the suspended production lines were necessarily covered by all the other products NEXTEEL produced. Commerce reasonably associated these costs with the general operations of the company as a whole (*i.e.*, with the production and sale of all products), and not specifically to products associated with those production lines as there were no products produced and sold from those suspended production lines. Section 773(b)(3)(B) of the Act directs Commerce to include as part of COP costs associated with the general operations of the company (*i.e.*, normal costs that are not directly associated with a product). Therefore, Commerce's treatment of these costs as G&A expenses does not contravene the statute. In fact, in the prior review of this instant case, the CIT upheld Commerce's reclassification of the suspended losses to G&A.[68] The CIT stated that although a company may shut down production lines from time to time for various intervals, at some point an extended shut down suggests that the costs of the product line are more akin to expenses borne by the company in its general operations.[69]

Finally, with respect to one production line that was suspended for a major part of the POR, we disagree with NEXTEEL that we should accept its reporting of the suspended production line losses in COGS, consistent with its books and records. Although there were products produced at the beginning of the POR, the products that were produced on the suspended line in question prior to the shutdown have already been assigned all direct costs incurred on that line while it

[64] *Id.*
[65] *See Acetone from the Republic of Korea: Final Determination in the Less-Than-Fair-Value Investigation*, 85 FR 8252 (February 13, 2020) (*Acetone from Korea*), and accompanying IDM at Comment 1.
[66] *See Magnesium Metal from the Russian Federation: Notice of Final Determination of Sales at Less Than Fair Value*, 70 FR 9041 (February 24, 2005), and accompanying IDM at Comment 10.
[67] *See* NEXTEEL's IQCDR at D-13; *see also* NEXTEEL's November SQDR at 2-3.
[68] *See Husteel Co., Ltd. et al. v. United States*, Slip Op. 21-70 (CIT 2021) at 18.
[69] *Id.*

was in operation. As such, those products already carry the full operating costs related to producing products on that line and should not be the only products bearing the cost associated with the shutdown period. If Commerce were to attribute the costs associated with the suspension of production only to the merchandise produced on that line, the per-unit production costs for such merchandise would be unreasonably high because the cost of the suspended line would be added on top of the normal operating cost for that line.

Therefore, for purposes of these final results, we continue to: (1) include NEXTEEL's suspended losses as a part of its G&A expenses; and (2) exclude from the COGS denominator the reclassified suspended loss in the calculation of the G&A and financial expense ratios.

**Comment 4: NEXTEEL's Obsolete Hot-Rolled Coil**

*NEXTEEL's Case Brief*

- NEXTEEL properly excluded obsolete HRC in its reported costs, as the reported costs pertain to the costs to produce finished WLP products, and the steel coils at issue are not WLP and were not used to produce WLP.[70] However, Commerce revised NEXTEEL's costs to exclude the offset of obsolete HRC in the *Preliminary Results*.[71]
- Section 773(f)(1)(A) of the Act directs Commerce to use the reported costs as long as (1) they are based on the records…kept in accordance with the {GAAP} and (2) reasonably reflect the cost of producing and selling the merchandise.[72]
- Because NEXTEEL maintains its financial records in accordance with Korean GAAP and Commerce has not found that NEXTEEL's reported costs do not reasonably reflect the cost of producing and selling subject WLP, Commerce should fulfill its statutory directive and accept NEXTEEL's reported costs.[73]
- Commerce should omit its adjustment to the G&A ratio calculation to include amounts for obsolescent HRC.[74]

*Domestic Interested Parties' Rebuttal Brief*

- Commerce's practice related to scrap offsets "is to allow such offsets based on the amount of scrap generated once the scrap has been shown to have commercial value through evidence of sales or reintroduction into the production process. NEXTEEL has not demonstrated, or even claimed, that obsolete HRC was recovered, sold, or utilized in any other manner.[75]

[70] *See* NEXTEEL's Case Brief at 7.
[71] *Id*. (citing *Preliminary Results* PDM at 14).
[72] *Id*. (citing *Certain Oil Country Tubular Goods from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 77 FR 74644 (December 17, 2012), and accompanying IDM at Comment 2.
[73] *Id*. at 7.
[74] *Id*.
[75] *See* Domestic Interested Parties' Rebuttal Brief at 23.

**Commerce's Position:** For these final results, we have continued to exclude the cost of the obsolete HRC that NEXTEEL used as an offset to its reported costs. Commerce's normal practice is to allow offsets to a respondent's reported costs based on the amount of scrap (metal cuttings, grindings, shavings, etc.) generated during the production of subject merchandise.[76] In this case, obsolete HRC cannot be considered akin to scrap because it was not generated during the production of WLP. Rather, the obsolete HRC that NEXTEEL reported merely constituted raw materials that NEXTEEL purchased but eventually deemed unusable.[77]

We also disagree with NEXTEEL that Commerce should use NEXTEEL's reported costs. In accordance with section 773(f)(1)(A) of the Act, Commerce normally relies on data from a respondent's normal books and records when those records are prepared in accordance with the GAAP of the exporting country and reasonably reflects the costs associated with the production and sales of merchandise. However, in instances when Commerce determines that a company's normal books and records do not reasonably reflect the production costs of the merchandise under review, Commerce' practice has been to adjust these costs as necessary.[78] The obsolete HRC did not result from NEXTEEL's own production but rather purchases from third party suppliers.[79] Therefore, NEXTEEL should not be allowed to offset its reported costs with the cost of the obsolete HRC.

**Comment 5: Treatment of COGS assigned to SeAH's Headquarters**

*Domestic Interested Parties' Case Brief*

- SeAH failed to provide the necessary information regarding the COGS assigned to the company's headquarters, despite Commerce's request for this information. Normally, the costs associated with a company headquarters represent various G&A expenses related to the company's overall operations. Therefore, for the final results, Commerce should add the COGS assigned to SeAH's headquarters to the company's G&A expenses.[80]
- Commerce asked SeAH to explain the nature of the costs assigned to headquarters and why they were assigned to headquarters. SeAH ignored these requests and instead discussed the unassigned material costs recorded at its headquarters.[81]

[76] *See Finished Carbon Steel Flanges from Spain: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 23931 (May 5, 2021); *see also Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 24085 (May 24, 2019), and accompanying IDM at Comments 16 and 17; *Certain Steel Nails from Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2016-2017*, 84 FR 11506 (March 27, 2019), and accompanying IDM at Comment 6.
[77] *See* NEXTEEL's November SQDR at 3.
[78] *See, e.g., Acetone from Korea* IDM at Comment 1.
[79] *See* NEXTEEL's IQCDR at D-9 and Exhibit D-3 (Inventory Movement Schedule of HRC showing that NEXTEEL purchase HRC).
[80] *See* Domestic Interested Parties' Case Brief at 10-11.
[81] *Id.* (citing SeAH's Letter, "Response to the Department's November 4 Supplemental Questionnaire," dated December 1, 2022 (SeAH's December SQR) at 13)).

*SeAH's Rebuttal Brief*

- SeAH provided a breakdown of unassigned material cost difference by plant.[82] When asked by Commerce about these costs, SeAH provided a breakdown of the unassigned material cost difference recorded at SeAH's headquarters.[83]
- The fact that COGS is recorded at the level of the company's headquarters means only that the costs for the items that were sold were recognized at the headquarters, and not at one of the company's plants.[84]
- The finished goods that SeAH purchased from other manufacturers were not produced at any of its plants and, as a result, the costs incurred to obtain those items were not part of the COGS for any of SeAH's manufacturing plants. Instead, the COGS for such purchased items were properly recorded at SeAH's headquarters.[85]

**Commerce's Position:** We disagree with the Domestic Interested Parties that an adjustment to SeAH's G&A expenses for COGS recorded at its headquarters is warranted. G&A expenses are those expenses that relate to the general operations of the company as a whole, rather than to the production process.[86] G&A expenses by their nature are indirect expenses incurred by the company as a whole and are not directly related to any product.[87] The Domestic Interested Parties argue that "the costs associated with a company headquarters represent various general and administrative expenses related to a company's overall operations," and conclude that "therefore…..the Department should add this amount to SeAH Steel's G&A expenses." The COGS on a company's income statement (which are reported separately from G&A expenses) are associated with producing finished goods or purchasing finished merchandise for resale, rather than the general operations of a company. SeAH calculated its reported G&A expense ratio by identifying all the expenses recorded on its income statement related to its general operations (*e.g.*, rent, insurance, service fees, loss of disposal of assets, etc.). In reviewing SeAH's overall cost reconciliation (which begins with the total COGS from the audited income statement) and the supporting documents from its accounting system, there is nothing on the record to support that the COGS figure for the headquarters expenses should more appropriately be classified for reporting as related to the "general operations" of a company. Therefore, for the final results, we have not adjusted the reported G&A expenses for the COGS recorded at SeAH's headquarters.

---

[82] *See* SeAH's Rebuttal Brief at 1 (citing SeAH DQR at Appendix D-11).
[83] *Id*. at 2 (citing SeAH's December SQR at 13-15).
[84] *See* SeAH's Rebuttal Brief at 1-3.
[85] *Id*. at 3.
[86] *See*, *e.g.*, *Acetone from Korea* IDM at Comment 5; and *U.S. Steel Group v. United States*, 998 F. Supp at 1154 (CIT 1998).
[87] *See Acetone from Korea* IDM at Comment 5.

**Comment 6: SeAH's Scrap Offset**

*Domestic Interested Parties' Case Brief*

- SeAH's reported scrap offset is unsupported and Commerce should deny the offset in the final results.[88]
- In *HWRP from Korea 2018-2019*, Commerce analyzed the scrap offset in SeAH's cost calculations and determined that it must be adjusted to reflect the actual sales value of the scrap.[89] However, SeAH provided no explanation as to what each of its scrap inventory movement schedule categories represent.[90]
- As Commerce emphasized in *HWRP from Korea 2018-2019*, a scrap offset must be based on the actual sales value of the scrap during the POR. SeAH failed to submit such information. Thus, there is no evidence that the reported scrap offset even approximates the actual sales value.[91]

*SeAH's Rebuttal Brief*

- The Domestic Interested Parties' argument that Commerce should disallow a scrap offset in this review because there is no way of determining whether the amount of scrap offset reported by SeAH is based on the actual sales value of the scrap during the POR runs contrary to the evidence.[92]
- The value SeAH assigns to recovered scrap is based on the standard cost for each type of scrap, and the standard cost is updated monthly based on the average sales price for scrap during the previous month. Under this methodology, there may be a one-month lag between the per-unit standard cost and the per-unit actual sales revenue for scrap. However, to the extent that the standard cost is lower than the actual sales value for scrap in a particular month, the standard cost of scrap in the following month will increase, and vice versa. Over time, any difference between the standard cost and the actual sales price will necessarily net to zero.[93]
- SeAH has used this same standard cost methodology in all previous segments of this case. Commerce accepted SeAH's calculation of the scrap offset in all prior reviews.[94]

---

[88] *See* Domestic Interested Parties' Case Brief at 11.
[89] *Id*. (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018–2019*, 86 FR 124 (July 1, 2021) (*HWRP from Korea 2018-19*), and accompanying IDM at Comment 5)).
[90] *Id*. at 12.
[91] *Id*. (citing SeAH's December SQR at Appendix S2D-12-A).
[92] *See* SeAH's Rebuttal Brief at 4.
[93] *Id*.
[94] *Id*. at 5 (citing *Welded Line Pipe from the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 39682 (August 10, 2018); *Welded Line Pipe from the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 35371 (July 23, 2019); *Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 76517 (November 30, 2020) (*2017-2018 Final Results*); *Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 58253 (October 21, 2021) (*2018-2019 Final Results*); and *Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 38061 (June 27, 2022) (*2019-2020 Final Results*)).

The CIT has affirmed Commerce's decision to grant SeAH a scrap offset based on the same standard cost methodology that SeAH reported in the present review.[95]

- The meaning of the categories listed in SeAH's inventory movement schedule is self-evident.[96]
- The inventory movement schedule SeAH provided used the same organization structure and the same general categories as the inventory movement schedules submitted by SeAH in previous segments of this case.[97]
- The Domestic Interested Parties argue that the per-unit values for the different categories in the inventory movement schedule diverge significantly. However, the evidence demonstrates that per-unit values for different types of scrap may vary considerably, even when the scrap is generated from the same raw material.[98]

**Commerce's Position:** We disagree with the Domestic Interested Parties that SeAH's reported scrap offset is unsupported. We determine that SeAH's reported scrap offset is reasonable, as we have in prior segments of this proceeding involving SeAH, and as affirmed by the CIT.[99] In its normal books and records, SeAH tracks scrap generated and values it based on the standard sales prices for each type of scrap.[100] SeAH reported that it relied on their normal books and records for cost reporting.[101] For support of SeAH's scrap offset, Commerce requested an inventory movement schedule for scrap, which SeAH provided.[102] SeAH reconciled the values from the inventory movement schedule to its reported scrap offset.[103]

Regarding the Domestic Interested Parties' reliance on *HWRP from Korea 2018-2019*, we note that upon Commerce's request, SeAH provided actual scrap sales data on the record and Commerce was able to determine that it was appropriate to make a scrap offset adjustment based on the specific facts available in that case.[104] In this review, we did not request this information from SeAH that would enable us to compare the standard values maintained in their normal books and the actual values. Therefore, we have not made any changes to SeAH's scrap offset for the final results.

**Comment 7: SeAH's G&A Expenses**

*Domestic Interested Parties' Case Brief*

- Commerce should calculate additional G&A expenses for SeAH based on certain transactions with affiliates under the transactions disregarded rule.[105]

---

[95] *Id*. (citing *Nexteel Co., Ltd. v. US*, 355 F. Supp 1336, 1363-1364 (CIT 2019) (*NEXTEEL 2019*)).
[96] *Id*. at 6-7.
[97] *Id*. at 7.
[98] *Id*. at 8 (citing SeAH's December SQR at Appendix S2D-12-B).
[99] *See NEXTEEL 2019*.
[100] *See* SeAH's Letter, "Response to Sections B, C, D, and E of Department's February 28 Questionnaire," dated April 20, 2022 (SeAH's Section BCDE QR) at Section D at 31.
[101] *Id*.
[102] *See* SeAH's December SQR at Appendix S2D-12-A.
[103] *Id*. at Appendix S2D-12-B.
[104] *See HWRP from Korea 2018-19* and accompanying IDM at Comment 5.
[105] *See* Domestic Interested Parties' Case Brief at 13.

- An analysis of the financial statements indicates that three of these affiliates, VNTG Inc. (VNTG), SeAH Steel Holdings Corporation (SSHC), and SeAH Holdings Corporation (SHC), operated at a loss in fiscal year 2021.[106]
- Commerce has indicated in various cases that the profitability of the affiliated supplier may be considered in evaluating the arms-length nature of the transactions.[107]
- SeAH's failure to submit SHC's consolidated financial statements did not allow calculation of financial expenses at the consolidated level for the entities that are part of SHC's consolidated group (*i.e.*, VNTG and SHC unconsolidated). Accordingly, Domestic Interested Parties had to rely on the entities' own financial expenses for the purposes of these calculations.[108]

*SeAH's Rebuttal Brief*

- SeAH received services from three of its affiliates during the review period. The costs for these services were included in SeAH's G&A expenses, based on actual amounts paid by SeAH to these suppliers.[109]
- Under the transactions disregarded rule, Commerce's normal practice is to adjust the transfer price for the service or input at issue so that it reflects the market price. In the absence of market-price data, Commerce will examine whether the affiliated company that provided the good or service was profitable during the relevant period.[110] If the affiliate was profitable, then no adjustment is warranted.[111]
- In this case, the audited unconsolidated financial statements SeAH submitted to the record for two of these affiliates, SSHC and SHC, demonstrate that they had operating profits during the 2020 and 2021 fiscal years. As a result, there is no basis for the Department to make an adjustment to the reported G&A expenses for SeAH under the transactions disregarded rule based on SeAH's transactions with SSHC and SHC.[112]
- The Domestic Interested Parties contend that Commerce should recalculate the financial-statement profits for SSHC and SHC's revenue and expenses to exclude investment-related income. Such an adjustment would be unreasonable because both of these companies are holding companies whose normal business operation is investment and it would therefore be unreasonable to exclude dividend income in calculating the profitability of these companies.[113]
- The Domestic Interested Parties also argue that VNTG had a loss during its 2021 fiscal year. However, the Domestic Interested Parties' calculation improperly excludes

---

[106] *Id.* at 13 (citing SeAH's December SQR at Appendix S2D-14).
[107] *Id.* (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 87 FR 67 (April 7, 2022) (*HWRP from Korea 2019-20*), and accompanying IDM at Comment 15).
[108] *Id.* at 14.
[109] *See* SeAH's Rebuttal Brief at 9 (citing SeAH's Letter, "Response to Section A of Department's February 28 Questionnaire," dated April 4, 2022 (SeAH's Section A IQR) at 14-15).
[110] *Id.* (citing *Rebar Trade Action Coal. V. United States*, 398 F. Supp. 3d 1359, 1372 (CIT 2019)).
[111] *Id.*
[112] *Id.* at 10.
[113] *Id.*

VNTG's investment income while including depreciation expenses related to VNTG's investment properties.[114]

- The Domestic Interested Parties' calculations also ignore the fact that VNTG was profitable during 2020. Because the POR includes parts of both the 2020 and 2021 fiscal years, an analysis based solely on VNTG's financial results during the 2021 fiscal year is distortive.[115]

**Commerce's Position:** We agree with the Domestic Interested Parties that it is appropriate to apply the transactions disregarded rule to services SeAH obtained from its affiliates. Pursuant to section 773(f) of the Act, Commerce may disregard the reported value of an input (*i.e.*, the transfer price) in favor of the market price if Commerce determines that a transaction between affiliated parties "does not fairly reflect" the market value of the input. Further, where a market price is not available, Commerce has developed a consistent and predictable approach whereby it may use an affiliate's total cost of providing the service as information available for a market price.[116] In this case, SeAH did not obtain these services from unaffiliated parties nor did the affiliates provide such services to unaffiliated parties. Therefore, consistent with past precedent, we consider it reasonable to determine whether the affiliated transactions were conducted at arm's length by analyzing whether the affiliates' audited financial statements show a profit.[117]

We agree with the Domestic Interested Parties that SSHC's and SHC's profit/loss calculations should exclude investment-related activities. In addition, we disagree with SeAH that, because SSHC and SHC are holding companies, their normal business operations are investment activities. In our analysis, we assessed whether the prices charged for affiliated services were at arm's length. As noted above, it is Commerce's practice to exclude investment-related gains and losses from the calculation of the COP; gains and losses on investment activity are separate from the determination of a fair price for such services and, accordingly, should not factor into the analysis.[118] Investment activities are a separate profit-making activity not related to the company's normal operations.[119] Therefore, for the final results, we have excluded these investment-related activities from the calculation of SSHC's and SHC's net profit or loss associated with determining whether the services provided to the respondent occurred at arm's-length prices.

Since both affiliated suppliers' financial statements, as adjusted, show a loss, for the final results, we determine that the affiliated transactions between SeAH and SSHC, SHC and VNTG did not occur at arms-length prices. Therefore, we have adjusted such transfer prices accordingly and revised SeAH's reported G&A in our calculations for the final results.[120]

---

[114] *Id.* at 10-11.
[115] *Id.* at 11.
[116] *See, e.g., Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*CTL Plate from Germany*), and accompanying IDM at Comment 33; and *HWRP from Korea 2019-20* IDM at Comment 15.
[117] *See HWRP from Korea 2019-20* IDM at Comment 15.
[118] *See, e.g., LDWP from Korea* IDM at Comment 16; and *CTL Plate from Germany* IDM at Comment 33.
[119] *See, e.g., LDWP from Korea* IDM at Comment 16; and *Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 FR 49950 (July 29, 2016), and accompanying IDM at Comments 6 and 10.
[120] *See* SeAH Final Calculation Memo at 2 and Attachment 3.

**Comment 8: SeAH's Interest Expense Ratio**

*Domestic Interested Parties' Case Brief*

- Gains and losses on valuation and disposal of SeAH's financial assets designated at fair value through profit and loss should be excluded from the interest expense ratio calculation, consistent with Commerce's practice.[121]

*SeAH's Rebuttal Brief*

- SeAH calculated the net financial expense ratio based on the 2021 consolidated financial statements of its parent company, SSHC, in accordance with Commerce's instructions.[122]
- This calculation included both the gains and losses on valuation and disposal of financial assets related to investments of working capital connected to the normal operations of SSHC and its subsidiaries, consistent with the methodology used in previous segments of this case that has been accepted by Commerce.[123]
- Commerce's determination in HWRP from Korea is inapplicable to this case.[124]
- Domestic Interested Parties' assertion that gains and losses on valuation and disposal of financial assets designated at fair value through profit and loss related to investments does not present a sufficient basis for determining that those gains and losses should be excluded from the financial expense calculation. Instead, those gains and losses should be excluded only if they related to long-term investments.[125]
- The evidence on the record indicates that the gains and losses at issue in this case did relate to short-term investments of working capital. SSHC's 2020-2021 consolidated financial statements demonstrate that the gains and losses at issue were derived from short term investments of working capital.[126]
- If Commerce were to improperly adjust SeAH's net interest expense ratio to exclude such gains and losses, Commerce may only exclude the portion of gains and losses on valuation and disposal of financial assets related to noncurrent assets. Since Commerce's practice is to allow an offset for income derived from current assets, the portion of gains and losses on valuation and disposal of financial assets attributable to current assets should be included in SeAH's net interest expense calculation.[127]

---

[121] *See* Domestic Interested Parties' Case Brief at 14-15 (citing *HWRP from Korea 2018-19* IDM at Comment 13; and *Welded Line Pipe from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 80 FR 61366 (October 13, 2015), and accompanying IDM at Comment 24)).
[122] *See* SeAH's Rebuttal Brief at 11.
[123] *Id.* (citing *Welded Line Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; *2019-2020*, 87 FR 928 (January 7, 2022) (*2019-2020 Preliminary Results*), unchanged in *2019-2020 Final Results*)).
[124] *Id.* at 12.
[125] *Id.*
[126] *Id.* at 13 (citing SeAH's Letter, "Remaining Financial Statements Requested by Department's February 28 Questionnaire," dated May 18, 2022, (SeAH's Financial Statements Submission) at Attachment 3)).
[127] *Id.* at 14.

**Commerce's Position:** We agree with the Domestic Interested Parties regarding the gains and losses on the valuation and disposal of financial assets. The record evidence demonstrates that these gains and losses are related to investment activity.[128] Commerce has a well-established practice of excluding all investment-related expenses from the reported COP.[129] The reasoning is that, in calculating the COP and CV, we seek to capture the cost of producing the foreign like product and subject merchandise and to exclude the cost of investment activities.[130] Investment activities, whether short or long term, constitute a separate profit-making activity not related to the company's normal operations.[131] Therefore, for the final results, we have excluded the gains and losses on the valuation and disposal of financial assets designated at fair value from the financial expense ratio calculation.[132]

**Comment 9: Reconciliation of State Pipe's Cost of Further Manufacturing**

*Domestic Interested Parties' Case Brief*

- Commerce should apply adverse facts available (AFA) to State Pipe's cost of further manufacturing, for SeAH's failure to submit a POR trial balance for State Pipe, and to reconcile State Pipe's cost of further manufacturing despite Commerce's repeated requests.[133]

*SeAH's Rebuttal Brief*

- The Domestic Interested Parties are wrong to claim that SeAH did not provide a copy of State Pipe's trial balance for the POR and that SeAH did not reconcile this trial balance to the reported cost of further manufacturing.[134]
- SeAH provided copies of State Pipe's trial balances for the POR, in accordance with Commerce's instructions.[135]
- Domestic Interested Parties' complaint appears to simply be that they would have preferred that SeAH combine State Pipe's trial balances into a single trial balance for the POR. Commerce did not require SeAH to prepare such material, and State Pipe's accounting system can only generate trial balances for the fiscal year or for specific months.[136]
- The account totals in State Pipe's trial balance will not directly match the reported further manufacturing expenses. Instead, a breakdown of the amounts in each relevant account

[128] *See* SeAH's Financial Statements Submission at Attachment 3.
[129] *See, e.g., Polyethylene Terephthalate Resin from Brazil: Final Determination of Sales at Less Than Fair Valu*e, 83 FR 48285 (September 24, 2018) (*PET Resin from Brazil*), and accompanying IDM at Comment 4; and *Ripe Olives from Spain: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 28193 (June 18, 2018) (*Ripe Olives from Spain*), and accompanying IDM at Comment 26.
[130] *See, e.g., PET Resin from Brazil* IDM at Comment 4; and *Notice of Final Determination of Sales at Less Than Fair Value: Live Cattle from Canada*, 64 FR 56739, 56758 (October 21, 1999).
[131] *See, e.g., PET Resin from Brazil* IDM at Comment 4; and *Ripe Olives from Spain* IDM at Comment 26.
[132] *See* SeAH Final Calculation Memo at 2 and Attachment 4.
[133] *See* Domestic Interested Parties' Case Brief at 15-17.
[134] *See* SeAH's Rebuttal Brief at 14.
[135] *Id*. (citing SeAH's December SQR at Appendices S2E-7-A and S2E-7-B).
[136] *Id*. at 15.

is needed, which in turn demonstrates that the figures used to calculate the reported per-unit further manufacturing costs reconcile to State Pipe's trial balance.[137]

- SeAH's reconciliation spreadsheet contained an inadvertent error. Therefore, Domestic Interested Parties' attempt to compile a new trial balance by account based solely on the erroneous reconciliation worksheets resulted in distortions.[138]

**Commerce's Position:** We disagree with the Domestic Interested Parties. To determine whether to apply AFA, Commerce follows a two-step process. First, Commerce may use facts otherwise available to fill gaps in the record if an interested party: "(a) withholds information that has been requested…(b) fails to provide such information by the deadlines for submission…and (c) significantly impedes a proceeding."[139] Next, Commerce may choose to "use an inference that is adverse to the interests of that party" if the interested party fails to cooperate to the best of its ability.[140] Here, neither requirement for AFA is met. The record demonstrates that SeAH provided a trial balance for State Pipe for the POR and reconciled State Pipe's cost of further manufacturing to the company's trial balance.[141] Additionally, SeAH has cooperated with Commerce throughout this review. Therefore, we find no basis to apply AFA to State Pipe's cost of further manufacturing for these final results.

**Comment 10: State Pipe's COGS Accounts**

*Domestic Interested Parties' Case Brief*

- If Commerce decides not to apply AFA to State Pipe's cost of further manufacturing, then it should make adjustments for certain omitted COGS accounts.[142]
- Commerce should include account 0101, COGS – Handling In and Out, in State Pipe's cost of further manufacturing.[143]
- Accounts 1069 - Inventory Loss Provision and 1773 - Intercompany Freight In/Out should be added to State Pipe's G&A expenses, because under Commerce's practice inventory valuation losses are generally included in the G&A expenses.[144]

*SeAH's Rebuttal Brief*

- Domestic Interested Parties argue that Commerce should include the amounts recorded in State Pipe's trial balance for account 0101 in the calculation of State Pipe's further manufacturing costs.[145] However, Domestic Interested Parties' calculation of the review-period total amount for account 0101 is flawed.[146]

---

137 *Id.* at 16.
138 *Id.* at 17-20.
139 *See* section 776(a)(2) of the Act.
140 *See* section 776(b)(1) of the Act.
141 *See* SeAH's December SQR at Appendices S2E-7-A and S2E-7-B
142 *See* Domestic Interested Parties' Case Brief at 17.
143 *Id.* at 17-19.
144 *Id.* at 19.
145 *See* SeAH's Rebuttal Brief at 20 (citing Domestic Interested Parties' Case Brief at 19).
146 *Id.*

- Due to an inadvertent reconciliation spreadsheet error, the costs for accounts 1069 and 0101 were incorrect as reported.[147]
- Domestic Interested Parties also contend that the inventory loss provision recorded in account 1069 should be included in G&A expenses because under Commerce's practice, "inventory valuation losses are generally included in G&A expenses."[148] The Domestic Interested Parties' description of Commerce's practice is not correct. Instead, Commerce's practice is to include only inventory loss provisions on raw materials and work-in-process inventories in its cost calculations. Inventory loss provisions on finished goods are not included.[149]
- If the actual price at which the merchandise is sold is above the actual costs incurred, then there is no basis for finding that the sales were made at below cost prices simply because an accountant predicted that the cost of those finished goods would have to be made at below-cost prices.[150]
- Because State Pipe's U.S. sales divisions do not themselves conduct any manufacturing, the inventory loss provision for those divisions (recorded in account 1069) relate only to finished goods. Consequently, any losses on raw materials or work-in-process inventory necessarily relate solely to non-subject merchandise that is not relevant to this case.[151]
- Domestic Interested Parties have suggested that Commerce should include amounts recorded in account 1773 (Intercompany Freight In/Out) in its calculations. However, there is no amount to include. According to State Pipe's trial balance, no amounts were recorded in that account in December 2020 or during the period from January to November 2021.[152]

**Commerce's Position:** We agree with the Domestic Interested Parties that SeAH's trial balances for State Pipe's further manufacturing costs contained an error which resulted in incorrect amounts being included for accounts 0101 and 1069. We note that including the corrected amount for account 0101 would not have a measurable impact on State Pipe's further manufacturing costs.

Moreover, we disagree with the Domestic Interested Parties that account 1069 should be included in the calculation of State Pipe's further manufacturing costs. SeAH stated that this account pertains only to finished goods. Commerce's practice is to include only inventory loss provisions on raw materials and work-in-process inventories in its cost calculations for further manufacturing, while inventory loss provisions on finished goods are not included. Therefore, for the final results, we have not made the Domestic Interested Parties' proposed changes to State Pipe's further manufacturing costs.

---

[147] *Id*. at 21.
[148] *Id*. (citing Domestic Interested Parties' Case Brief at 19).
[149] *Id*. (citing *Notice of Final Determination of Sales at Less Than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit and Above ("DRAMs") From Taiwan*, 64 FR 56308 (October 19, 1999).
[150] *Id*. at 22.
[151] *Id*. at 22-23.
[152] *Id*. at 23.

**Comment 11: State Pipe's G&A Expenses**

*Domestic Interested Parties' Case Brief*

- The methodology SeAH used to calculate State Pipe's G&A expense ratio runs contrary to Commerce's long-standing practice, as well as the instructions in the Section D and E questionnaires.[153]
- SeAH deliberately blurred the distinction between COM and general expenses, which allowed the company to misreport or omit a significant amount of the costs. Commerce should adjust the G&A expense calculations for the final results accordingly.[154]
- SeAH argued that excluding other divisions' G&A expenses from State Pipe's G&A expense ratio was appropriate "because the activities of the relevant State Pipe divisions exclusively related to production or sale of non-subject merchandise."[155] This resulted in misreporting or outright omission of a significant amount of costs.[156]
- Commerce's initial questionnaires stated that G&A expenses are those period expenses that relate to the general production operations of the company rather than directly to the production process for the subject merchandise.[157] Commerce has confirmed this definition of G&A expenses in other cases. This is in contrast to the COM that is related to a product and/or production process and selling expenses that must be reported on a transaction-specific basis.[158]
- Either all U.S. division's selling, general, and administrative (SG&A) expenses should be classified only as manufacturing (*i.e.*, processing) costs or selling expenses, in which case the entire amount currently classified as the U.S. division's G&A expenses should be added to its processing costs, or the SG&A expenses of other divisions should also be split between G&A and other components as was done for the U.S. division, in which case the G&A portion of their expenses should become part of State Pipe's company-wide G&A expense ratio calculation. Commerce should estimate the other divisions' G&A expenses based on the U.S. division's experience.[159]
- SeAH also inappropriately allocated "common" expenses. SeAH failed to provide the necessary information regarding how it allocated amounts between selling and G&A expenses, despite Commerce's request.[160]
- SeAH allocated the remaining expenses between indirect selling and G&A expenses after first removing the "Non-Subject Divisions," and the expenses assigned to direct selling, processing, and bank charges. Commerce asked SeAH to explain and demonstrate how they allocated the amounts between selling and G&A expenses. Instead of discussing the nature of each account category and why the employed allocation methodology is appropriate for each of them, SeAH simply restated the original explanations. SeAH

[153] *See* Domestic Interested Parties' Case Brief at 19.
[154] *Id.*
[155] *Id.* at 20 (citing SeAH's December SQR at Appendix S2E-11-B).
[156] *Id.* at 21.
[157] *Id.* at 20 (citing Commerce's Letter, "Initial AD Questionnaire," dated February 28, 2022 (Initial Questionnaire) at D-19 and E-10)).
[158] *Id.* at 21 (citing *Certain Steel Nails from Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 FR 28959 (May 15, 2015), and accompanying IDM at Comment 13; *HWRP from Korea 2018-19* IDM at Comment 6).
[159] *Id.*
[160] *Id.* at 23.

failed to respond to Commerce's supplemental question and the issues with the employed allocation methodology remain unaddressed.[161]

- Allocating the compensation of employees performing "common" functions in proportion to the sales and administrative personnel's salaries or headcount is not appropriate. These are by definition general expenses, and as such belong to G&A expenses.[162] In its initial section D questionnaire, Commerce specifically instructed the company to treat executives' compensation as part of the G&A expenses.[163] Commerce has reaffirmed this policy in other cases.[164]
- As to using headcount as the basis for allocating SG&A expenses between ISE and G&A, Commerce allowed such methodology in *HWRP from Korea* but only "because most of the expenses depend{ed} on the number of employees performing these functions." Commerce was careful to note that its "decisions regarding what to include in G&A were based on the record developed in those cases, a review of the nature of the items at issue, and those items' relation to the general operations of the company as a whole."[165]
- Since SeAH failed to provide the requested information, Commerce must rely on the descriptions of the accounts in question. Commerce should revise State Pipe's G&A expenses per the Domestic Interested Parties suggested calculations.[166]

*SeAH's Case Brief*

- During the review period, SeAH's U.S. affiliate State Pipe engaged in both sales and manufacturing activities.[167]
- Commerce's longstanding practice is that when a company engages only in sales activities, then that company's G&A expenses should be considered selling expenses. This does not mean that the administration expenses of a company engaged in both manufacturing and sales can be classified as selling expenses.[168]
- Commerce's longstanding practice has been to disregard the G&A expenses of a U.S. company that engages in both manufacturing and sales when calculating the adjustment for U.S. selling expenses.[169]
- Commerce would also include an allocated portion of such U.S. company's G&A expenses in its calculation of the adjustment for U.S. further manufacturing costs under section 772(d)(2) of the Act. In such instances, Commerce calculated a G&A expense ratio by allocating the total G&A expenses incurred by the company over the total company-wide COGS, and then applied that calculated ratio to the sum of the material, labor, and overhead costs for further manufacturing. The amount applied to the further manufacturing costs was included in the adjustment under section 772(d)(2) of the Act.

---

[161] *Id*. at 23-24 (citing SeAH's Section BCDE QR at Appendix E-6 and SeAH's December SQR at Appendix S2E-11-B).
[162] *Id*. at 24-25.
[163] *Id*. at 25 (citing Initial Questionnaire at D-19).
[164] *Id*. (citing *HWRP from Korea 2018-19* IDM at Comment 6).
[165] *Id*. at 25-26.
[166] *Id*. at 27 and Attachment E-2.
[167] *See* SeAH's Case Brief at 8.
[168] *Id*. at 9-10 (citing *Potts & Fiss, Policy Paper #H: Definition of 'Selling Expenses' in the Context of the Exporter's Sales Price Provisions*, Potts/Fiss).
[169] *Id*. at 10.

Any remaining amount was disregarded, as it did not fall under any of the other adjustments to U.S. price permitted by the statute.[170]

- For the *Preliminary Results*, Commerce applied the calculated State Pipe G&A expense ratio not only to the material, labor, and overhead costs for further manufacturing, but also to the cost of the imported pipe. For products that were subject to further manufacturing processes, the G&A expenses assigned to the further manufacturing operations and to the imported pipe have both been included in the further manufacturing adjustment. For products that were *not* subject to U.S. further manufacturing, the G&A expenses allocated to the cost of the imported pipe have been classified as indirect selling expenses and deducted from construed export price under the statute.[171]
- The statute does not direct Commerce to deduct all expenses incurred by a U.S. affiliate of the exporter from constructed export price. It specifically limits the adjustment to direct and indirect selling expenses and further manufacturing costs.[172]
- G&A expenses of companies that perform both sales and manufacturing activities are not selling expenses, and as such they can only be deducted from CEP to the extent that they are part of the cost of further manufacturing.[173]
- Furthermore, even if it is reasonable to treat the portion of G&A expenses attributable to managing the further-manufacturing processes as further-manufacturing costs, it is not reasonable to treat G&A expenses attributable to managing imported materials as a further manufacturing cost. The G&A expenses allocated to the cost of the imported pipe cannot properly be included in the adjustment for further-manufacturing costs for further-manufactured products.[174]
- SeAH also engages in both manufacturing and sales operations in Korea. Commerce did not classify SeAH's G&A expenses as selling expenses. Instead, it treated them entirely as part of the COP of the merchandise. As a result, there is an imbalance in Commerce's calculations, which deduct U.S. G&A expenses as indirect selling expenses but do not include Korean G&A expenses as home market (or third-country) indirect selling expenses for which a "CEP offset" might be allowed.[175]
- The CIT has held that Commerce was permitted to depart from the requirements of the statute and treat PPA's G&A expense as indirect selling expenses. However, it is SeAH's belief that the CIT's decision is not correct as a matter of law or fact.[176]
- The portion of State Pipe's G&A expenses that are allocated to further manufacturing activities can and should be deducted under section 772(d)(2) of the Act. The remaining G&A expenses do not fall under any of the permissible adjustments to CEP and therefore must be disregarded in the final calculations.[177]

---

[170] *Id.* (citing *Final Determinations of Sales at Less Than Fair Value: Calcium Aluminate Cement, Cement Clinker and Flux from France*, 59 FR 14136, 14146-47 (March 25, 1994); *First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 57995 (November 10, 2009), and accompanying IDM at Comment 5(b)).
[171] *Id.* at 10-11.
[172] *Id.* at 11.
[173] *Id.*
[174] *Id.* at 11-12.
[175] *Id.* at 12.
[176] *Id.* at footnote 30 (citing *NEXTEEL Co., Ltd. v. United States*, 461 F. Supp. 3d 1336, 1343 (CIT 2020)).
[177] *Id.*

*Domestic Interested Parties' Rebuttal Brief*

- Commerce correctly applied State Pipe's G&A expense ratio. Commerce's logic was explained in the *Preliminary Results*.[178]
- The denominator used in State Pipe's G&A expense ratio calculation represents the full COGS, inclusive of the cost of the further processed material, and not only the further manufacturing costs. Therefore, the G&A ratio must be applied not only to the cost of further manufacturing, but to all costs of manufacturing incurred by the company, inclusive of the material cost. It is Commerce's established practice that the denominator of a ratio should be on the same basis as the value to which the ratio is applied.[179]
- Commerce's G&A methodology is also consistent with that applied in various past proceedings, including those involving SeAH.[180]
- SeAH itself acknowledges that this same methodology has been upheld by the CIT. Commerce should continue to apply this methodology in the final results.[181]

*SeAH's Rebuttal Brief*

- Domestic Interested Parties argue that the G&A expenses recorded by State Pipe's West Coast Pipe (WCP) and West Coast Spiral Pipe (WCSP) divisions should be included in the reported further-manufacturing costs for subject merchandise. The WCP and WCSP expenses are unrelated to further-manufacturing of the subject merchandise, and are different in nature from the SG&A expenses relating to State Pipe's general operations. The activities of WCP and WCSP exclusively relate to non-subject merchandise – large diameter water pipe that is produced by WCSP and coated with concrete at WCP.[182]
- Domestic Interested Parties assert that it would be unfair to allocate a portion of State Pipe's company-wide G&A expenses to the WCP and WCSP divisions. It is clear that State Pipe's corporate management, accounting, and financing teams have to provide management to those divisions. There is no basis to believe that the administrative functions unique to managing the manufacturing operations of the WCP and WCSP divisions have any bearing on State Pipe's sales or further processing of WLP. In such circumstances, it is not appropriate to allocate any of the WCP and WCSP division SG&A expenses to the further manufacturing of the subject merchandise.[183]
- Domestic Interested Parties argue that an allocation of total company-wide SG&A expenses (including the expenses of the WCP and WCSP divisions) is required by Commerce's past decisions. However, the cases they cite relate only to the calculation of COP for subject merchandise. It makes no sense to follow such an approach for a U.S. selling company that performs only minor processing for subject merchandise but

---

[178] *See* Domestic Interested Parties' Rebuttal Brief at 8-9 (citing Memorandum, "Preliminary Results Margin Calculation for SeAH Steel Corporation," dated December 22, 2022 (SeAH Preliminary Calculation Memo)).
[179] *Id.* at 9 (citing *Carbon and Certain Alloy Steel Wire Rod from Mexico: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 31592 (May 19, 2016) (*Wire Rod from Mexico*), and accompanying IDM at Comment 1).
[180] *Id.* at 10 (citing *Large Diameter Welded Pipe from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 84 FR 6374 (February 27, 2019), and accompanying IDM at Comment 13).
[181] *Id.* (citing SeAH's Case Brief at 12).
[182] *See* SeAH's Rebuttal Brief at 24.
[183] *Id.* at 24-25.

engages in substantial manufacturing activities for non-subject products manufactured in the United States, because the activities required to administer manufacturing operations are substantially different from the activities required to administer the sales operations and minor processing like those performed by State Pipe's U.S. sales divisions.[184]

- Domestic Interested Parties argue that Commerce should reject SeAH's allocation of common SG&A expenses between further selling and administrative functions, because, they claim, SeAH failed to respond to Commerce's inquiry regarding the allocation.[185] Domestic Interested Parties misread Commerce's question regarding this allocation. Commerce asked SeAH to explain *how* the common State Pipe expenses were allocated, to which SeAH properly responded, not *why* they had been allocated in that manner.[186]
- The use of salaries to allocate SG&A expenses between selling and administrative activities is consistent with longstanding and well-established Commerce practice. SeAH has used the same salary-based allocation methodology in all previous reviews of this case that involved further processing by State Pipe, as well as in all previous reviews involving sales by SeAH of pipe products that involved processing by SeAH's U.S. affiliate Pusan Pipe America (PPA). Commerce has never asked SeAH to revise that methodology. Therefore, there is no basis to reject the allocation in the present review.[187]
- The allocation of SG&A expenses between selling and administrative activities affects both the amount of indirect selling expenses and the amount of G&A expenses. If Commerce were to accept the Domestic Interested Parties' request to revise the allocation, any changes that increased G&A expenses would necessarily reduce indirect selling expenses by the same amount, while changes that reduced G&A expenses would necessarily increase indirect selling expenses by the same amount.[188]

**Commerce's Position:** Consistent with our methodology in the *Preliminary Results*,[189] we continue to include State Pipe's G&A expenses as part of SeAH's selling expenses (either as indirect selling expenses or further manufacturing expenses) in our calculations for the final results.

We disagree with SeAH that if an affiliated company engages in both further manufacturing and reselling activities, the statute prohibits the recognition of all G&A expenses. SeAH argues that if State Pipe had only imported and resold the product, its associated G&A expenses would be properly recognized as indirect selling expenses.[190] However, according to SeAH, if the

---

[184] *Id.* at 25 (citing Domestic Interested Parties' Case Brief at 21).
[185] *Id.* (citing Domestic Interested Parties' Case Brief at 23).
[186] *Id.* at 25-26 (citing Commerce's Letter, "Supplemental Questionnaire," dated November 4, 2022 at 8).
[187] *Id.* at 28 (citing *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders*, 60 FR 10900, 10919 (February 28, 1995) at Comment 41; *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 20815 (April 8, 2022); *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 41015 (July 30, 2021); and *Frontseating Service Valves from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 73825 (December 9, 2013)).
[188] *Id.* at 29.
[189] *See* SeAH Preliminary Calculation Memo at 3-4.
[190] *See* SeAH's Case Brief at 11.

imported product is further manufactured in any way, Commerce is precluded from recognizing the portion of G&A expenses previously allocated to those imported products.[191]

Under section 772(d) of the Act, the price used to establish CEP must be reduced by:

> (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—
> (A) commissions for selling the subject merchandise in the United States;
> (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
> (C) any selling expenses that the seller pays on behalf of the purchaser; and
> (D) any selling expenses not deducted under subparagraph (A), (B), or (C).

Further, under section 772(d)(2) of the Act, Commerce is also directed to reduce CEP by "the cost of any further manufacture or assembly (including additional material and labor)…" The CIT has explained that "in calculating U.S. prices using the {constructed export price} methodology, Commerce is to deduct any expenses generally incurred by or for the account of … the affiliated seller in the United States, in selling subject merchandise."[192] In other words, the statute *requires* that Commerce deduct both the selling expenses and costs of further manufacture from the price used to determine CEP.[193] Accordingly, if all G&A expenses incurred by an affiliated U.S. reseller can be treated as indirect selling expenses when the affiliated U.S. reseller only performs reselling activities, and all G&A expenses incurred by an affiliated U.S. further-manufacturer/reseller can be treated as further manufacturing expenses when the affiliated U.S. further manufacturer/reseller performs both further manufacturing and reselling activities, Commerce has the authority to allocate G&A expenses to both types of activities when both activities occur and to make appropriate deductions.[194] Thus, the statute directs Commerce to reduce the U.S. price by any selling expenses and further manufacturing costs.

We also disagree with SeAH that, because it engages in both manufacturing and sales operations in Korea, there is an imbalance in Commerce's calculations in that Commerce is deducting U.S. G&A expenses as an indirect selling expense, but not including Korean G&A expenses as a indirect selling expense.[195] SeAH's reported G&A expenses are included as part of the COP pursuant to section 773(b)(3)(B) of the Act, and the calculation of that ratio used a denominator for COGS which included the cost of all products sold, whether they were simply purchased and resold or manufactured by SeAH. However, SeAH's purchased and resold products would likely not be considered reportable transactions because SeAH is not the producer.[196] As a result,

[191] *Id.*
[192] *See United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1336 (CIT 2010).
[193] *Id.*
[194] *See 2018-2019 Final Results* IDM at Comment 7.
[195] *See* SeAH's Case Brief at 12.
[196] Only if SeAH made sales of merchandise produced by another manufacturer to the United States would such merchandise be reportable. This is because Commerce limits its product matching to merchandise produced by the same manufacturer.

because SeAH would likely not have been required to report or disclose purchased and directly resold products, it would not have had to report the G&A expenses allocated to such products. However, in the U.S. market, WLP products that State Pipe purchased from SeAH and resold (or further manufactured and then resold) are subject merchandise; therefore, we find it appropriate to consider all G&A and indirect selling expenses allocated to these products in our calculations. Therefore, we find that Commerce's method for allocating State Pipe's G&A expenses as either further manufacturing or indirect selling expenses is based on a reasonable interpretation of sections 772(d)(1)(D) and 772(d)(2) of the Act. Consequently, consistent with the *Preliminary Results* and *OCTG 2018-2019 Final Results*,[197] we continue to include State Pipe's G&A expenses in our calculations as either further manufacturing or indirect selling expenses, pursuant to section 772(d)(1)(D) of the Act.

We agree with the Domestic Interested Parties that it is appropriate to base the further manufacturing G&A on the company-wide figures, and not exclude other divisions' G&A expenses from State Pipe's G&A expense ratio. It is Commerce's practice to calculate the G&A ratio by dividing the company-wide G&A expenses by the company-wide total costs of goods sold.[198] While we recognize that in previous segments of this case we have accepted SeAH's methodology, for this review we have revised State Pipe's G&A accordingly in accordance with our practice to rely on company-wide G&A expenses.

We disagree with the Domestic Interested Parties' claim that SeAH improperly allocated SG&A expenses between selling and administrative functions. According to the Domestic Interested Parties, SeAH did not respond to Commerce's supplemental question regarding how State Pipe allocated the amounts between selling and G&A expenses and they allege that there are issues with the methodology that remain unaddressed. However, we find that SeAH has fully answered the questions related to its allocations. SeAH explained State Pipe's normal books and records do not separate selling and G&A expenses by cost center. For reporting purposes SeAH identified the actual salaries and related expenses of employees performing selling and administrative functions. Salaries for specific management personnel whose activities could not be classified as only selling or administrative were allocated based on the salary ratio of the sales and administrative personnel. Other expenses were allocated to indirect selling and G&A expenses based on headcount.[199] We determine that the allocation method for State Pipe's G&A expenses is reasonable. We find SeAH's methodology acceptable and have not made changes to this allocation for these final results.

Therefore, we find that Commerce's method for allocating State Pipe's G&A expenses as either further manufacturing or indirect selling expenses is based on a reasonable interpretation of sections 772(d)(1)(D) and 772(d)(2) of the Act. Consequently, consistent with the *Preliminary Results* and *OCTG 2018-2019 Final Results*,[200] we continue to include State Pipe's G&A

---

[197] *See Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018–2019*, 86 FR 41015 (July 30, 2021) (*OCTG 2018-2019 Final Results*), and accompanying IDM at Comment 14.
[198] *See Wire Rod from Mexico* IDM at Comment 1.
[199] *Id*. at 35.
[200] *See OCTG 2018-2019 Final Results* IDM at Comment 14.

expenses (revised as noted above) in our calculations as either further manufacturing or indirect selling expenses, pursuant to section 772(d)(1)(D) of the Act.

**Comment 12: State Pipe's Loan Forgiveness**

*Domestic Interested Parties' Case Brief*

- Commerce should disallow the portion of "Other Income" represented by the gain of forgiveness of PPP loans in State Pipe's G&A expenses.[201]
- SeAH argues that Commerce should use its "Other Income" as an offset to State Pipe's G&A expenses because "the underlying activities that resulted in 'other income' is considered a 'government subsidy' (*i.e.*, PPP loan and interest forgiveness) that is applicable to the company as a whole under Commerce's practice or related to the overall operation of the company (*i.e.*, remaining other income amounts)."[202] While it is true that in general Commerce includes subsidy income in G&A expenses,[203] in the current case, Commerce should also take into account the underlying cost that resulted in this subsidy.[204]
- In general, when Commerce considers whether to allow an offset to the reported costs, it considers whether the underlying costs were included in the reported costs, and, if so, where and how they were included, so the offset matches the underlying costs to the extent possible.[205]
- Even if Commerce decides to allow an offset, only a portion of the claimed offset can be allowed as an offset against the G&A expenses.[206]

*SeAH's Rebuttal Brief*

- Domestic Interested Parties have accepted that the gains from forgiveness of the PPP loans are, in principle, items that should be included in the G&A calculation under Commerce's normal practice. They also accept that the forgiveness of the PPP loans constituted a reimbursement of certain State Pipe labor costs by the U.S. government. They also concede that Commerce has previously held that gains from such salary reimbursements are properly included in the G&A calculation.[207]
- Domestic Interested Parties assert that Commerce should disregard the gains on forgiveness of PPP loans recorded in State Pipe's financial statements for its 2021 fiscal year because the loan in question related to salary expenses incurred prior to the review period. The Domestic Interested Parties have not established that State Pipe could not have received additional or similar gains in subsequent years relating to salary expenses

[201] *See* Domestic Interested Parties' Case Brief at 27.
[202] *Id.* at 28 (citing SeAH's December SQR at 38).
[203] *Id.* (citing *Notice of Final Determination of Sales at Less Than Fair Value: Live Swine from Canada*, 70 FR 12181 (March 11, 2005), and accompanying IDM at Comment 2)).
[204] *Id.*
[205] *Id.* (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 15765 (March 19, 2020), and accompanying IDM at Comments 8 and 9)).
[206] *Id.* at 30.
[207] *See* SeAH's Rebuttal Brief at 29 (citing Domestic Interested Parties' Case Brief at 28-29).

during the review period. They are not suggesting that the dumping margins in prior reviews be recalculated to reflect the reversal during the current period of State Pipe costs incurred in a prior period.[208]

- Commerce's longstanding practice has been to calculate G&A expenses based on the items recorded in a company's normal accounting records for the fiscal year corresponding most closely to the period under examination. Under this "slice of time" approach, Commerce only considers the date on which an item was reflected in the respondent's financial statements, without analyzing whether the underlying transaction that gave rise to the items might have occurred in an earlier year. Commerce does not allow a respondent to exclude costs recorded during the current period on the grounds that those costs related to transactions in prior years or based on claims that the costs might be reversed in a subsequent period.[209]
- Commerce has no ability to recalculate the dumping margins in a prior review to reflect reimbursements received in a subsequent year that relate to costs incurred during the prior review period.[210]
- In the current review, State Pipe's 2021 fiscal year is the fiscal year corresponding most closely to the review period. Therefore, State Pipe correctly calculated G&A expenses based on the items record during the 2021 fiscal year.[211]

**Commerce's Position:** We agree with the Domestic Interested Parties and have adjusted State Pipe's G&A expenses to exclude this gain. We view the gains from "forgiveness of PPP loan" as unrelated to the general operations of the company and, as such, should not be included as an offset to State Pipe's G&A expenses. Commerce's practice is to treat gains on exemption of debt as specifically related to the company's financing activities, rather than the general operations of the company.[212] Therefore, for the final results, we have excluded State Pipe's gain on forgiveness from PPP loan from the company's G&A expenses.

**Comment 13: Whether SeAH's Reported Movement Expenses Should Be Deducted from its Home Market Price**

*SeAH's Case Brief*

- In previous reviews, when SeAH had home market sales that underwent processing performed by an unaffiliated processor before sale to the final user, Commerce instructed SeAH to report the sale of the processed product to the final customer. Accordingly, the freight costs for transporting the unprocessed product to the unaffiliated processor were

---

[208] *Id*. at 30 (citing Domestic Interested Parties' Case Brief at 29).
[209] *Id*. (citing *Liberty Frozen Foods Pvt., Ltd. v. United States*, 35 CIT 1002 (2011)).
[210] *Id*. at 30-31.
[211] *Id*. at 31.
[212] *See*, *e.g.*, *Certain Preserved Mushrooms from India: Final Results of the Antidumping Duty Administrative Review*, 68 FR 41303 (July 11, 2003), and accompanying IDM at comment 13; *Structural Steel Beams from South Korea: Final Determination in the Antidumping Duty Investigation*, 65 FR 41437, (July 5, 2000), and accompanying IDM at Comment 26; *and Citric Acid and Certain Citrate Salts from Thailand: Affirmative Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances in Part*, 83 FR 25998 (June 5, 2018), and accompanying IDM at Comment 2.

not included in the home market sales listing and were instead included in the reported COM for the sale of the processed WLP.[213]

- In this review, SeAH initially reported its home market sales and COP in the same manner as it had in previous reviews. However, in its September 26 supplemental questionnaire, Commerce requested that SeAH report the trucking charges from SeAH's facility to the unaffiliated processor for each relevant home market sale in a separate field.[214] Accordingly, SeAH reported the trucking charges incurred by its affiliate SeAH L&S for arranging the transportation from SeAH's facility to the unaffiliated processor in the "INLFTPH" field and the mark-up charged by SeAH L&S for the transportation to the unaffiliated processor in the "FTPLNSMH" field of the revised home market sales listing. To avoid double counting, SeAH provided a revised cost data file that reported the COM for the processed items net of the freight cost from SeAH to the processor.[215]
- Commerce used the revised home market sales listing and cost file that SeAH provided to calculate the preliminary margin, but did not deduct the cost of transporting merchandise from SeAH's facility to the unaffiliated processor.[216]
- Consistent with the methodology in the previous review, Commerce must deduct all freight expenses, including the amounts reported "INLFTPH" and "FTPLNSMH" fields, to calculate SeAH's home market net price.[217]

Domestic Interested Parties did not comment on this issue.

**Commerce's Position:** We agree with SeAH that we made an error in our *Preliminary Results* margin calculations by failing to deduct the cost of transporting merchandise from SeAH's facility to the unaffiliated processor for applicable home market sales. Therefore, we have revised our final results calculations to deduct these home market freight expenses (*i.e.*, INLFTPH and FTPLNSMH).[218]

**Comment 14: Whether Commerce Should Use SeAH's Reported Surrogate Costs**

*SeAH's Case Brief*

- In the *Preliminary Results*, Commerce did not use SeAH's reported quarterly surrogate costs for all control numbers that were sold but not produced during the review period. Instead, Commerce recalculated surrogate costs using its margin program for control numbers that were sold during certain quarters during the relevant period.[219]

---

[213] *See* SeAH's Case Brief at 2.
[214] *Id.* (citing SeAH's Letter, "Response to the Department's September 26 Supplemental Questionnaire," dated October 25, (SeAH's October SQR) at 24-25).
[215] *Id.* at 2-3 (citing SeAH's October SQR at 24-25 and Appendix SD-1).
[216] *Id.* at 3.
[217] *Id.* (citing *2019-2020 Final Results* IDM at Comment 4; and section 773(a)(6)(B)(ii) of the Act).
[218] *See* SeAH Final Sales Calculation Memo.
[219] *See* SeAH's Case Brief at 3-4 (citing *Preliminary Results* PDM at 12).

- Commerce has provided no justification for replacing SeAH's reported quarterly surrogate costs for those quarters. In the absence of an explanation, it must recalculate SeAH's margin in the final determination based on SeAH's reported information.[220]
- In the event that Commerce continues to use surrogate costs calculated based on its margin program, it must index those costs to reflect the quarterly periods.[221]

*Domestic Interested Parties' Rebuttal Brief*

- Where Commerce's margin calculations include sales of CONNUMs that were not produced during the POR, Commerce's established practice is to apply surrogate costs from the POR to the CONNUMs at issue. Commerce's default methodology for determining those surrogate costs "is to allow SAS to perform the surrogate cost search function, rather than relying on the respondent's reported surrogate cost, even if the similar CONNUMs identified by SAS and the respondent are the same."[222] Commerce's preliminary calculations were consistent with this established practice.[223]
- SeAH has failed to identify any specific distortions or inaccuracies generated by Commerce's SAS-executed surrogate cost search function or otherwise explain why the agency must deviate from its default methodology.[224]
- To the extent that Commerce indexes surrogate direct material and scrap costs in the final results to reflect the quarterly periods, it should ignore SeAH's suggested SAS programming. Commerce need only insert the necessary indexing values and execute the standard formatting in its comparison market SAS computer program.[225]

**Commerce's Position:** We disagree with SeAH that Commerce must recalculate SeAH's margin using its reported surrogate costs for all control numbers that were sold but not produced during the review period. It is Commerce's practice to, where possible, use the SAS program to assign surrogate costs for CONNUMs that were sold but not produced during the POR.[226]

We disagree with both SeAH and the Domestic Interested Parties that Commerce must index the values for surrogate direct material and scrap costs to reflect quarterly periods in the comparison market program. Because SeAH reported production of at least one CONNUM in every quarter that it had sales, the margin program calculated surrogate material costs based on the most similar CONNUM in the quarter. As a result, we have made no changes to the assignment of surrogate costs for those CONNUMs SeAH sold but did not produce during the POR in our calculations for the final results.

---

220 *Id.* at 4 (citing *Hynix Semiconductor, Inc. v. United States*, 27 C.I.T. 1719, 1723 (2003)).
221 *Id.*
222 *See* Domestic Interested Parties' Rebuttal Brief at 4 (citing *LDWP from Canada* IDM at Comment 4).
223 *Id.*
224 *Id.*
225 *Id.* at 4-5.
226 *See LDWP from Canada* IDM at Comment 4.

**Comment 15: SeAH's CEP Offset**

*SeAH's Case Brief*

- The information submitted by SeAH demonstrates that SeAH performs additional selling activities and at much greater intensity on SeAH's sales to unaffiliated customers in Korea compared to its sales to PPA and State Pipe in the United States. As a result, Commerce should grant SeAH a CEP offset in its calculations for the final results.[227]
- Commerce's regulations provide that, when assessing whether a CEP offset is appropriate, it will determine the U.S. level of trade (LOT) for CEP sales based on the "constructed" level (*i.e.*, the level after deducting all expenses for U.S. selling and further manufacturing activities).[228]
- Therefore, for SeAH's U.S. sales through PPA and State Pipe, the relevant LOT for purposes of Commerce's analysis was at the level of sales from SeAH to PPA. The subsequent activities that PPA and State Pipe performed on their sales to unaffiliated U.S. customers are irrelevant to the LOT analysis, because those activities are excluded from the determination of the constructed LOT for U.S. CEP sales. By contrast, Commerce's regulations make clear that the relevant LOT for NV is determined based on the starting price or CV without adjustment. As a result, the activities SEAH performed on its sales to unaffiliated Korean customers are relevant to the LOT analysis because those activities are included in the starting price for home market sales.[229]
- Such an approach would be consistent with *LDWP from Korea*, a case with virtually identical facts, where Commerce granted SeAH a CEP offset.[230]

*Domestic Interested Parties' Rebuttal Brief*

- SeAH failed to provide information critical to the CEP offset adjustment, and Commerce properly denied and should continue to deny SeAH a CEP offset.[231]
- Commerce's regulations stipulate that, "substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing."[232]
- As articulated in the investigation of heavy-walled pipe from Korea, in making an LOT determination, Commerce requires evidence from the respondent supporting the claimed

---

[227] *See* SeAH's Case Brief at 5-6 (citing SeAH's Section A IQR at Appendix A-5).
[228] *Id.* (citing 19 CFR 351.412(c)(ii)).
[229] *Id.* at 6-7.
[230] *Id.* at 7-8 (citing *Large Diameter Welded Pipe from the Republic of Korea: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 FR 43651 (August 27, 2018) (*LDWP from Korea Preliminary Determination*), and accompanying PDM at 21, unchanged in *Large Diameter Welded Pipe From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 84 FR 6374 (February 27, 2019) (*LDWP from Korea*)).
[231] *See* Domestic Interested Parties' Rebuttal Brief at 5.
[232] *Id.* (citing 19 CFR 351.412(c)(2)).

differences, as well as evidence demonstrating that those differences were significant enough to constitute a distinct LOT.[233]
- Simply performing more activities at one channel compared to another is not a sufficient basis for finding a distinct LOT. Where the same activities are performed, there is no basis to find that the reported differences in intensity constitute a different LOT.[234]
- SeAH's sales activity chart clearly indicates that the activities reported specifically relate to those "Performed by SeAH Steel on US Export Sales of Welded Line Pipe." Commerce reasonably interpreted the chart as specific to those activities performed by SeAH. Indeed, to the extent that the activities performed by SeAH's U.S. affiliates are represented, SeAH failed to make that clear. Only now in its brief does SeAH make that claim.[235]
- SeAH failed to provide the quantitative analysis necessary for a CEP offset. Commerce requested that SeAH provide a quantitative analysis showing how the expenses assigned to POR sales made at different claimed LOT impact price comparability.[236] SeAH ignored Commerce's instructions, repeatedly referring Commerce back to its original charts.[237]
- The burden is on the party seeking the price adjustment to fully support its claim for that adjustment.[238]

**Commerce's Position:** Consistent with the *Preliminary Results*, we continue to find that a CEP offset is not warranted for SeAH for the purposes of these final results.[239] In determining whether a respondent is entitled to a CEP offset, section 773(a)(7)(B) of the Act states:

> When normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine under subparagraph (A)(ii) a level of trade adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under section 772(d)(1)(D).[240]

Moreover, Commerce's regulations at 19 CFR 351.412(c)(2) outline Commerce's policy regarding finding differences in the LOTs:

[233] *Id.* at 6 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 81 FR 47347 (July 21, 2016), and accompanying IDM at Comment 7*; Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 533, 556, 616 F. Supp. 2d 1354, 1374 (2009); and *Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317, 1347, n.22 (CIT 2020)).
[234] *Id.* at 6-7.
[235] *Id.* at 7 (citing SeAH's Section A IQR at Appendix A-5-B).
[236] *Id.* at 7-8 (citing *Preliminary Results* PDM at 11).
[237] *Id.* at 8 (citing SeAH's October SQR at 10-14).
[238] *Id.* (citing 19 CFR 351.401(b)(1)).
[239] *See also 2017-2018 Final Results* IDM at Comment 9, and *2018-2019 Final Results* IDM at Comment 8, where Commerce also denied SeAH's CEP offset claim given similar facts.
[240] *See* section 773(a)(7)(B) of the Act.

> The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent). *Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.*[241]

In the *Preliminary Results*, we analyzed SeAH's U.S. and home market selling functions and organized them into the following five categories for analysis: (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales-related administrative activities. For SEAH's U.S. sales we found that:

> SeAH reported that it performed the following selling functions for all sales to U.S. customers: research and analysis of market strategy, sales planning and performance review, personnel training, technical assistance for computer systems, inventory maintenance/warehouse operation, controlling of freight and delivery, order input, and invoicing.[242] Based on the selling function categories noted above, we find that SeAH performed sales support, training services, technical support, logistical services, and sales-related administrative activities for its reported sales to customers in the United States. Because SeAH performed the same selling functions at the same relative level of intensity for all its U.S. sales, we determine that all U.S. sales are at the same LOT.[243]

In addition, in the home market we found that:

> According to SeAH, it performed the following selling functions for all home market sales: research and analysis of market strategy, sales planning and performance review, advertising/sales promotion, personnel training, technical assistance for computer systems, inventory maintenance/warehouse operation, controlling of freight and delivery, sales negotiation with customer, order input, invoicing, collection of payment from customer, customer relationship management, and provision of cash discount … Based on the selling function categories noted above, we find that SeAH performed sales support, training services, technical support, logistical services, and sales-related administrative activities at the same relative level of intensity for all home market sales. Because we find that the differences in the selling activities SeAH performed to sell to its home market customers were not significant, we determine that there is one LOT in the home market for SeAH.[244]

When we compared SeAH's sales in each market in our *Preliminary Results*, we determined the following:

---

[241] *See* 19 CFR 351.412(c)(2) (emphasis added).
[242] *See* SeAH Section A IQR at Appendix A-5-B
[243] *See Preliminary Results* PDM at 11 (footnote omitted).
[244] *Id*. at 10-11.

> Finally, we compared SeAH's U.S. LOT to the home market LOT and found that the selling functions SeAH performed for its home market customers are at the same or similar stage of distribution as those performed by SeAH for its U.S. sales. Therefore, based on the totality of the facts and circumstances, we preliminarily determine that SeAH's home market LOT is at the same stage of distribution as SeAH's CEP LOT. Consequently, we preliminarily find that no CEP offset is warranted for SeAH.[245]

We agree with SeAH that the activities its U.S. affiliates performed on U.S. sales are not relevant to our analysis of its U.S. LOT and, as noted above, we did not include these activities in our LOT analysis. Further, while we acknowledge that the selling functions SeAH performed for its home market and U.S. sales are not identical, we disagree that the few additional activities SeAH performed to make its home market sales were so significant that SeAH's home market LOT constitutes a different marketing stage, within the meaning of 19 CFR 351.412(c)(2). The CIT has upheld similar determinations by Commerce where only minor differences exist between the U.S. and home markets.[246]

Finally, we disagree with SeAH's claim that it is entitled to a CEP offset in this proceeding because Commerce granted it a CEP offset in *LDWP from Korea*. Whether SeAH is entitled to a CEP offset is a fact-intensive and case-specific inquiry. Here, we find that the information SeAH provided to support its CEP offset claim does not demonstrate that there were significant differences in the selling functions performed for its home market and U.S. sales. Moreover, the selling function categories Commerce uses in its analysis have been revised since the date of *LDWP from Korea*.[247] Consequently, consistent with the *Preliminary Results* and the previous administrative review, we continue to find no basis to grant SeAH a CEP offset for purposes of the final results.[248]

**Comment 16: Differential Pricing Methodology**

*SeAH's Case Brief*

- In the *Preliminary Results*, Commerce applied its differential pricing analysis to determine whether there was a pattern of prices for comparable merchandise that differed significantly among purchasers, regions, or time periods for SeAH's U.S. sales.

---

[245] *Id*. at 11 (footnote omitted).
[246] *See, e.g.*, *Sucocitrico Cutrale Ltda.* v. *United States*, 2012 WL 2317764, *6 (CIT 2012) ("Although Commerce noted minor differences between the two markets, these differences do not rise to the level required by the statute, such as the difference between wholesale and retail.... Commerce's factual determination that there is not a substantial difference in the levels of trade in the two markets is reasonable and supported by substantial evidence.")
[247] Compare *LDWP from Korea Preliminary Determination* PDM at 19 (discussing grouping selling activities into the following four selling function categories for analysis: (1) sales and marketing; (2) freight and delivery services; (3) inventory maintenance and warehousing; and (4) warranty and technical support) with *2019-2020 Preliminary Results* PDM at 19 (discussing grouping selling activities into the following five selling functions categories for analysis: (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales-related administrative activities), unchanged in *2018-2019 Final Results*.
[248] *See 2019-2020 Preliminary Results* PDM at 19-20 (unchanged in *2019-2020 Final Results*).

Commerce's use of its differential pricing methodology in the *Preliminary Results* was both mathematically and legally improper.[249]

- The Federal Circuit in *Stupp* confirmed that Commerce's use of the Cohen's *d* test in such circumstances is improper.[250] The Federal Circuit has made clear that Commerce's application of its differential pricing analysis in other cases must also be consistent with the *Stupp* decision.[251]
- Commerce cannot rely on an allegedly "widely adopted" statistical test when it is not using that test in the context for which it was proposed and is appropriately applied.[252]
    - Commerce has explicitly admitted that it is not using the Cohen's *d* test for the purposes for which Professor Cohen developed it or for which it has been widely adopted.[253]
    - The comparisons of SeAH's U.S. sales data upon which Commerce relied in the *Preliminary Results* do not satisfy the criteria required by widely adopted statistical practices. In particular, the groups that Commerce compared do not follow normal distributions, have substantially equal variances, or a substantially equal number of data points. Furthermore, many of the subsets being compared have very few observations, contain sales with little to no variance in prices, and do not have substantially equal variances or substantially equal number of data points. In such circumstances, the Cohen's *d* statistic does not provide meaningful results.[254]
- Neither mathematics nor substantial evidence support Commerce's assertion that it can apply Professor Cohen's proposed cut-offs when the assumptions of the test do not apply.[255]
    - Commerce has asserted in the past that the conditions laid out by Professor Cohen are irrelevant because Commerce is analyzing the complete population of the respondent's U.S. sales, not just a sample. Mathematically, that assertion is untenable. Normal distributions, whether consisting of a sample or the entire population, have mathematical characteristics that non-normal distributions do not have. The Cohen's *d* test explicitly relies on the mathematical characteristics of normal distributions in the development of the proposed cut-offs. If data does not have those mathematical characteristics, then the justification for the proposed cut-offs is inapplicable.[256]

---

[249] *See* SeAH's Case Brief at 13.
[250] *Id*. (citing *Stupp Corporation v. United States*, 5 F. 4th 1341 (Fed. Cir. 2021) (*Stupp*)).
[251] *Id*. at 14 (citing *Nexteel Co., Ltd. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022); and *Nexteel Co., Ltd. v. United States*, Court No. 18-0083 (June 3, 2022)).
[252] *Id*. at 14-17.
[253] *Id*. at 14 (citing *Welded ASTM A-312 Stainless Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; 2013-2014, 81 FR 46647 (July 18, 2016), and accompanying IDM at Comment 4).
[254] *Id*. at 15-17 (citing *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; 2014–2015, 82 FR 18105 (April 17, 2017) (*OCTG from Korea 2014-15*), and accompanying IDM at Comment 2)).
[255] *Id*. at 17-18.
[256] *Id*. at 17.

  - In *Stupp*, the Federal Circuit explicitly rejected Commerce's claim that the widely-adopted statistical prerequisites for applying the Cohen's *d* test do not apply to the differential pricing analysis.[257]
- Under the Act, Commerce is not permitted to utilize an "average-to-transaction" comparison methodology for any of SeAH's U.S. sales.[258]
  - The Act grants Commerce authority to depart from the average-to-average (A-to-A) comparison methodology only when certain factual prerequisites, not present here, are met.[259] Commerce has not established, based on substantial evidence, that there exists in SeAH's U.S. sales a pattern of U.S. prices for comparable merchandise that differs significantly among purchasers, regions, or periods of time. In these circumstances, the exception set forth in section 777A(d)(1)(B) of the Act does not apply and Commerce is required to calculate SeAH's dumping margin using the average-to-average methodology for all U.S. sales.[260]
- Commerce's differential pricing analysis did not account for the fact that the currency exchange rates affected SeAH's U.S. prices.[261]
  - Commerce's use of differential pricing analysis violates the Act's requirement that, "fluctuations in exchange rates shall be ignored."[262]

*Domestic Interested Parties' Rebuttal Brief*

- SeAH supports its position on Commerce's differential pricing analysis with arguments that Commerce has repeatedly rejected with detailed explanations of why those arguments are without merit.[263]
- In *Stupp*, the Federal Circuit did not prohibit Commerce's use of the Cohen's *d* test, but only remanded it for further explanation.[264]
- SeAH asserts that the *d* statistic does not provide meaningful results, without demonstrating how Commerce's preliminary comparisons between datasets with allegedly too few observations, too little variance, or low normal distribution probabilities actually generated inaccurate analytical results.[265]
- Because statistical inferences do not apply to Commerce's application of the Cohen's *d* test, the underlying datasets need not follow normal distributions or adhere to SeAH's preferred statistical criteria.[266]

---

[257] *Id*. (citing *Stupp*, 5 F.4th at 1360; and *SeAH Steel Corp. v. United States,* Ct. No. 20-00150, Slip Op. 21-146, at 14 (CIT 2021)).
[258] *Id*. at 18.
[259] *Id*. (citing *Creswell Trading v. United States*, 15 F.3d 1054, 1060-61 (Fed. Cir. 1994)).
[260] *Id*.
[261] *Id*. at 19.
[262] *Id*. (citing section 773A(a) of the Act).
[263] *See* Domestic Interested Parties' Rebuttal Brief at 11.
[264] *Id*. (citing *Stupp* at 1357-1360)
[265] *Id*. at 12.
[266] *Id*. at 13 (citing *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 FR 9861 (February 15, 2023), and accompanying IDM at Comment 8)).

- SeAH provides no evidence of price distortions caused by alleged random exchange rate fluctuation. There is no basis for Commerce to abandon or otherwise modify its differential pricing analysis.[267]

**Commerce's Position:** We continue to apply the Cohen's *d* test as part of our differential pricing analysis in our calculations for the final results. As an initial matter, we note that there is nothing in section 777A(d) of the Act that mandates how Commerce measures whether there is a pattern of prices that differ significantly or explains why the average-to-average (A-to-A) method or the transaction-to-transaction (T-to-T) method cannot account for such differences. On the contrary, carrying out the purpose of the statute here is a gap filling exercise properly conducted by Commerce.[268] As explained in the *Preliminary Results*, as well as in various other proceedings, Commerce's differential pricing analysis, including the use of the Cohen's *d* test, is reasonable and in accordance with the law.[269]

In carrying out the statutory objective, Commerce determines whether "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and … explains why such differences cannot be taken into account using {the A-to-A or T-to-T comparison method}."[270] Commerce finds that the purpose of section 777A(d)(1)(B) of the Act is to evaluate whether the A-to-A method is the appropriate method to determine if, and if so, to what extent, a given respondent is dumping the subject merchandise in the U.S. market.[271]

We disagree with SeAH that the Cohen's *d* test is improper because the groups that Commerce compared do not have substantially equal variances or a substantially equal number of data points.[272] The Cohen's *d* coefficient is based on the difference between the means of the test and the comparison groups relative to the variances within the two groups, *i.e.*, the pooled standard deviation. When the difference in the weighted-average sale prices between the two groups is measured relative to the pooled standard deviation, then this value is expressed in standardized units, and is based on the dispersion of the prices within each group. In other words, the "significance" of differences between the average prices of the test group and the comparison group (*i.e.*, between a specific purchaser, region, or time period and all other purchasers, regions, or time periods, respectively) is measured by how widely the individual prices differ within these two groups. When there is little variation in prices within each of these groups (*i.e.*, not between the two groups), then a small difference in the mean prices of the test and comparison groups will be found to be significant. Conversely, when there are wide variations in prices within each of these groups, then a much larger difference in the mean prices of the test and comparison groups will be necessary in order to find that the difference is significant. Thus, we rely on the

---

[267] *Id.*
[268] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (recognizing deference where a statute is ambiguous and an agency's interpretation is reasonable); *see also Apex Frozen Foods Private Limited v. United States*, 37 F. Supp. 3d 1286, 1302 (CIT 2014) (applying Chevron deference in the context of the Department's interpretation of section 777A(d)(1) of the Act).
[269] *See Preliminary Results* PDM at 4-7; *see also 2019-2020 Preliminary Results* PDM at 6-7 (unchanged in *2019-2020 Final Results*).
[270] *See* section 777A(d)(1)(B) of the Act.
[271] *See* 19 CFR 351.414(c)(1).
[272] *See* SeAH's Case Brief at 15.

Cohen's *d* coefficient as a measure of effect size to determine whether the observed price differences are significant. In this application, the difference in the weighted-average (*i.e.*, mean) U.S. price to a particular purchaser, region, or time period (*i.e.*, the test group) and the weighted-average U.S. price to all other purchasers, regions, or time periods (*i.e.*, the comparison group) is measured relative to the variance of the U.S. prices within each of these groups (*i.e.*, all U.S. prices).

We also disagree with SeAH that the Cohen's *d* test does not provide meaningful results because the data is not normally distributed. As Commerce explained in *Thermal Paper from Germany*, because we use the differential pricing analysis to examine all U.S. sales, this data constitutes a complete population.[273] Thus, sample size, sample distribution, and the statistical significance of the same are not relevant to Commerce's analysis.[274] Moreover, in *SeAH I*, the CIT stated that "Commerce explained that application of the Cohen's *d* test was appropriate because 'the U.S. sales data…reported to Commerce constitute{} a population. As such, sample size, sample distribution, and the statistical significance of the sample are not relevant to Commerce's analysis.'"[275] After weighing the evidence, the CIT in *SeAH I* held that "Commerce's application of the Cohen's *d* test to determine whether there was a significant pattern of differences was reasonable. Commerce did not need to consider sample size, sample distribution, and the statistical significance of the sample."[276]

Moreover, we disagree with SeAH's claim that Commerce either "has explicitly admitted that it is not using Professor Cohen's *d* test for the purposes for which Professor Cohen developed it or the purposes for which that methodology has been 'widely adopted,'"[277] nor has Commerce "admitted that it is using the Cohen's *d* test to address an entirely different condition without any logic, evidence, or academic material supporting such an application"[278] SeAH offers no support or citation to where Commerce has made these admissions; as a result, Commerce is unable to respond directly to them.

Furthermore, we disagree with SeAH that "Professor Cohen himself made clear that his proposed cut-offs could only be applied appropriately in specific circumstances — where 'samples, each of *n* cases, have been randomly and independently drawn from normal populations,' and where the two samples do not have 'substantially unequal variances' or 'substantially unequally sample sizes (whether small or large).'"[279] The support SeAH raises for this argument comes from their own case brief in an administrative review of certain oil country tubular goods from Korea. In that review, Commerce concluded:

---

[273] *See Thermal Paper from Germany: Final Affirmative Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 FR 54512 (September 30, 2021) (*Thermal Paper from Germany*), and accompanying IDM at Comment 1.
[274] *Id.*
[275] *See SeAH Steel Corporation v. United States*, Consol. Court No. 19-00086, Slip. Op. 21-43 (CIT 2021) (*SeAH I*) at 21.
[276] *Id.* at 21-22.
[277] *See* SeAH's Case Brief at 14.
[278] *Id.*
[279] *Id.* at 14-15 (quoting *OCTG from Korea 2014-15* IDM at Comment 2).)

> {Commerce} finds SeAH's claim misplaced. SeAH's quotation is from section 2.1 of Dr. Cohen's text, "Introduction and Use" of the "T Test for Means." As described above, this concerns the statistical significance of the difference in the means for two sampled sets of data, and is not relevant when considering whether this difference has a practical difference. This is not to say that sample size and sample distribution have no impact on the description of "effect size" for sampled data, but that is not the basis for {Commerce}'s analysis of SeAH's U.S. sale price data.[280]

The CIT sustained the final results of Commerce's remand redetermination, holding that the explanation for the use of the Cohen's *d* test when applied as a component of the differential pricing analysis is reasonable.[281]

SeAH provides no further support for its argument on the record of this review; thus, we continue to find that there is no basis for SeAH's claim.

Finally, we disagree that *Stupp* requires Commerce to change its application of the Cohen's *d* test. Specifically, in *Stupp*, the Federal Circuit remanded the underlying administrative review to Commerce to provide further explanation; the Federal Circuit did not find Commerce's use of the Cohen's *d* test unlawful.[282] The CIT agreed with the further explanation that Commerce provided with respect to the Cohen's *d* test and affirmed Commerce's remand redetermination.[283] Accordingly, there is no requirement for Commerce to alter its application of the Cohen's *d* test in these final results pursuant to *Stupp*. As a result, we continue to apply the Cohen's *d* test as part of our differential pricing analysis in our calculations for both NEXTEEL and SeAH for the final results.

**Comment 17: SeAH's Assessment Rates**

*SeAH's Case Brief*

- Commerce's regulations concerning the assessment of AD duties states that Commerce will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes.[284]
- In previous reviews of WLP from Korea, Commerce has assessed SeAH's antidumping liability as an *ad valorem* amount based on the entered value of merchandise.[285]
- Commerce failed to explain in its *Preliminary Results* why it was appropriate to depart from the methodology in previous reviews and apply a per-metric ton assessment rate in this review. Accordingly, for the final liquidation instructions, Commerce should assess SeAH's antidumping liability as an *ad valorem* amount based on the value of entered

[280] *See OCTG from Korea 2014-15* IDM at Comment 2 (citation omitted).
[281] *See Stupp Corporation v. United States*, 619 F. Supp. 3d 1314 (CIT 2023).
[282] *See Stupp* at 1317.
[283] *Id.*
[284] *See* SeAH's Case Brief at 20 (citing 19 CFR 351.212(b)(1)).
[285] *Id.*

merchandise reported to CBP and instruct CBP to apply that rate to the actual entered value of merchandise as it has done in previous reviews of this case.[286]

*Domestic Interested Parties' Rebuttal Brief*

- Commerce found the entered values reported by SeAH to be unusable. Commerce's draft liquidation instructions therefore properly apply a per-unit assessment rate.[287]

**Commerce's Position:** As SeAH stated in its initial questionnaire response, it did not report actual entered values for those U.S. sales State Pipe made to unaffiliated customers.[288] In such situations, Commerce calculates: (1) an entered value itself for such sales using the margin calculation program; and (2) per-unit importer-specific assessment rates for these transactions.[289] Therefore, we made no changes to the methodology used to calculate SeAH's assessment rates in the final results.

## V. RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting all of the above positions. If this recommendation is accepted, we will publish the final results of this administrative review in the *Federal Register*.

| ☒ | ☐ |
|---|---|
| Agree | Disagree |

6/26/2023

X

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

[286] *Id.*
[287] *See* Domestic Interested Parties' Rebuttal Brief at 14-15.
[288] *See* SeAH's Section BCDE QR at Section C at 61.
[289] *See Preliminary Results* at 87 FR 80157, and *2019-2020 Final Results* at 87 FR 38062.

ATTACHMENT 3

Welded Line Pipe Korea 2020-2021 Antidumping Review
Preliminary Calculation Memorandum for SeAH Steel

Barcode:4324458-01 A-580-876 REV - Admin Review 12/1/20 - 11/30/21

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-580-876
AR: 12/01/2020 - 11/30/2021
Public Version
E&C OpsIX: AS

**DATE:** December 22, 2022

**MEMORANDUM TO:** The File

**THROUGH:** Elizabeth Eastwood
Director
AD/CVD Operations, Office IX
Enforcement & Compliance

**FROM:** Adam B. Simons
Senior International Trade Analyst
AD/CVD Operations, Office IX
Enforcement & Compliance

**RE:** 2020-2021 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea

**SUBJECT:** Preliminary Results Margin Calculation for SeAH Steel Corporation

This memorandum transmits the Department of Commerce's (Commerce's) preliminary results margin calculation for SeAH Steel Corporation (SeAH). Attachment 1 to this memorandum consists of the home market program log and output. Attachment 2 of this memorandum consists of the margin calculation program log and output. Attachment 3 of this memorandum consists of Commerce's quarterly cost analysis. The public version of this memorandum does not include the contents of Attachments 1, 2, and 3.

Commerce used the following databases to calculate SeAH's margin: (1) home market sales database, named seahlp_ar2021_hm03.sas7bdat (ACCESS barcode 4315706-10); (2) U.S. sales database, named seahlp_ar2021_us03.sas7bdat (ACCESS barcode 4315706-11); (3) cost of production (COP) database, named seahlp_ar2021_copqtr03.sas7bdat (ACCESS barcode 4315706-08); and (4) further manufacturing database, named seahlp_ar2021_fmg03.sas7bdat (ACCESS barcode 4315706-09).

## I. Use of an Alternative Cost Methodology

In determining whether to deviate from our normal methodology of calculating an annual weighted-average cost, we evaluate the case-specific record evidence by examining two primary criteria: (1) the change in the cost of manufacturing (COM) recognized by the respondent during the period of review (POR) must be deemed significant; and (2) the record evidence must indicate that sales prices during the shorter cost-averaging periods could be reasonably linked

Filed By: Adam Simons, Filed Date: 12/23/22 1:52 PM, Submission Status: Approved

with the COM during the same shorter cost-averaging periods. Below, we provide our analysis using record information provided by SeAH in this administrative review.

a) Significance of Cost Changes

In prior cases, we have established 25 percent as the threshold (between the high and low quarterly COM) over a 12-month period for determining that the changes in COM are significant enough to warrant a departure from our standard annual-average cost approach. The data on the record shows that the percentage difference between the high and low quarterly COM during the POR exceeded 25 percent. *See* Attachment 3.[1] Thus, we preliminarily conclude that the change in COM for SeAH is significant enough to warrant a departure from our standard annual costing approach.

b) Linkage Between Cost and Sales Information

Because we found the changes in COM to be significant, we evaluated whether there is evidence of linkage between the COM changes and the sales prices during the POR. For purposes of this broad analysis, we compared SeAH's weight-averaged U.S. market and comparison market sales prices, by quarter, with the reported quarterly COM. Our comparison revealed that SeAH's sales and costs showed a reasonable correlation between the quarterly COM and sales prices for the same period.[2] After reviewing this information and determining that changes in sales prices correlate reasonably to changes in unit COM, we preliminarily determine that there is linkage between SeAH's changing sales prices and COM during the POR.

c) Application of Quarterly Costing Methodology

In light of the factors discussed above, for the preliminary results, we have employed an alternative costing methodology to calculate direct material costs. We calculated TOTCOM for each CONNUM using the quarterly weighted-average per-unit cost of direct materials and the annual weighted-average per-unit conversion costs.

## II. Adjustments to the Comparison Market Program

1. We used the following language to make SeAH's reported quarters into two-digit numerical values:

```
DATA COST;
/**/ LENGTH QUARTER $ 2;
    SET COMPANY.&COST_DATA /* <COMPANY.CVDATABASE> */;

/**/ IF QTR in ('Q-1' 'Q0') AND &COST_QTY = 0 THEN &COST_QTY = 1;
```

[1] *See also* SeAH's Letter, "Response to Sections B, C, D, and E of Department's February 28 Questionnaire," dated April 20, 2022 (SeAH BCDEQR), at Appendix D-18-B (showing the quarterly variation in the total cost of manufacturing (TOTCOM) by CONNUM and the top 5 control numbers (CONNUMs) sold in the home and U.S. markets).
[2] *Id*. at Appendix D-18-A.

```
/**/ IF QTR = 'Q-4' THEN QUARTER = '-4';
/**/ IF QTR = 'Q-3' THEN QUARTER = '-3';
/**/ IF QTR = 'Q-2' THEN QUARTER = '-2';
/**/ IF QTR = 'Q-1' THEN QUARTER = '-1';
/**/ IF QTR = 'Q0' THEN QUARTER = '0';
/**/ IF QTR = 'Q1' THEN QUARTER = '1';
/**/ IF QTR = 'Q2' THEN QUARTER = '2';
/**/ IF QTR = 'Q3' THEN QUARTER = '3';
/**/ IF QTR = 'Q4' THEN QUARTER = '4';
/**/ IF QTR = 'Q5' THEN QUARTER = '5';
```

2. We based the universe of SeAH's U.S. sales on the sales which entered the United States (reported in the field ENTRYDTU) during the POR.[3]

## III. Cost of Production and Constructed Value

1. For those CONNUMs that were sold but not produced during the POR, we used the SAS program to assign surrogate costs. For those CONNUMs that were sold between June and November 2020 (*i.e.*, reported as quarters -1 and 0) but not produced during the POR, we used the surrogate costs for these CONNUMs which SeAH reported.

2. Because SeAH reported negative net interest expenses (INTEX) for all CONNUMs, we set SeAH's INTEX equal to zero, using the following language:

```
    TCOMCOP = TOTCOM;
    VCOMCOP = TCOMCOP - FOH;

    GNACOP = GNA;
    INTEXCOP = 0;

TOTALCOP = TCOMCOP + GNACOP + INTEXCOP;
```

## IV. Adjustments to the Margin Calculation Program

1. Consistent with the denominator used in the calculation of State Pipe & Supply Inc.'s (State Pipe's) general and administrative (G&A) expense ratio, we applied the company's general expenses to all activities of the company. Thus, for further manufactured products, we applied State Pipe's reported G&A expense ratio to the total cost of further manufacturing, and we included the amount as further manufacturing under section 772(d)(2) of the Tariff Act of 1930, as amended (the Act), and for the imported products, we applied State Pipe's reported G&A expense ratio to the cost of production of the imported welded line pipe whether further manufactured or not and included the amount as an indirect selling expense under section 772(d)(1)(D) of the Act.

[3] *Id*. at C-4.

2. We made the following programming changes to SeAH's further manufacturing cost database:

*Sales through State Pipe that were further manufactured*

```
IF CHANNELU = "2" AND FURMANU NE 0 THEN
    DO;
           FURCOM = INPROC_WT + OUTPROC_WT;
           FURGNA = SPSFMGNAU;
           FURINT = SPSFMINTU;
           GNAUS = SPSOTHGNAU;
  END;
```

*Sales through State Pipe that were not further manufactured*

```
  IF CHANNELU = "2" AND FURMANU = 0 THEN
    DO;
        FURCOM = 0;
FURGNA = (AVGCOST * EXRATE_SKOREA) * [       ];4
           FURINT = 0;
           GNAUS = FURGNA;
  END;
```

## V. Results of Differential Pricing Analysis

In order to determine whether SeAH's U.S. sales of subject merchandise were made at less than normal value (NV), Commerce compared the U.S. prices to the NV by using a differential pricing analysis of SeAH's U.S. sales. For details on the differential pricing analysis, see the "Determination of Comparison Method" section of the PDM.[5] The results of the differential pricing analysis are as follows:

| Value Of Passing Sales ============== | Value Of All Sales ========== | Percent Of Sales Passing Cohens *d* Test By Value ============== |
|---|---|---|
| $[ ] | $[ ] | **70.80%** |

[4] SeAH reported the rate used in this calculation in SeAH BCDEQR at Appendix E-6.
[5] *See* Memorandum, "Decision Memorandum for the Preliminary Results of the 2020-2021 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from Korea," dated concurrently with this memorandum (PDM).

The weighted-average dumping margins calculated using the three comparison methodologies are shown below:

| Comparison Method | | |
|---|---|---|
| Average-to-average (A-A) Method for All U.S. Sales | Average-to-transaction (A-T) Method for U.S. Sales Which Pass the Cohen's *d* Test; A-to-A Method for Sales Which Do Not Pass | A-T Method for All U.S. Sales |
| **0.00%** | **3.25%** | **4.14%** |

The percentage of U.S. sales that passed the Cohen's *d* test, 70.80 percent, confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, we preliminary determine that the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the average-to-average method and the average-to-transaction method applied to all U.S. sales. Thus, we preliminarily used the average-to-transaction method for all U.S. sales to calculate the weighted-average dumping margin.

# ATTACHMENT 1

## Home Market Calculation SAS Program Log and Output

Business Proprietary

(*omitted in public version*)

# ATTACHMENT 2

Margin Calculation SAS Program Log and Output
Business Proprietary
(*omitted in public version*)

# ATTACHMENT 3

Quarterly Cost Analysis
Business Proprietary
(*omitted in public version*)

ATTACHMENT 4

Domestic Interested Parties' Extension Request
for Rebuttal Ministerial Error Comments

wiley

PUBLIC DOCUMENT

May 18, 2026

DOC Case No. A-580-897
Total Pages: 6
Administrative Review for the POR:
05/01/23 – 04/30/24
AD/CVD Operations, E&C Office VIII
**PUBLIC DOCUMENT**

The Honorable Howard W. Lutnick
Secretary of Commerce
International Trade Administration
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

**Re:** ***Large Diameter Welded Pipe from the Republic of Korea:*** Request for Extension to Submit Reply to Ministerial Error Allegations

Dear Secretary Lutnick:

On behalf of the American Line Pipe Producers Association Trade Committee (the "Committee"), we hereby request an extension of the deadline to submit any replies to the ministerial error allegations filed by SeAH Steel Corporation ("SeAH").[1] This is the Committee's first request for an extension of this deadline. The current deadline is May 18, 2026.[2] The Committee requests an extension of two days, until May 20, 2026.

[1] *See* Letter from Winton & Chapman PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Large Diameter Welded Pipe from Korea – Comments on Ministerial Errors in the Final Determination* (May 11, 2026).

[2] 19 C.F.R. § 351.224(c)(3). Replies to ministerial error comments are due five days after the date on which such comments are filed with the Department. Because this deadline falls on Saturday, May 16, the deadline rolls over to the next business day. While the Department's memorandum establishing the deadline for ministerial error allegations stated that the agency will not consider replies to ministerial error comments, citing 19 C.F.R. § 351.224(c)(3), the cited regulatory provision states that the Department will not consider replies to ministerial error allegations filed "in connection with a preliminary determination." Memorandum from Katerina Katsiadas to The File, re: *Administrative Review of the Antidumping Duty Order on Large Diameter Welded Pipe from the Republic of Korea; 2023-2024: Corrected Deadline for Ministerial Error Concerning the Final Results* (May 5, 2026). The regulations permit replies to ministerial error allegations filed in connection with final results in administrative reviews. *See id.*; *see also* 19 C.F.R. § 351.224(d).

**PUBLIC DOCUMENT**

The Department's regulations at 19 C.F.R. § 351.302(b) specify that "{u}nless expressly precluded by statute, the Secretary may, for good cause, extend any time limit" established in its regulations, provided that the request for such an extension is submitted before the expiration of the applicable time limit. The Committee submits that good cause exists for this extension. While SeAH filed its ministerial error allegations on May 11, 2026, there was a delay in ACCESS releasing the files, and both the confidential and public versions of the filing were not released until Friday, May 15.[3] This was the first time that the Committee became aware of such filing and gained access to the files. As such, the Committee requires sufficient time to review SeAH's allegations and prepare any necessary response. For this reason, the Committee requests an extension of the deadline for any replies to SeAH's ministerial error allegations until Wednesday, May 20, which would provide the Committee with the full five days to review contemplated in the regulations.[4]

* * *

Should you have any questions regarding this request, please do not hesitate to contact us.

Respectfully submitted,

*<u>/s/ Timothy C. Brightbill</u>*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.

*Counsel to the American Line Pipe Producers Association Trade Committee*

---

[3] *See, e.g.*, Public Release Digest Email at **Attachment**.

[4] 19 C.F.R. § 351.224(c)(3).

***Large Diameter Welded Pipe from the Republic of Korea***
**Case No. A-580-897**
**Administrative Review for the POR: 05/01/2023-04/30/2024**

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, in accordance with 19 C.F.R. § 351.303(f)(1)(i), the foregoing public submission was filed electronically on ACCESS and service has been effectuated on the parties on the Public Service List issued by the U.S. Department of Commerce in the above-captioned proceeding.

*/s/ Elizabeth S. Lee*
Elizabeth S. Lee, Esq.

# ATTACHMENT

**From:** Access <access@trade.gov>
**Sent:** Friday, May 15, 2026 12:02:36 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Brightbill, Timothy <tbrightbill@wiley.law>
**Subject:** Public Release Digest (REV NSR)

**External Email - Use Caution**

Link to access documents: https://access.trade.gov/ This email digest is the official notification to current members of the Public Service list of public document(s) and public version(s) released by the Department in the below case segment(s). A complete listing of public documents and public versions submitted on the record of the below case and segment(s) may be obtained by any Guest User or E-Filer by searching the ACCESS system.

The following Public Document(s) and Public Version(s) were generated and released by Enforcement & Compliance:

**C-570-118 - Wood Mouldings and Millwork Products From People's Republic of China**

| | |
|---|---|
| Barcode | 4921190-01 |
| Filed Date | 5/14/2026 5:17:47 PM |
| Case Segment | REV - Admin Review |
| POR/POI | 1/1/25 - 12/31/25 |
| Security Classification | Public Version |
| Document Title | Respondent Selection |
| Pertaining To | Interested Parties |

**A-484-803 - Large Diameter Welded Carbon and Alloy Steel Line Pipe From Greece**

| | |
|---|---|
| Barcode | 4919850-01 |
| Filed Date | 5/11/2026 1:30:33 PM |
| Case Segment | REV - Admin Review |
| POR/POI | 5/1/24 - 4/30/25 |
| Security Classification | Public Version |
| Document Title | Sec A-D Supp QR |

| | |
|---|---|
| Pertaining To | CPW |

**A-580-876 - Welded Line Pipe From South Korea**

| | |
|---|---|
| Barcode | 4919771-01 |
| Filed Date | 5/11/2026 12:15:17 PM |
| Case Segment | REV - Admin Review |
| POR/POI | 12/1/23 - 11/30/24 |
| Security Classification | Public Version |
| Document Title | Minor Correction |
| Pertaining To | SeAH Steel |

**A-580-897 - Large Diameter Welded Carbon and Alloy Steel Line and Structural Pipe From South Korea**

| | |
|---|---|
| Barcode | 4919944-01 |
| Filed Date | 5/11/2026 3:09:55 PM |
| Case Segment | REV - Admin Review |
| POR/POI | 5/1/23 - 4/30/24 |
| Security Classification | Public Version |
| Document Title | Ministerial Error Allegations |
| Pertaining To | SeAH |

ATTACHMENT 5

Merriam-Webster
Online Dictionary Printout

can

Search

- [Chatbot]
- [Games]
- [Word of the Day]
- [Grammar]
- [Word Finder]
- [Slang]

Newsletters
Wordplay
More
Rhymes
Thesaurus
Join MWU
- Shop
- Books
- Merch
  - Log In
  - Username
  - My Words
  - Recents
  - Account
  - Log Out

Est. 1828

Dictionary Definition

- verb (1)
- noun
- verb (2)
- verb 3
  - verb (1)
  - noun
  - verb (2)
- Cite this EntryCitation
- More from M-W

- Save Word
  - To save this word, you'll need to log in.
    Log In

# Simple Definition of can

from our Learner's Dictionary

## can

1 of 3

# verb

kən
ˈkæn
past tense could kəd ˈkʊd ; present tense for both singular and plural can; negative cannot ˈkænɑt
kəˈnɑːt,
British ˈkænət
or can't ˈkænt
British
ˈkɑːnt

NEW Simple Definition | You're viewing the Simple Definition. For a more detailed definition, see the full entry.

1
**:** to be able to (do something)
I don't need any help. I *can* do it myself.
I *can't* decide what to do.
All we *can* do [=the only thing we can do] now is wait.
**:** to know how to (do something)
She *can* read, *can't* she?
I *can* whistle.
**:** to have the power or skill to (do something)
A weight lifter *can* lift a very heavy weight.
She *can* play the piano.
Only Congress *can* do that.
**:** to be designed to (do something)
a car that *can* hold five people [=a car that has enough room for five people]
How fast *can* [=*does, will*] the car go?
→
—sometimes used without a following verb
I visit her whenever I *can*.
I don't know if I'll be able to fix the problem, but I'll do what I *can*.
Please help us if you *can*.
2
→
—used to describe what someone sees, feels, thinks, etc.
"*Can* you see him yet?" "Yes, I *can* see him clearly."
I *can* barely hear you.
*Can* [=*do*] you remember/understand how to do it?
3
a
→
—used to say that something is or is not possible
Do you think he *can* still be alive? [=do you think it is possible that he is still alive?]
I don't think he *can* still be alive. [=I think he must be dead]
These problems *can* be dealt with more easily at the local level.
You *can't* always get what you want in life.
At this time of year many birds *can* be found on the island. [=there are many birds on the island at this time of year]
If you don't tell me what the problem is, I *can't* help you.

You *can't* be very smart [=you aren't very smart] if you believe that!
He was supposed to be here an hour ago. Where can he (possibly) be? [=where is he?]
→
—sometimes used in the emphatic phrase as…as can be
I want a cake *as* big *as can be*! [=I want the biggest cake possible]
They seemed *as* happy *as can be* [=they seemed extremely happy] when I last saw them.
b
→
—used in speech to express surprise or disbelief
You must be joking! You *can't*/*cannot* (possibly) be serious!
He *can't* really have meant that. [=I don't believe that he meant that]
You *can't* (possibly) believe that!
The price is $50? That *can't* be right. [=that must be wrong]
4
a
**:** to have permission to (do something)
You *can* do it tomorrow if you like.
"*Can* I leave now?" "No, you *can't*."
You *can't* leave until you finish washing the dishes.
b
→
—used in speech to make a request or suggestion
Can [=*could*] I have another cookie?
*Can* [=*could*] you open the window a little more, please?
You *can* sit here if you like.
If you're not sure what to do, you *can* always ask for help.
We *can* leave early if you're feeling tired.
5
a
→
—used to say what should or should not be done
You *can't* leave now! The party is just getting started!
Why *can't* you be more polite? [=you should be more polite; why aren't you more polite?]
b
→
—used in angry speech to tell someone to do something
If you don't like it here, you *can* just leave!
6
a
→
—used to describe the way a person sometimes behaves
She *can* be very rude at times. [=she is sometimes very rude]
b
→
—used to describe something that sometimes or often happens
In this part of the country the weather *can* change quickly. [=the weather often changes quickly]
Usage Discussion of *can Could* is used as the past tense of *can* to describe an ability that someone had in the past or to say that something was possible in the past. I *could* run fast when I was young, but I can't run fast now. It used to be that you *could* drive for miles here without seeing another person, but now there are houses and people everywhere. To describe a specific occurrence in the past, use *was/were able to* instead of *could*. By working long hours, *we were able to* finish the project on time. In the future tense, *will be able to* is used.

If you keep practicing, *you'll be able to* play the piano someday. She believes that someday people *will be able to* vote at home on their computers. *Can* can be used to suggest something that might happen in the future. If we save enough money, we *can* go to Hawaii for our vacation next year.

can

2 of 3

# noun

'kæn
plural cans
1
a
**:** a closed metal container that is usually shaped like a cylinder and that holds food or drink
Open a *can* [=(*Brit*) *tin*] of beans.
a *can* of tomatoes
a soda/beer *can*
b
**:** the food or drink that is in a can
He ate the whole *can* of beans.
2
a
**:** a metal or plastic container that has a removable top and that is used for holding liquid, trash, etc.
a *can* of oil = an oil *can*
a garbage *can*
a trash *can*
b
**:** spray can
a *can* of deodorant

can

3 of 3

# verb

'kæn
cans; canned; canning
1
chiefly US **:** to preserve food by putting it in a metal or glass container
a factory where meats are *canned* [=(*Brit*) *tinned*]
*canning* tomatoes
2
US, informal **:** to dismiss (someone) from a job
He got *canned* [=*fired, sacked*] for being late to work.
3
US, informal **:** to stop or end (something)
The boss angrily told him to *can* the jokes. [=to stop making jokes]
Just can it! [=stop talking; shut up]

# Cite this Entry

Style
MLA

"Can." *Merriam-Webster.com Simple Definition*, Merriam-Webster, https://www.merriam-webster.com/simple/can. Accessed 21 Aug. 2026.

Copy Citation

# More from Merriam-Webster on *can*

Thesaurus: All synonyms and antonyms for *can*

Nglish: Translation of *can* for Spanish Speakers

Last Updated: 2 Apr 2026 - Entry added

# More from Merriam-Webster

Top Lookups
Next refresh: 16

- 1
  jejune
- 2
  digress
- 3
  look
- 4
  Kafkaesque
- 5
  apogee
- 6
  can
- 7
  woke

**Word of the Day**

**rigmarole**

See Definitions and Examples »

Get Word of the Day daily email!

SUBSCRIBE Your email address

## Popular in Grammar & Usage

See More

**A Who's Who Regarding 'Who's' and 'Whose'**

**How to Pronounce the Trickiest Menu Items**

**'A' or 'an'? What about before 'h'? An Indefinite Article Guide**

**Do you 'say your piece' or 'say your peace'?**

**Why is '-ed' sometimes pronounced at the end of a word?**

See More

## Popular in Wordplay

See More

**Words from the 'Odyssey'**

**The Longest Long Words List**

**Even More Words That Sound Like Insults But Aren't**

**The Words of the Week - Aug. 21**

**12 Lovely and Unusual Words for the Natural World**

See More

## Popular

See More

## A Who's Who Regarding 'Who's' and 'Whose'

## Words from the 'Odyssey'

## The Longest Long Words List

See More

# Games & Quizzes

See All

Quordle Can you solve 4 words at once? Play

Blossom Pick the best words! Play

The Missing Letter A daily crossword with a twist Play

Add A Letter Quiz Pick the letter that goes in the same spot in fou... Take the quiz
See All
Merriam Webster

Learn a new word every day. Delivered to your inbox!

Your email address SUBSCRIBE >

- Help
- About Us
- Apps
- Advertising Info
- Contact Us
- Privacy Policy
- Terms of Use

- Facebook
- Twitter
- YouTube
- Instagram

© 2026 Merriam-Webster, Incorporated